# EXHIBIT 1

Case 2:26-cv-00698-JNW     Document 31-1     Filed 05/21/26     Page 2 of 146

Install Steam    sign in  |  language

 **STEAM**®

**STORE**  **COMMUNITY**  **ABOUT**  **SUPPORT**

Browse        Recommendations        Categories        Hardware        Ways to Play        Speci    *Search the store*

All Products > News

# Updated Steam Subscriber Agreement

- Valve

Jul 31, 2012

Every so often we need to update the Steam Subscriber Agreement ("SSA") and Valve's Privacy Policy. These documents are the terms to which you (and all Steam users) agreed when first creating an account. Whenever we need to make changes to these agreements we like to bring the changes to your attention and explain why they're necessary. The next time you log in to Steam you'll be asked to read and agree to the new terms.

This time around there are a number of changes reflected in both documents including the opening of a new Valve office in Luxembourg to better serve our EU customers and partners. If you live in the EU, your SSA will be with our Luxembourg subsidiary Valve S.a.r.l. and the SSA has been amended to reflect additional terms specific to our EU customers. We've added other terms related to the Steam Wallet and Steam trading to accommodate new features and capabilities of Steam.

We're also introducing a new dispute resolution process that will benefit you and Valve. Recently, a number of companies have created similar provisions which have generated lots of discussion from customers and communities, and we've been following these discussions closely. On Steam, whenever a customer is unhappy with any transaction, our first goal is to resolve things as quickly as possible through the normal customer support process. However in those instances in which we can't resolve a dispute, we've outlined a new required process whereby we agree to use arbitration or small claims court to resolve the dispute. In the arbitration process, Valve will reimburse your costs of the arbitration for claims under a certain amount. Reimbursement by Valve is provided regardless of the arbitrator's decision, provided that the arbitrator does not determine the claim to be frivolous or the costs unreasonable.

Most significant to the new dispute resolution terms is that customers may now only bring individual claims, not class action claims. We considered this change very carefully. It's clear to us that in some situations, class actions have real benefits to customers. In far too many cases however, class actions don't provide any real benefit to users and instead impose unnecessary expense and delay, and are often designed to benefit the class action lawyers who craft and litigate these claims. Class actions like these do not benefit us or our communities. We think this new dispute resolution process is faster and better for you and Valve while avoiding unnecessary costs, and that it will therefore benefit the community as a whole.

Thanks for reading through our thoughts on these updates and for your continued use of Steam.

Share:

**Channels**

All News

Announcements

Client Updates

Press Releases

Product Releases

Product Updates

Steam Blog

SYNDICATED

Eurogamer

Kotaku

Left 4 Dead Official Blog

PC Gamer

Portal 2 Official Blog

Rock, Paper, Shotgun

Shacknews

Steam Community Announcements

TF2 Official Blog

**Search news**

enter search term

**Archive**

2026

May  Apr  Mar  Feb  Jan

ARCHIVES BY YEAR

2026  2025  2024  2023  2022
2021  2020  2019  2018  2017
2016  2015  2014  2013  2012
2011  2010  2009  2008  2007
2006  2005  2004  2003  2002

 

© 2026 Valve Corporation. All rights reserved.
All trademarks are property of their respective
owners in the US and other countries.
VAT included in all prices where applicable.

   

**STEAM**

About Steam

Steam SSA

Steamworks

Steam Distribution

Gift Cards

**VALVE**

About Valve

Jobs

Hardware

Recycling

**LEGAL**

Privacy

Accessibility

Notices & Policies

Cookies

Refunds

**MORE**

Get Steam

Get Mobile Apps

Get Support

My Account

# EXHIBIT 2

**News**     **Games**     **Hardware**     **Guides**     **Indie**     **Follow**     **About**



As an Amazon Associate, we earn from qualifying purchases and other affiliate schemes. Learn more.

# Gabe Newell explains Steam clause forbidding class action lawsuits: It's "really not about users", but avoiding "shakedowns" from lawyers

**Did you miss...**

Best free PC games

Join PCGamesN's community Discord

Best gaming VPN 2025

**Ad**

**News**    **Games**    **Hardware**    **Guides**    **Indie**    **Follow**    **About**





**Jeremy Peel**
Published: Nov 13, 2012

It's rare that 4Chan press a leading industry figure on their failures to preserve user rights, but when they mood takes them they *do it right*. /v/ visited Valve recently to meet Gabe Newell on his 50th birthday, and followed up musings on father Valve's beard with a grilling about the change in Steam's terms of service that left users unable to sue via class action lawsuits.

## More Stories



How to help the Thin Man in THSP 3+4



All Marvel Rivals characters and full roster

NOW
PLAYING



7/11/2025, 10:12 AM

explained

Newell was laudably open in his reply, expanding on the statement Valve released at the time: "There are all these class action lawsuit lawyers who just pop up and… the problem is that it's asymmetric, so they can basically file a lawsuit against you in federal court and it costs them nothing," he said. "Then the first thing they say is, 'Now, you have to do discovery on every single document you've ever created in history'. It's a shakedown."

"So they are effectively trying to say: 'You can either spend, just in the first filing, $3 million,' - because it takes a lot for lawyers to read every document, blah blah blah - And they say, 'Or why don't you just give us $500,000?' So it really is a shakedown. So, arbitration - that's really not about users."

Ad

Ad

News    Games    Hardware    Guides    Indie    Follow    About

RAID +BONUS START NOW

Instead it's about a "classic litigation" problem, said Newell, who further pointed out that as users "you can still sue us" by other means as individuals.



Top Steam Deck cases, skins and storage



We've tested the best pre-built gaming PCs today



Get a gaming PC that's big on power, but small on size

Play the very best PC games of 2025

Newell continued: "We're happy you're mad at us and you let us know because we'll do better. There's a relationship we have customers. We don't have bankers, we don't have publishers, all the decisions are ours.

"But occasionally there are these other places called courtrooms.

RAID +BONUS START NOW

out a way to avoid letting other people interfere in the relationship that we have with customers in that domain.

"So, let's start our own country."

Ad

Access regional loot and lobbies with a VPN

PCIe 6.0 SSDs are coming, and the speeds are mind blowing

Start the earthquake in THPS 3+4

Best Sons of the Forest settings for PC and Steam Deck

It's reassuring to hear that Valve were moving to protect themselves from lawyers three months ago, not their own customers. But nonetheless, as Steve pointed out in our original story on Steam's terms of service, no organisation in possession of your card details is hack-proof and there'll be no consumer rights group with teeth to run to should the worst happen. It's exactly the reason German

Gabe Newell explains Steam clause forbidding class action lawsuits: It's "really not about user...          https://www.pcgamesn.com/gabe-newell-explains-steam-clause-forbidding-class-action-lawsuit...

Is consumer rights something that keeps you revolving into the wee hours? Or does Valve's track record with their customers put you at ease?

**Jeremy Peel** *Jeremy was one of PCGamesN's earliest, most formative voices. Now a freelancer, expect to find his byline on features about Fallout 4's Nick Valentine, immersive sims like Thief, and clever CRPGs like Baldur's Gate 2.*



## these Amazon Prime Day deals

From huge monitors that immerse you in RPGs, headphones that will make those jump scares more impactful, or a new controller to help you win those matches, Amazon Prime Day's batch of deals will help turn your setup into a beast of a PC.



# EXHIBIT 3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| G.G., A.L., and B.S., individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>    v.<br><br>VALVE CORPORATION, a Washington corporation,<br><br>                    Defendant. | No. 2:16-cv-01941-RSL<br><br>**VALVE CORPORATION'S MOTION TO COMPEL ARBITRATION**<br><br>NOTE ON MOTION CALENDAR: JANUARY 20, 2017 |

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION AND RELIEF REQUESTED | 1 |
| II. | RELEVANT BACKGROUND | 2 |
|  | A. Steam Subscribers Agree to Arbitrate All Disputes | 2 |
|  |     1. Valve, Steam, CS:GO and Skins | 2 |
|  |     2. Every Steam Subscriber, CS:GO Purchaser, and Skin Buyer Agrees to the SSA | 3 |
|  |         a. Agreement to the SSA When Creating a Steam Account | 3 |
|  |         b. Agreement to the SSA When Purchasing Game Subscriptions or Digital Content | 4 |
|  |         c. Agreement to the SSA When Purchasing Skins From Other Steam Subscribers | 4 |
|  |     3. The SSA Requires Arbitration of All Disputes | 4 |
|  | B. Procedural Background and Plaintiffs' Allegations | 7 |
| III. | ARGUMENT | 8 |
|  | A. There is A Valid and Enforceable Arbitration Agreement Between Plaintiffs and Valve | 9 |
|  |     1. The SSA Is Valid; Plaintiffs Were Presented with It and Agreed to It Multiple Times | 9 |
|  |     2. The Arbitration Agreement is Enforceable Against All Plaintiffs | 10 |
|  |         a. The SSA is Enforceable Against the Minor Plaintiffs | 10 |
|  |         b. The Parent Plaintiffs Must Arbitrate Their Claims | 13 |
|  |         c. Valve Did Not Waive its Right to Enforce the SSA Against Plaintiffs | 15 |
|  | B. Plaintiffs' Claims are Within the Scope of the SSA's Broad Arbitration Provision, Satisfying the Second Prong of the FAA Test | 16 |
|  | C. All Claims Against Valve Should be Stayed Pending Arbitration | 20 |
| IV. | CONCLUSION | 20 |

## I.   **INTRODUCTION AND RELIEF REQUESTED**

Plaintiffs—video game players and their parents—sued Valve Corporation ("Valve") over the popular video game Counter-Strike: Global Offensive ("CS:GO"), which Valve developed and distributes over its Steam digital distribution and online gaming platform.  In subscribing to Steam, in buying a license to play CS:GO, and in purchasing virtual items or other digital content on Steam, Plaintiffs repeatedly agreed to Valve's Steam Subscriber Agreement ("SSA") and its requirement to arbitrate "all disputes and claims" against Valve.  Yet instead of commencing arbitration as agreed, Plaintiffs sued in court.

Plaintiffs seek to evade arbitration by claiming that the SSA's arbitration clause cannot be enforced against the three minor Plaintiffs because they disaffirmed their contractual obligation in their complaint, or against their parents because they never saw or agreed to the SSA their children accepted.  But Washington law does not permit minors to accept the benefits of a contract—here, the right to play and enjoy Valve's video games and its Steam network— while disaffirming the contractual obligations they (or, here, their lawyers) do not like.  Nor does Washington law permit parents to sue over claims arising from their children's contractual relationship with Valve while avoiding the obligations in that contract.  Equitable estoppel binds the parents to the arbitration agreement.

This case is virtually identical to four prior lawsuits the same lawyers brought against Valve and seeks the same proposed class.  But in bringing this case, they jettisoned all adult Steam subscribers as named plaintiffs in an effort to avoid arbitration, yet they seek certification of the same class, which includes adult Steam subscribers as well as minors.  Plaintiffs' maneuvering fails because the SSA binds *all* proposed class members, including the minor and parent Plaintiffs here.

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, contains a strong public policy in support of arbitration when there is a valid arbitration agreement and the dispute falls within the scope of that agreement.  The SSA readily satisfies both criteria.  Accordingly, Valve

VALVE CORPORATION'S MOTION TO COMPEL
ARBITRATION - (2:16-cv-01941-RSL) - 1
63478.00052
122716/1056/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

moves the Court for an order: (1) compelling Plaintiffs to arbitrate all claims against Valve pursuant to the arbitration agreement in the SSA, which Plaintiffs agreed to and which lies at the core of their claims, and (2) staying all claims against Valve pending arbitration.

## II.      RELEVANT BACKGROUND

### A.      Steam Subscribers Agree to Arbitrate All Disputes.

*1.      Valve, Steam, CS:GO and Skins.*

Valve develops and distributes video games and other content for use on personal computers. (Declaration of Christopher Boyd ("Boyd Decl.") ¶ 3.) Valve also operates the Steam digital distribution and online gaming platform. (*Id.*) Over 4000 game titles are available on Steam. (*Id.*) Steam includes an online store, where users can purchase subscriptions to games. (*Id.*) Steam also features a "Steam Wallet" for virtual Steam currency that subscribers can purchase using various payment methods. (*Id.*) That virtual currency can then be later used to purchase digital content and subscriptions to games. (*Id.*)

CS:GO is a video game developed and distributed by Valve. (*Id.* ¶ 4.) It is a multiplayer first-person shooter video game where teams compete to eliminate the enemy team or complete objectives. (*Id.*) Steam subscribers must have a subscription to CS:GO in order to play. (*Id.*)

In 2013, Valve introduced virtual items called "skins" into CS:GO. (*Id.* ¶ 5.) "Skins" are virtual CS:GO weapons that have different finishes or textures. (*Id.*) They are entirely cosmetic and do not affect gameplay; they only change how weapons look. (*Id.*) For example, the picture on the left shows a pistol used in CS:GO without a skin, while the right shows it with a skin:



VALVE CORPORATION'S MOTION TO COMPEL
ARBITRATION - (2:16-cv-01941-RSL) - 2
4839-4895-0846.01
122716/1056/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

Skins can be acquired in a number of different ways.  Among other ways, they can be collected when playing CS:GO, e.g., through random "drops" or by opening weapon "crates" during game play.  (*Id.* ¶ 5.)  Skins can be acquired through trades with other players over Steam using CS:GO's trade feature.  (*Id.*)  And Steam subscribers can "buy" and "sell" skins to and from each other in the Steam Community Market using virtual Steam currency in their Steam Wallet.  (*Id.*)

> 2.      *Every Steam Subscriber, CS:GO Purchaser, and Skin Buyer Agrees to the SSA.*

> a.      Agreement to the SSA When Creating a Steam Account.

To use Steam, a user must first create a Steam account, which requires accepting the SSA[1] and its prominently displayed arbitration clause.  (Boyd Decl. ¶¶ 6, 8.)  A user can create a Steam account in two ways, either:  (1) create an account on the "Create an Account" webpage accessible through the Steam website at http://store.steampowered.com; or (2) create an account through the "Steam client," a software program that the user installs on his or her computer.  (*Id.* ¶ 6.)  In both of these methods, the user is presented with the SSA, asked to "[p]lease review" or "[p]lease read" the agreement, and then click an "I agree" box.  (*Id.* ¶¶ 6-9.)

A Steam account cannot be created unless a subscriber either:  (1) accepts the SSA on the "Create an Account" webpage by clicking a box under the SSA saying, "I agree AND am 13 years of age or older"; or (2) accepts the SSA by clicking a button under it labeled "I AGREE" when creating a Steam account on his or her computer.  (*Id.* ¶¶ 6-9.)  Either way, it is impossible to create a Steam account without clicking "I agree" in lower case or capital letters.  (*Id.*)

---

[1] The current version of the Steam Subscriber Agreement, which became effective on January 1, 2016, is attached to the Boyd Declaration as Exhibit G.  All prior versions since January 1, 2013 are attached as Exhibit H.

VALVE CORPORATION'S MOTION TO COMPEL
ARBITRATION - (2:16-cv-01941-RSL) - 3
4839-4895-0846.01
122716/1056/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington  98154-1192
206.624.3600

b.      Agreement to the SSA When Purchasing Game Subscriptions or Digital Content.

After setting up an account, a Steam subscriber may purchase subscriptions to CS:GO or other video games or digital content on Steam, but must agree anew to the SSA with each purchase by clicking a box that states, "I agree to the terms of the Steam Subscriber Agreement." (Boyd Decl. ¶ 11.)  The SSA is hyperlinked to the words "Steam Subscriber Agreement," which means clicking on those words opens a webpage containing the SSA's full text.  (*Id.* & Ex. D.) If a subscriber does not click the "I agree" box at checkout, the screen refreshes and a notice appears at the top of the webpage, saying, "You must agree to the terms of the Steam Subscriber Agreement to complete this transaction."  (*Id.* ¶ 12 & Ex. E.)

c.      Agreement to the SSA When Purchasing Skins From Other Steam Subscribers.

Steam subscribers who purchase CS:GO skins through Steam's Community Market are required to accept the SSA yet again by clicking the "I agree to the terms of the Steam Subscriber Agreement" box, hyperlinked to the SSA as before.  (Boyd Decl. ¶ 13.)  Otherwise, the notice requiring agreement to the SSA appears and the transaction does not proceed.  (*Id.*)

As a result, Steam subscribers typically agree to the SSA at least twice before they can even start playing CS:GO, and often agree *three or more times* before completing the purchase of any virtual items—first at account creation, again when purchasing a CS:GO subscription, and again before each purchase.

3.      *The SSA Requires Arbitration of All Disputes.*

The SSA grants Steam users a license to use Steam and the content and services available on Steam, such as CS:GO and skins.  (SSA ¶¶ 1(B), 2(A) (Boyd Decl., Ex. G).)  But the granting of that license is conditioned upon their agreement to arbitrate all disputes.  The arbitration agreement is conspicuous, clear, and consumer-friendly, and every version of the SSA in effect during the proposed class period includes an arbitration provision and a notice of that provision in capital letters near the top of the first page.  (Boyd Decl. ¶ 15 & Ex. H.)

VALVE CORPORATION'S MOTION TO COMPEL
ARBITRATION - (2:16-cv-01941-RSL) - 4
4839-4895-0846.01
122716/1056/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

The SSA's introductory paragraph directs Steam subscribers right to the arbitration provision: "SECTION 11 CONTAINS A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER. IT MAY AFFECT YOUR LEGAL RIGHTS. PLEASE READ IT." (SSA at 1.) That language is visible to everyone who signs up for a Steam account, regardless of whether they scroll through the whole SSA. (*See* Boyd Decl. at Exs. A & C.) For example, that language is conspicuously shown on the Create Account screen seen when creating a Steam account online through the Steam website (highlighted in the callout box):



(Boyd Decl., Ex. A.) The same conspicuous notice appears in the same place on the screen shown in the screenshot in Paragraph 93 of the Complaint, though it is blurred out in the picture Plaintiffs used. (*See* Compl. ¶ 93.)

VALVE CORPORATION'S MOTION TO COMPEL
ARBITRATION – (2:16-cv-01941-RSL) – 5
4839-4895-0846.01
122716/1056/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

Section 11 of the SSA is titled "DISPUTE RESOLUTION/BINDING ARBITRATION/CLASS ACTION WAIVER" and states in part, in capital letters:

> YOU AND VALVE AGREE TO RESOLVE ALL DISPUTES AND CLAIMS BETWEEN US IN INDIVIDUAL BINDING ARBITRATION.  THAT INCLUDES, BUT IS NOT LIMITED TO, ANY CLAIMS ARISING OUT OF OR RELATING TO: (i) ANY ASPECT OF THE RELATIONSHIP BETWEEN US; (ii) THIS AGREEMENT; OR (iii) YOUR USE OF STEAM, YOUR ACCOUNT OR THE CONTENT AND SERVICES. IT APPLIES REGARDLESS OF WHETHER SUCH CLAIMS ARE BASED IN CONTRACT, TORT, STATUTE, FRAUD, UNFAIR COMPETITION, MISREPRESENTATION OR ANY OTHER LEGAL THEORY.

It also explains that the FAA applies to the arbitration provision, and provides that the "[t]he arbitration will be governed by the Commercial Arbitration Rules of the American Arbitration Association ('AAA') and, where applicable, the AAA's Supplementary Procedures for Consumer Related Disputes, as modified by this Agreement." (*Id.*)  The SSA even hyperlinks to the AAA website for ease of access. (*Id.*)

Section 11 includes other consumer-friendly provisions and plain language explanations of the parties' arbitration agreement, such as:

- Agreeing that arbitration may be conducted by phone, on documents, or in person in the county where the Steam subscriber lives or at another agreed location. (*Id.*)

- Agreeing Valve will pay all arbitration costs of claims under $10,000, and not seek attorney fees or costs on such claims, unless the arbitrator determines they are frivolous. (*Id.*)

- Describing the differences between arbitration and court proceedings in plain English. (*Id.*)

- Explaining that Steam subscribers and Valve are waiving their rights to a trial in court. ("YOU UNDERSTAND THAT YOU AND VALVE ARE GIVING UP THE RIGHT TO SUE IN COURT AND TO HAVE A TRIAL BEFORE A JUDGE OR JURY.") (*Id.*)

VALVE CORPORATION'S MOTION TO COMPEL
ARBITRATION - (2:16-cv-01941-RSL) - 6
4839-4895-0846.01
122716/1056/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

It also includes a conspicuous class action waiver and agreement to arbitrate claims individually:

> YOU AND VALVE AGREE NOT TO BRING OR PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION OR COLLECTIVE ARBITRATION, EVEN IF AAA's PROCEDURES OR RULES WOULD OTHERWISE ALLOW ONE. THE ARBITRATOR MAY AWARD RELIEF ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT OF THAT PARTY'S INDIVIDUAL CLAIM. You and Valve also agree not to seek to combine any action or arbitration with any other action or arbitration without the consent of all parties to this Agreement and all other actions or arbitrations.

**B.      Procedural Background and Plaintiffs' Allegations.**

This is the fifth similar class action filed against Valve alleging that it facilitates online gambling of "skins" through CS:GO and Steam. The same plaintiffs' law firm filed virtually identical lawsuits against Valve on behalf of the same proposed national class in Connecticut, Florida, and New Jersey earlier this year. Plaintiffs then dismissed those cases and refiled a new consolidated case in this District. (*McLeod v. Valve Corporation,* WAWD Case No. C16-1227 JCC.) That case was dismissed without prejudice after this Court dismissed the plaintiffs' RICO claim (their sole federal claim). Plaintiffs then re-filed state-law claims in King County Superior Court on behalf of the same proposed national class, and Valve removed that case to this Court. (Dkt. 1.)

The named Plaintiffs in this case come from Illinois, Oregon and Missouri. (Compl. ¶¶ 13-15, 99-101.) Three are Steam subscribers who are minors; the other three are their parents. (*Id.*) As in the prior lawsuits, Plaintiffs claim, wrongly, that Valve facilitates illegal gambling on third-party websites that use Steam's item-trading feature to let Steam users gamble their virtual "skins" on the outcome of CS:GO matches and games of chance. (Compl. ¶¶ 3, 5, 42-43, 46.) Plaintiffs claim—wrongly—that Valve profits from such gambling or has business relationships with third-party gambling websites. (*See generally* Compl. ¶¶ 10, 44-48.)

VALVE CORPORATION'S MOTION TO COMPEL
ARBITRATION - (2:16-cv-01941-RSL) - 7
4839-4895-0846.01
122716/1056/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

The three minor Plaintiffs allege that they purchased skins then gambled and lost them on third-party websites. (Compl. ¶¶ 99-101.) The three parent Plaintiffs claim they gave the minor Plaintiffs money to buy those skins, and that they lost their money when the minor Plaintiffs lost the skins in gambling. (*Id.*) Plaintiffs purport to bring this suit as a class action on behalf of a class defined as "All persons in the United States ("National Class") and/or in Washington ("Washington Subclass") who (1) purchased Skins or (2) are parents/guardians of a minor child who purchased Skins." (Compl. ¶ 113.)

Plaintiffs' Complaint alleges six separate claims against Valve: (1) violation of the Consumer Protection Act, Ch. 19.86 RCW; (2) violation of RCW 4.24.070; (3) violation of the Gambling Act of 1973, Ch. 9.46 RCW; (4) unjust enrichment; (5) negligence; and (6) declaratory relief that the SSA is invalid as to certain Plaintiffs.

III. **ARGUMENT**

The FAA "establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution" and it applies to all federal and state court proceedings. *Preston v. Ferrer*, 552 U.S. 346, 349 (2008). Courts should "'rigorously enforce' arbitration agreements according to their terms" to further the FAA's strong policy favoring arbitration. *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2309 (2013). To do so, courts must "place arbitration provisions on the same footing as all other contractual provisions," and must "ensur[e] that private arbitrations are enforced." *Mortensen v. Bresnan Commc'ns, LLC*, 722 F.3d 1151, 1159 (9th Cir. 2013) (internal quotations omitted).

The Ninth Circuit has embraced the strong public policy favoring arbitration by enforcing arbitration agreements. *See, e.g.*, *Mortensen*, 722 F.3d at 1159-60; *Ferguson v. Corinthian Colleges, Inc.*, 733 F.3d 928 (9th Cir. 2013); *Coneff v. AT&T Corp.*, 673 F.3d 1155, 1160-61 (9th Cir. 2012). This Court too has enforced arbitration agreements in consumer contracts. *See, e.g.*, *Ekin v. Amazon Servs., LLC*, 84 F. Supp. 3d 1172 (W.D. Wash. 2014) (Coughenour, J.) (compelling arbitration in a putative consumer class action and recognizing district court's

VALVE CORPORATION'S MOTION TO COMPEL
ARBITRATION - (2:16-cv-01941-RSL) - 8
4839-4895-0846.01
122716/1056/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

limited discretion to disregard valid arbitration agreements under *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) and Ninth Circuit law); *Coppock v. Citigroup, Inc.*, No. C11-1984-JCC, 2013 WL 1192632, at *2 (W.D. Wash. Mar. 22, 2013) (Coughenour, J.) (enforcing arbitration agreement in putative consumer class action asserting TCPA and FDCPA claims); *see also Peters v. Amazon Servs., LLC*, 2 F. Supp. 3d 1165, 1169 (W.D. Wash. 2013) (Pechman, J.) (noting "there is a presumption of arbitrability" where a contract contains an arbitration clause and instructing that "the most minimal indication of the parties' intent to arbitrate must be given full effect").

The arbitration agreement in the SSA should similarly be enforced. Under the FAA, a court's role is limited to making two inquiries in deciding whether to enforce an arbitration agreement: (1) does a valid agreement to arbitrate exist and, if so, (2) does the current dispute fall within the scope of that agreement? *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).[2] When, as here, an arbitration provision satisfies these conditions, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration …" *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original).

A.      **There is A Valid and Enforceable Arbitration Agreement Between Plaintiffs and Valve.**

1.      *The SSA Is Valid; Plaintiffs Were Presented with It and Agreed to It Multiple Times.*

The SSA is at the center of Plaintiffs' relationship with Valve. It grants the license right to use Steam and Valve's other content and services (CS:GO, skins) that are at the heart of

---

[2] The existence and interpretation of the arbitration agreement is governed by Washington law pursuant to the SSA's choice of law provision. (SSA ¶ 10.) Washington law uses the most significant relationship test to determine whether a contractual choice of law provision is effective. *See Coppock*, 2013 WL 1192632, at *2. Washington law applies under that test because Washington has a substantial relationship to the parties (Valve is based here) and no other state with contrary policy interests has a materially greater interest in the outcome of this dispute than Washington. *See* Restatement (Second) of Conflict of Laws § 187(2) (1971).

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

Plaintiffs' case. (SSA ¶¶ 1(B), 2(A).) The SSA defines the scope of that license and specifies the conditions upon which it is granted—including the condition that Steam subscribers agree to arbitrate "all disputes and claims" with Valve. (SSA ¶ 11.) Plaintiffs accepted that condition by agreeing to the SSA, forming a valid and enforceable arbitration agreement.

The SSA, which every Steam subscriber accepts by clicking "I agree," is known as a "clickwrap" agreement. *Kwan v. Clearwire Corp.*, No. C09-1392JLR, 2012 WL 32380, at *7 (W.D. Wash. Jan. 3, 2012). Courts in this District follow the overwhelming authority from jurisdictions across the country in holding that clickwrap agreements are enforceable. *Ekin*, 84 F. Supp. 3d at 1175 n.5 (acknowledging "this District's recognition of the Ninth Circuit rule that similar 'clickwrap' agreements are completely enforceable"); *Day v. Microsoft Corp.*, No. C13-478-RSM, 2014 WL 243159, at *2 (W.D. Wash. Jan. 22, 2014) (enforcing arbitration provision in online clickwrap agreement).

> 2. *The Arbitration Agreement is Enforceable Against All Plaintiffs.*

A party opposing application of a valid arbitration agreement bears the burden of showing that the agreement is unenforceable. *Zuver v. Airtouch Commc'ns, Inc.*, 103 P.3d 753, 759 (Wash. 2004) (citations omitted). Under the FAA, an arbitration provision may be deemed unenforceable only through "'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Concepcion*, 563 U.S. at 339 (quoting *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). "Any doubts about the scope of arbitrable issues, including applicable contract defenses, are to be resolved in favor of arbitration." *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1022 (9th Cir. 2016) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).

> a. The SSA is Enforceable Against the Minor Plaintiffs.

Plaintiffs do not deny that the minor Plaintiffs were presented with the SSA or that they clicked "I Agree" to accept it (likely multiple times when they created their Steam accounts,

VALVE CORPORATION'S MOTION TO COMPEL
ARBITRATION - (2:16-cv-01941-RSL) - 10
4839-4895-0846.01
122716/1056/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

bought a subscription to CS:GO, and purchased virtual skins).  Instead, Plaintiffs seek to evade the arbitration clause in that agreement while retaining all of the SSA's benefits—including the right to acquire and play video games on the Steam platform.  (Compl. ¶¶ 164-172.)  Well-settled Washington law prevents this.

Under Washington law, contracts with minors are not void, but valid unless the minor disaffirms the contract within a reasonable time after attaining the age of majority.  *See* RCW 26.28.030 ("A minor is bound, not only by contracts for necessaries, but also by his or her other contracts, unless he or she disaffirms them within a reasonable time after he or she attains his or her majority … ."); *Finney v. Farmers Ins. Co.*, 586 P.2d 519, 524 (Wash. Ct. App. 1978) ("The contracts of a minor are not void, but voidable, and unless disaffirmed within a reasonable time after attaining majority, are valid."), *aff'd*, 600 P.2d 1272 (Wash. 1979).

The minor Plaintiffs purport to disaffirm the SSA, (Compl. ¶ 168), but their attempted disaffirmance is ineffective.  First, it is based on the false premise that "Plaintiffs have not received any benefit from the Subscriber Agreement" and the incorrect claim that the SSA is "not material" to their use of Steam or CS:GO.  (Compl. ¶¶ 166, 168-169).  The SSA is *very* material and beneficial because Plaintiffs cannot use Steam and CS:GO without it.  The SSA grants Steam subscribers "a non-exclusive license and right, to use the Content and Services for your personal, non-commercial use," until termination of the SSA.  (SSA ¶ 2(A).)  "Content and Services" include "[t]he Steam client software and any other software, content, and updates you download or access via Steam, including but not limited to Valve or third-party video games and in-game content, and any virtual items you trade, sell or purchase in a Steam Subscription Marketplace."  (SSA ¶ 1(B).)  Accordingly, all of the conduct on which Plaintiffs rest their claims derives from the license granted in the SSA, which is a significant and ongoing benefit.

Second, the minor Plaintiffs never purport to disaffirm the *entire* contract, just the parts their lawyers do not like.  (Compl. ¶ 168 (purporting to "disaffirm any waivers of rights, limitations on liability, dispute resolution, and/or the Subscriber Agreement as a whole to the

VALVE CORPORATION'S MOTION TO COMPEL
ARBITRATION - (2:16-cv-01941-RSL) - 11
4839-4895-0846.01
122716/1056/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

extent Plaintiffs have not received any benefit from the Subscriber Agreement.").) Washington law does not recognize "partial disaffirmance" or allow any contracting party, including a minor, to disaffirm only obligations. Rather, "[i]f an infant enters into any contract subject to conditions or stipulations, the minor cannot take the benefit of the contract without the burden of the conditions or stipulations." 5 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 9:14 at 126 & n.11 (4th ed. 2009 & Supp. 2016) (collecting cases); Joseph Perillo, *Contracts* § 8.3 at 264 (7th ed. 2014) ("The infant is not entitled to enforce portions that are favorable, and at the same time disaffirm other portions that are burdensome.")

Courts repeatedly reject attempts to disaffirm contractual obligations—including arbitration agreements—based on infancy at the time of contracting after a minor has received benefits under the contract, as here. *See, e.g., E.K.D. ex rel. Dawes v. Facebook, Inc.*, 885 F. Supp. 2d 894, 899–900 (S.D. Ill. 2012) (minors could not disaffirm the forum-selection clause in Facebook's terms of service while continuing to use Facebook; "[t]he infancy defense may not be used inequitably to retain the benefits of a contract while reneging on the obligations attached to that benefit"); *AV v. iParadigms, Ltd. Liability Co.,* 544 F. Supp. 2d 473, 481 (E.D. Va. 2008) (minors could not disaffirm the limitation of liability provision in an educational contract because they already received benefits under that contract of "receiv[ing] a grade from their teachers, allowing them the opportunity to maintain good standing in the classes in which they were enrolled" and "gain[ing] the benefit of standing to bring the present suit"), *aff'd in part and rev'd in part on other grounds*, 562 F.3d 630 (4th Cir. 2009); *Value Auto Credit, Inc. v. Talley*, 727 So. 2d 61, 61 (Ala. 1999) (car buyer, upon reaching majority, could not avoid only arbitration provision and ratify rest of contract); *Sheller by Sheller v. Frank's Nursery & Crafts, Inc.*, 957 F. Supp. 150, 153–54 (N.D. Ill. 1997) (district court was "confident" that the Illinois Supreme Court would not permit plaintiffs to disaffirm employment contract containing arbitration provision where result would be that plaintiffs would retain the advantage of employment but repudiate the basis of that employment).

VALVE CORPORATION'S MOTION TO COMPEL
ARBITRATION - (2:16-cv-01941-RSL) - 12
4839-4895-0846.01
122716/1056/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

Further, Washington law renders any purported disaffirmance ineffective unless Plaintiffs return to Valve "all money and property received by him or her by virtue of the contract …" RCW 26.28.030. Plaintiffs continue to use Steam's content and services, exercising their license and other rights granted under the SSA. (Compl. ¶¶ 13-15, 171.) Their continued use and exercise of the license granted in the SSA bars disaffirmance. *See Snodderly v. Brotherton*, 21 P.2d 1036, 1037 (Wash. 1933) (for any minor seeking to disaffirm a contract, "the statute requires the minor to restore to the other party all money and other property received by him by virtue of the contract and remaining within his control"); *see also E.K.D.*, 885 F. Supp. 2d at 900 (rejecting minor plaintiffs' argument that they disaffirmed Facebook's Terms of Use by bringing the lawsuit against Facebook because plaintiffs "used and continue to use facebook.com").

b. The Parent Plaintiffs Must Arbitrate Their Claims.

The parent Plaintiffs purport to assert claims "both individually and as guardian[s]" for minor Plaintiffs. (Compl. ¶¶ 13-15.) In either capacity, the parent Plaintiffs' claims are subject to the arbitration agreement because they are asserted on behalf of the minor children (and subject to binding arbitration for the reasons set forth above), or because they are entirely derivative of the minor Plaintiffs' claims.

All individual claims by the parent Plaintiffs arise from and through the **minors'** relationship with Valve, which in turn exists through the SSA and the license it grants. The Complaint pleads facts (in summary form) about each minor plaintiff's use of Steam, CS:GO and skins, but it neither alleges any facts to establish the parent Plaintiffs' personal claims nor pleads facts to establish that Valve owed parents any independent duties or obligations. (Compl. ¶¶ 13-15, 99-102.) Instead, it contains only a single, general assertion that the parent Plaintiffs "suffered financial harm" when "[m]inor children … used their parents' money for Skins gambling transactions…" (Compl. ¶ 98.) Thus, the relationship giving rise to the parents' claims exists solely through the SSA, which licensed the minor Plaintiffs to use Steam.

VALVE CORPORATION'S MOTION TO COMPEL
ARBITRATION - (2:16-cv-01941-RSL) - 13
4839-4895-0846.01
122716/1056/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

Equitable estoppel prevents the parent Plaintiffs from dodging arbitration by claiming they never expressly agreed to the SSA. There would be no relationship between the minors and Valve—and therefore no possible derivative claims for the parents—but for the agreement to the SSA and its arbitration provision. The minors accepted the benefit of the license granted in the SSA, and the parents' claims derive directly from the use of that license. Because the parent Plaintiffs' claims are based on the same facts as the minor Plaintiffs' claims, they are estopped from denying the arbitration obligation that binds the minors and was a condition of Valve's granting the minors a license to use Steam and CS:GO. *See International Paper Co. v. Schwabediessen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000) (enforcing the arbitration agreement in a purchase order between a dealer and a manufacturer against a nonsignatory customer under the doctrine of equitable estoppel because the purchase order "provide[d] part of the factual foundation for every claim asserted" by the customer); *Ritter v. Grady Automotive Group, Inc.*, 973 So. 2d 1058, 1065-66 (Ala. 2007) (nonsignatory husband was bound by arbitration agreement signed by his wife when his tort claims arose from the same breach of duties allegedly owed to her).[3]

On similar facts three months ago, the court in *Montoya v. Comcast Corp.*, No. 2:15-CV-02573-TLN-DB, 2016 WL 5340651 (E.D. Cal. Sept. 23, 2016), enforced the arbitration provision in Comcast's subscriber agreement against non-signatories who lived in a house that received Comcast cable service. The non-signatories argued they were not bound by Comcast's subscriber agreement because they never saw or signed it. The court rejected that argument, holding that the plaintiffs' knowing use and benefit from Comcast's services acted as consent to

---

[3] *See also Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988) (enforcing forum-selection clause against non-parties where the alleged conduct of the non-parties was "so closely related to the contractual relationship that the forum-selection clause applies to all defendants"); *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 (11th Cir. 1998) (non-signatories were bound by forum-selection clause because their interests were "completely derivative of" and "directly related to, if not predicated upon" those of a contracting party).

VALVE CORPORATION'S MOTION TO COMPEL
ARBITRATION - (2:16-cv-01941-RSL) - 14
4839-4895-0846.01
122716/1056/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

its obligations. (*Id.* at *5 ("Plaintiffs knowingly exploited Defendant's service and therefore accepted its terms by accepting the benefits of service. Accordingly, the Plaintiffs are bound by the obligations of this contract, including the arbitration provision") (citation omitted).) The court also held that the plaintiffs' claims were "intertwined" with the underlying contractual obligations because they "rely on, or presume the existence of, the underlying contract benefits or obligations." (*Id.*) (citing *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1046 (9th Cir. 2009)). Accordingly, arbitration was required because "by bringing forth these claims, and predicating them on the direct receipt of services from Defendant, Plaintiffs presume the existence of the underlying contract." (*Id.* at *6.)

Like the plaintiffs in *Montoya* who knowingly accepted the benefits of Comcast's services*,* the parent Plaintiffs here were aware of the minor Plaintiffs' use of Steam and CS:GO and pled that they gave the minors money to buy skins. (Compl. ¶¶ 99-101.) Similarly, the parent Plaintiffs' claims are intertwined with the underlying contractual benefits and obligations; as in *Montoya,* their claims are "predicat[ed] on the direct receipt of services from Defendant." Because those services are delivered solely through the license granted by the SSA, Plaintiffs' claims necessary "presume the existence of the underlying contract." As in *Montoya*, that contract should be enforced and the parent Plaintiffs required to arbitrate their claims.

        c.       <u>Valve Did Not Waive its Right to Enforce the SSA Against Plaintiffs.</u>

Plaintiffs also vaguely assert that Valve waived its ability to enforce "any part" of the SSA against Plaintiffs because it has not stopped third parties from violating a provision in the SSA regarding acceptable use of Steam accounts. (Compl. ¶¶ 88, 170.) But whether Valve enforced one SSA provision about allowable use of Steam accounts against a third party cannot amount to Valve's waiver of the entirely separate arbitration provision in the unrelated Plaintiffs' SSAs. Further, "[w]aiver of a contractual right to arbitration is not favored [and] any party arguing waiver of arbitration bears a heavy burden of proof." *Fisher v. A.G. Becker Paribas*

VALVE CORPORATION'S MOTION TO COMPEL
ARBITRATION - (2:16-cv-01941-RSL) - 15
4839-4895-0846.01
122716/1056/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

*Inc.*, 791 F.2d 691, 694 (9th Cir. 1986) (citations omitted). "A party seeking to prove waiver of a right to arbitration must demonstrate: (1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from such inconsistent acts." (*Id.*) (citations omitted). Where there is no evidence that Valve has acted inconsistently with its right to compel arbitration with Plaintiffs and Plaintiffs have not been prejudiced by any alleged inconsistent acts, Valve's right to arbitration remains.

**B.      Plaintiffs' Claims are Within the Scope of the SSA's Broad Arbitration Provision, Satisfying the Second Prong of the FAA Test.**

The arbitration provision also satisfies the second prong of the FAA test, which asks whether the provision encompasses Plaintiffs' claims. In making that determination, the FAA mandates a strong presumption in favor of arbitrability. As this Court recognized:

> "[A]n order to arbitrate … should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582-83 (1960)); *see Warrior & Gulf*, 363 U.S. at 584-85 ("In the absence of any express provision excluding a particular grievance from arbitration, … only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail …").

*Coppock*, 2013 WL 1192632, at *5; *accord Tuminello v. Richards*, No. C11-5928BHS, 2012 WL 750305, at *2 (W.D. Wash. Mar. 8, 2012) ("the FAA divests courts of their discretion and requires courts to resolve any doubts in favor of compelling arbitration"). Plaintiffs "bear[] the burden of showing that the agreement does not cover the claims at issue." *Coppock*, 2013 WL 1192632, at *5 (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000)).

VALVE CORPORATION'S MOTION TO COMPEL
ARBITRATION - (2:16-cv-01941-RSL) - 16
4839-4895-0846.01
122716/1056/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

Plaintiffs' claims are all within the scope of the SSA's arbitration provision, which covers:

> ANY CLAIMS ARISING OUT OF OR RELATING TO: (i) ANY ASPECT OF THE RELATIONSHIP BETWEEN US; (ii) THIS AGREEMENT; OR (iii) YOUR USE OF STEAM, YOUR ACCOUNT OR THE CONTENT AND SERVICES … ***REGARDLESS OF WHETHER SUCH CLAIMS ARE BASED IN CONTRACT, TORT, STATUTE, FRAUD, UNFAIR COMPETITION, MISREPRESENTATION OR ANY OTHER LEGAL THEORY.***

(SSA ¶ 11.) (emphasis added).

This type of expansive "any claims" clause creates a broad arbitration agreement. *See Chiron Corp.*, 207 F.3d at 1131 ("any dispute" provisions are "broad and far reaching" in scope); *Ekin* 84 F. Supp. 3d at 1178 (broadly construing and enforcing arbitration agreement encompassing "any dispute or claim relating in any way to your use of any Amazon Service, or to any products or services sold or distributed by Amazon or through Amazon.com."); *Coppock*, 2013 WL 1192632, at *5 (enforcing similar arbitration clause covering "[a]ll [c]laims relating to your account, a prior related account, or our relationship are subject to arbitration … , no matter what legal theory they are based on or what remedy … they seek."). Plaintiffs' claims need not fall squarely within the clause to be arbitrable (although they do here); rather, "factual allegations need only 'touch matters' covered by the contract containing the arbitration clause and all doubts are to be resolved in favor of arbitrability." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 632-35 (1985)).

Here, Plaintiffs' claims plainly touch matters relating to Plaintiffs' relationship with Valve, and their use of Steam and the content and services Valve provided. All of Plaintiffs' claims against Valve are premised on the SSA—because they arise from the license it grants to use Steam, to play CS:GO, and to purchase and trade skins—and on factual allegations that the

VALVE CORPORATION'S MOTION TO COMPEL ARBITRATION - (2:16-cv-01941-RSL) - 17
4839-4895-0846.01
122716/1056/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

minor Plaintiffs' relationships with Valve caused harm. (Compl. ¶¶ 99-102.) Thus, they fall squarely within the scope of the arbitration agreement.

The SSA's arbitration provision contains only two narrow exclusions to arbitration:

> [T]his Section does not apply to the following types of claims or disputes, which you or Valve may bring in any court with jurisdiction: (i) claims of infringement or other misuse of intellectual property rights, including such claims seeking injunctive relief; and (ii) claims related to or arising from any alleged unauthorized use, piracy or theft.

(SSA ¶ 11.) Plaintiffs' claims are not about infringement, intellectual property, piracy or theft.

Instead, Plaintiffs try to squeeze into the second exclusion by asserting their claims are about "unauthorized use" of Steam, (Compl. ¶¶ 79, 86-87) , even though courts reject those attempts when, as here, a third party's unauthorized use is alleged. Plaintiffs do not claim Valve made unauthorized use of Plaintiffs' Steam accounts or information. Rather, Plaintiffs claim that *third parties* engaged in "unauthorized use" against Valve, in breach of the *third parties'* contracts with Valve, and that if Valve had stopped those third parties, Plaintiffs could not have gambled on their sites and lost money. (*Id.*) Plaintiffs do not claim they are third-party beneficiaries of Valve's contracts with these third parties, or that Valve owes Plaintiffs a contractual duty to enforce the SSAs against the third parties. Whether a third party's use of Steam was authorized under the SSA need not be, and will not be, determined in this case. Simply put, Plaintiffs make no claim that relates to *their* or *Valve's* alleged "unauthorized use," so the exclusion does not apply.

The court in *Montoya*, 2016 WL 5340651, at *9-10, held that an "unauthorized use" exclusion in the arbitration provision of Comcast's subscriber agreement was not triggered by allegations of unauthorized use by third parties. The plaintiffs in *Montoya* claimed Comcast failed to protect their personal information against theft by third parties. Comcast moved to compel arbitration under its subscriber agreement, which required arbitration of "any dispute, claim, or controversy… regarding any aspect of your relationship … whether based in contract, statute, regulation, ordinance, tort … or any other legal or equitable theory," but excluded from

VALVE CORPORATION'S MOTION TO COMPEL
ARBITRATION - (2:16-cv-01941-RSL) - 18
4839-4895-0846.01
122716/1056/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

arbitration any "allegations associated with *unauthorized use or receipt of service*." (*Id.* at *9) (emphasis in original). Plaintiffs argued their claims fell under that exclusion because they alleged the third parties made unauthorized use of Comcast's services. (*Id.*) The court rejected that argument. Because plaintiffs' claims arose from their relationship with Comcast and related to their use of Comcast's services, they were specifically covered by the arbitration provision requiring arbitration of "any dispute, claim, or controversy between you and [Comcast] regarding any aspect of your relationship." (*Id.* at *10.) Insofar as they alleged tort violations by Comcast, they were again within the scope of the provision, which expressly required arbitration of any tort claims. (*Id.*) Noting that "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," the court compelled arbitration. (*Id.*)

Similarly, the court in *Aerotel, Ltd. v. RSL Comms., Ltd.*, 99 F. Supp. 2d 368 (S.D.N.Y. 2000), held that a provision excluding claims arising from "unauthorized use" from arbitration did not cover all activity that allegedly violated relevant laws. In that case, RSL and NACT had a technology licensing agreement with an arbitration clause covering "all disputes arising out of or in connection with this Agreement," but excluding "disputes arising out of any unauthorized use of the Licensed Software or Documentation." (*Id.* at 371-72.) When Aerotel sued RSL for patent infringement for using the licensed technology, RSL brought third-party claims against NACT. (*Id.* at 371.) NACT moved to compel arbitration under the licensing agreement; RSL argued its claims were specifically excluded from arbitration because they arose from "unauthorized use" of the licensed technology. (*Id.* at 371-72.) The court read the exclusion narrowly and rejected RSL's argument. In light of the strong federal policy favoring arbitration, an arbitration clause broadly worded to cover "all disputes" "creates a strong presumption in favor of arbitrability that applies with even greater force." (*Id.* at 372.) Accordingly, the "unauthorized use" exception applied "only to uses not authorized by NACT, not to uses that may violate the United States patent laws." (*Id.* at 373.)

VALVE CORPORATION'S MOTION TO COMPEL
ARBITRATION - (2:16-cv-01941-RSL) - 19
4839-4895-0846.01
122716/1056/63478.00052

Like *Montoya* and *Aerotel*, Valve's arbitration clause is broadly worded to cover "all disputes and claims" relating to "any aspect of the relationship between us." The same policy reasons and practical justifications relied on by the courts in *Montoya* and *Aerotel* drive a narrow reading of the exclusion here. As the Supreme Court instructed, "[t]he Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25). Exclusion is not warranted in these circumstances.

### C. All Claims Against Valve Should be Stayed Pending Arbitration.

Section 3 of the FAA "requires courts to stay litigation of arbitral claims pending arbitration of those claims in accordance with the terms of the agreement." *Concepcion*, 563 U.S. at 344 (internal quotation omitted); *Coppock,* 2013 WL 1192632, at *10 (granting motion to compel arbitration and staying the case pending arbitration). Accordingly, the Court should stay the claims against Valve pending arbitration.

## IV. CONCLUSION

Plaintiffs' relationship with Valve arises from, and is controlled by, the SSA. The SSA grants Plaintiffs the license necessary to use Steam and the other content and services that are at the heart of Plaintiffs' claims, requiring in exchange that Steam subscribers agree to arbitrate all disputes with Valve. Plaintiffs repeatedly agreed to the SSA and its arbitration provision. Because both prongs of the FAA test are satisfied, the Court should require Plaintiffs to honor their agreement and arbitrate their claims.

Pursuant to the FAA and Washington law, Valve respectfully requests that the Court (1) compel Plaintiffs to arbitrate all claims against Valve pursuant to the arbitration agreement in the SSA, and (2) stay all claims against Valve pending arbitration.

VALVE CORPORATION'S MOTION TO COMPEL
ARBITRATION - (2:16-cv-01941-RSL) - 20
4839-4895-0846.01
122716/1056/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

DATED this 27th day of December, 2016.

RIDDELL WILLIAMS P.S.


By  */s/ Gavin W. Skok*
Gavin W. Skok, WSBA #29766
Sarah E. Joye, WSBA #44357
James H. Wendell, WSBA #46489

and

MONTGOMERY McCRACKEN WALKER &
RHOADS, LLP


By  */s/ Charles B. Casper*
Charles B. Casper (admitted *pro hac vice*)
123 S. Broad Street, 24th Floor
Philadelphia, PA  19109
(215) 772-1500

Attorneys for Defendant Valve Corporation

VALVE CORPORATION'S MOTION TO COMPEL
ARBITRATION - (2:16-cv-01941-RSL) - 21
4839-4895-0846.01
122716/1056/63478.00052

## CERTIFICATE OF SERVICE

I certify that I am a secretary at the law firm of Riddell Williams P.S. in Seattle, Washington. I am a U.S. citizen over the age of eighteen years and not a party to the within cause. On the date shown below, I caused to be served a true and correct copy of the foregoing on counsel of record for all other parties to this action as indicated below:

| Service List | |
|---|---|
| Kim D. Stephens, WSBA #11984<br>Jason T. Dennett, WSBA #30686<br>**TOUSLEY BRAIN STEPHENS PLLC**<br>1700 Seventh Avenue, Suite 2200<br>Seattle, WA 98101<br>Tel: (206) 682-5600<br>Fax: (206) 682-2992<br>kstephens@tousley.com<br>jdennett@tousley.com<br><br>*Attorneys for Plaintiffs* | ☐ Via US Mail<br>☐ Via Messenger<br>☒ Via CM/ECF / Email<br>☐ Via over-night delivery |
| Jasper D. Ward IV<br>Alex C. Davis<br>Patrick Walsh<br>**JONES WARD PLC**<br>Marion E. Taylor Building<br>312 S. Fourth Street, Sixth Floor<br>Louisville, Kentucky 40202<br>Tel. (502) 882-6000<br>Fax (502) 587-2007<br>jasper@jonesward.com<br>alex@jonesward.com<br>patrick@jonesward.com<br><br>*Attorneys for Plaintiffs* | ☐ Via US Mail<br>☐ Via Messenger<br>☒ Via CM/ECF / Email<br>☐ Via over-night delivery |

VALVE CORPORATION'S MOTION TO COMPEL
ARBITRATION – (2:16-cv-01941-RSL) – 22
4839-4895-0846.01
122716/1056/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

<table>
<tr><td>

Paul C. Whalen (PW1300)<br>
**LAW OFFICE OF PAUL C. WHALEN, P.C.**<br>
768 Plandome Road<br>
Manhasset, NY 11030<br>
Tel. (516) 426-6870<br>
Fax (212) 658-9685<br>
pcwhalen@gmail.com<br>
<br>
*Attorneys for Plaintiffs*

</td><td>

☐ Via US Mail<br>
☐ Via Messenger<br>
☒ Via CM/ECF / Email<br>
☐ Via over-night delivery

</td></tr>
</table>

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

EXECUTED this 27th day of December, 2016, in Seattle, Washington.

_____

Courtney R. Tracy

VALVE CORPORATION'S MOTION TO COMPEL
ARBITRATION - (2:16-cv-01941-RSL) - 23
4839-4895-0846.01
122716/1056/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

# EXHIBIT 4

The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| G.G., A.L., and B.S., individually and on behalf of all others similarly situated,<br><br>                              Plaintiffs,<br><br>v.<br><br>VALVE CORPORATION, a Washington corporation,<br><br>                              Defendant. | No. 2:16-cv-01941-JCC<br><br>**REPLY IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL ARBITRATION**<br><br>**NOTED ON MOTION CALENDAR MARCH 10, 2017** |

REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION
   (No. 16-cv-01941-JCC)
63478.00052
030917/1000/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

Plaintiffs seek to avoid their arbitration agreement by arguing it exempts their claims and that it is not enforceable.  Both challenges fail.

## A.    Plaintiffs' Claims Are Squarely Within the Arbitration Agreement.

Plaintiffs argue their claims are excluded from their arbitration agreement because they concern "unauthorized use."  That argument is inconsistent with the agreement's text, contrary to the broad construction given to arbitration agreements, and has been rejected before.

Plaintiffs and Valve agreed in the SSA to arbitrate "ALL DISPUTES AND CLAIMS BETWEEN US."  SSA § 11 (Dkt. #11-7 at 11.)  The SSA gives several examples of such claims, e.g., those related to "any aspect of the relationship between us," to the SSA, or to "your use of Steam, your account or the Content and Services."  *Id.*  It covers legal theories of every kind, including "contract, tort, statute, fraud, unfair competition, misrepresentation or any other legal theory."  *Id.*  The arbitration provision is written as broadly as possible to include every type of claim under any legal theory.

Plaintiffs' claims are squarely within the scope of the SSA's arbitration agreement because they arise from Plaintiffs' relationship with Valve, the SSA, and Plaintiffs' authorized use of Steam.  Plaintiffs do not dispute that.  Instead, Plaintiffs try to avoid their agreement by arguing their claims squeeze into one of the SSA's two narrow exceptions to arbitration:

> [T]his Section does not apply to the following types of claims or disputes, which you or Valve may bring in any court with jurisdiction: (i) claims of infringement or other misuse of intellectual property rights, including such claims seeking injunctive relief; and ***(ii) claims related to or arising from any alleged unauthorized use, piracy or theft.***

*Id.* (emphasis added).  There is good reason to exempt both types of claims from arbitration.  Issues of "unauthorized use, piracy or theft" often demand immediate action and injunctive relief, which can be obtained more quickly in court than in arbitration.  "Unauthorized use, piracy or theft" may also involve underlying criminal activity, which is the province of courts.  The exclusion for infringement or misuse of intellectual property serves similar purposes.

REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION
(No. 16-cv-01941-JCC) -1
4815-7353-0948.05
030917/1000/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington  98154-1192
206.624.3600

Plaintiffs argue their claims fit within the second exception for "unauthorized use, piracy or theft" because **unaffiliated third-party website operators**—not parties to Plaintiffs' agreements with Valve or this lawsuit—violated the SSA by using automated Steam accounts ("bots"), operating unaffiliated gambling websites, and using Steam accounts for commercial purposes. (Dkt. #27 at 6.) Plaintiffs are wrong.

First, Plaintiffs do not claim they are third-party beneficiaries of these website operators' contracts with Valve, or that Valve owes Plaintiffs a duty to enforce the SSA against others.

Second, Plaintiffs' claims do not relate to any alleged "unauthorized use, piracy or theft" by Valve (e.g., Plaintiffs do not claim Valve allegedly misused their information), nor is Valve suing Plaintiffs for "unauthorized use, piracy or theft."

Third, it is unnecessary to determine whether the third parties operating the gambling websites violated any obligations under their own agreements with Valve in order to resolve Plaintiffs' claims; whether third-party SSA violations occurred is not an element of any of Plaintiffs' claims against Valve. Nearly any claim could be re-characterized as concerning "unauthorized use, piracy or theft" if the exception required only an allegation that somewhere a non-party breached the SSA. Under that theory, a claim that Valve did not stop a data breach would fall within the "unauthorized use, piracy or theft exception" because the third-party hacker's use was not authorized under the SSA. But the court in *Montoya v. Comcast Corp.*, No. 2:15-CV-02573-TLN-DB, 2016 WL 5340651 (E.D. Cal. Sept. 23, 2016), rejected that very scenario, holding that claims alleging a third-party hacker illegally accessed the plaintiffs' personal information were not excluded from arbitration under an "unauthorized use" exception, even though the hacker's use of Comcast's services was, indeed, unauthorized. *Id.* at *9-10.

Plaintiffs' theory of the "unauthorized use, piracy or theft" exception is also contrary to the FAA's purpose of promoting arbitration and the parties' stated intent in the SSA to arbitrate "all disputes and claims between us." In fact, claims fit into this exemption only if they concern "unauthorized use, piracy or theft" between the parties and require the fact-finder to determine if

REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION
(No. 16-cv-01941-JCC) -2
4815-7353-0948.05
030917/1000/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

the alleged "unauthorized use, piracy or theft" occurred.  *See Montoya*, 2016 WL 5340651, at *10 (noting that "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration" and holding that the "unauthorized use" exception was inapplicable where alleged unauthorized use was by a third party).

Plaintiffs' argument that Section 4 of the SSA ("Online Conduct, Cheating and Illegal Behavior") defines "unauthorized use" for purposes of the arbitration agreement in Section 11 to include third-party unauthorized use actually supports Valve's position.  Section 4 says: "***You*** may not use Cheats, automation software (bots), mods, hacks, or any other unauthorized third-party software, to modify or automate any Subscription Marketplace process."  SSA § 4 (Dkt. #11-7 at 6-7) (emphasis added).  Nothing in the Complaint alleges that Plaintiffs ("You") did this.  Rather, Plaintiffs allege that ***third parties*** created "bot accounts" to "modify or automate [a] Subscription Marketplace process" for trading skins, which Plaintiffs later traded skins to.  (Dkt. #1-3, ¶¶ 7, 43, 96).  No one contends that ***Plaintiffs*** violated the SSA, and thus engaged in unauthorized use, by trading skins with these "bot" accounts.

Plaintiffs cite a few cases they claim require exceptions to be read broadly (Dkt. #27 at 10), but misread them.  Plaintiffs' cases actually say that language ***authorizing*** arbitration should be read broadly, but do not discuss how ***exceptions*** are to be construed.  *See Ownzones Media Network, Inc. v. Systems in Motion, LLC*, No. C14-0994JLR, 2014 WL 4626302, at *2-7 (W.D. Wash. Sept. 15, 2014) (granting motion to compel arbitration and recognizing arbitration agreements should be broadly construed to include claims); *McClure v. Davis Wright Tremaine*, 77 Wash. App. 312, 314, 890 P.2d 466 (1995) (granting motion to compel arbitration and recognizing that an arbitration clause encompassing any controversy "relating to" a contract is broad); *Lagrone v. Advanced Call Ctr. Techs., LLC*, No. C13-2136JLR, 2014 WL 4966738, at *1 (W.D. Wash. Oct. 2, 2014) (granting motion to compel arbitration).  Courts cannot at the same time broadly construe both arbitration clauses and exclusions to those clauses.  Construing exceptions broadly—as Plaintiffs urge this Court to do—would contravene the FAA's purpose.

REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION
(No. 16-cv-01941-JCC) -3
4815-7353-0948.05
030917/1000/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

*See, e.g., KPMG LLP v. Cocchi*, 132 S. Ct. 23, 25 (2011) (per curiam) ("The [FAA] reflects an emphatic federal policy in favor of arbitral dispute resolution") (internal quotations omitted).

Plaintiffs also argue the arbitration provision should be construed against Valve as the drafter. But they allege that the arbitration provision is unambiguous (Dkt. #27 at 10), and the construe-against-the-drafter rule applies only to ambiguous provisions. *See Guy Stickney, Inc. v. Underwood*, 67 Wash. 2d 824, 827, 410 P.2d 7 (1966). Moreover, the usual rule for ambiguous provisions differs in arbitration cases due to the FAA's strong support for arbitration. "Even if an ambiguity exists, it is resolved in favor of arbitration." *Richardson v. Bart's Car Store, Inc.*, No. 1:14-CV-00707-SEB, 2014 WL 7184433, at *4 (S.D. Ind. Dec. 15, 2014).

Plaintiffs next mistakenly argue that *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, 830 F.3d 1335 (Fed. Cir. 2016), requires a broad reading of the exclusion. *Verinata* involved a narrow arbitration agreement requiring arbitration of contract-based claims but expressly excluding "disputes relating to issues of scope, infringement, validity and/or enforceability" of any patents. *Id.* at 1337. Unsurprisingly, the court held that counterclaims alleging breach of a patent license were not required to be arbitrated because "[t]he nucleus of [defendant's] counterclaims is the patent infringement lawsuit filed by [plaintiff]" such that the counterclaims "rise or fall on the scope determination of licensed intellectual property rights, a matter that the parties expressly agreed to exempt from arbitration." *Id.* at 1341. *Verinata* supports Valve, not Plaintiffs. Unlike in *Verinata*, where the contract claims could be decided only by resolving intellectual property rights that were excluded from arbitration, here establishing that third parties committed "unauthorized use, piracy or theft" in violation of the SSA is neither necessary nor sufficient to establish any of Plaintiffs' claims against Valve.

Plaintiffs also argue that *Rebolledo v. Tilly's, Inc.*, 228 Cal. App. 4th 900, 175 Cal. Rptr. 3d 612 (2014), and *Richardson*, 2014 WL 7184433, require the exemption to be broadly construed. Neither case holds that exclusionary clauses must be broadly interpreted, and both are specific to their facts. *See Rebolledo*, 228 Cal. App. 4th at 917 (a statutory wage claim allowed

REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION
(No. 16-cv-01941-JCC) -4
4815-7353-0948.05
030917/1000/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

to be brought before the California Labor Commissioner was excluded from arbitration under an exemption for claims "governed by the California Labor Commissioner" or "within the jurisdiction of the California Labor Commissioner"); *Richardson*, 2014 WL 7184433, at *4 (not discussing exceptions; issue was whether the evidence revealed an amount in controversy over the dollar threshold in a  clause authorizing arbitration only of certain small claims).

The court's narrow construction of an "unauthorized use" exception in *Aerotel, Ltd. v. RSL Comms., Ltd.*, 99 F. Supp. 2d 368 (S.D.N.Y. 2000), further supports Valve.  There, the court explained that a broad clause requiring arbitration of "all disputes"—as in the SSA—"creates a strong presumption of arbitrability that applies with even greater force" and compels a narrow reading of any exceptions.  *Id.* at 372-73.  The court interpreted "unauthorized use" narrowly as use not authorized by the licensor, instead of more broadly as use not authorized under patent laws.  *Id.*  Plaintiffs here argue that the claims sent to arbitration in *Aerotel* "were not as clearly related to 'unauthorized use' as the claims here." (Dkt. #27 at 18.)  Not so.  The issue in *Aerotel* was the exception's breadth, not the type of claims asserted.  Here, as in *Aerotel*, the broad agreement in the SSA to arbitrate "all disputes and claims between us" creates a strong presumption that all claims are arbitrable and requires a narrow reading of any exceptions.

Finally, even if this issue were close or debatable—which it is not—Plaintiffs should not prevail.  The federal presumption in favor of arbitration controls and arbitration should be ordered.  *See AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (explaining presumption of arbitrability); *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1284 (9th Cir. 2009) (same); *Coppock v. Citigroup, Inc.*, No. C11-1984-JCC, 2013 WL 1192632, at *5 (W.D. Wash. Mar. 22, 2013) (same).

**B.      The SSA is Valid and Enforceable.**

Plaintiffs' other enforceability challenges fail too.  The minor plaintiffs have not disaffirmed the SSA, and cannot do so while continuing to use Steam (as they indisputably do). The parent plaintiffs cannot have greater rights than the minors through whom their claims are

REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION
(No. 16-cv-01941-JCC) -5
4815-7353-0948.05
030917/1000/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

derived, and therefore are bound by the same arbitration agreements as the minor plaintiffs. Plaintiffs' miscellaneous challenges to the enforceability of the arbitration agreement are for the arbitrator to decide; insofar as this Court reaches them, they are easily rejected because the arbitration clause is procedurally and substantively fair.

      1.    <u>The SSA is Enforceable Against the Plaintiffs Who Agreed to it as Minors Because They Have Not Disaffirmed the SSA.</u>

Plaintiffs do not refute (or even address) three key points in their opposition brief: (1) a minor must disaffirm an entire contract, (2) partial disaffirmance is ineffective as a matter of law, and (3) a minor cannot retain the beneficial parts of the contract while denying his or her obligations. (*See* Dkt. #10 at 10-14.) Plaintiffs' ongoing and admitted use of Steam pursuant to the license granted in the SSA renders their purported disaffirmance ineffective. Compl. ¶ 168.

Valve gave the minor Plaintiffs valuable consideration in exchange for their agreement to arbitrate all disputes by granting Plaintiffs a license right in the SSA to use Steam and its content. *See* SSA §§ 1(B) & 2(A) (Dkt. #11-7 at 2, 3.) Washington law requires any minor seeking to disaffirm a contract to return to the other party any consideration he or she still has at the time of disaffirmance. *See* RCW 26.28.030. Accordingly, Plaintiffs must surrender their license rights to use Steam and content on Steam in order to disaffirm the SSA. Plaintiffs have chosen not to do that; instead, Plaintiffs admit they continue to use Steam. (*See* Dkt. # 27 at 22.)

Contrary to Plaintiffs' assertions, there is nothing unfair about requiring them to surrender the benefits of the SSA if they wish to avoid its obligations. *See E.K.D. ex rel. Dawes v. Facebook, Inc.,* 885 F. Supp. 2d 894 (S.D. Ill. 2012) (minors could not disaffirm a forum-selection clause in Facebook's terms of service while continuing to use Facebook because "[t]he infancy defense may not be used inequitably to retain the benefits of a contract while reneging on the obligations attached to that benefit").

Unable to avoid that fatal flaw in their disaffirmance argument, Plaintiffs raise a "straw man" by claiming Valve's position is that disaffirmance is ineffective unless Plaintiffs refund all

REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION
(No. 16-cv-01941-JCC) -6
4815-7353-0948.05
030917/1000/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

value they ever received from Steam. Plaintiffs then "refute" that argument with *Snodderly v. Brotherton*, 173 Wash. 86, 21 P.2d 1036 (1933). But that is not Valve's position. Valve's position is that Plaintiffs cannot meet the *Snodderly* standard that minors seeking disaffirmance need only return any consideration remaining in their hands, because the minor Plaintiffs continue to use Steam under the license the SSA granted. Each minor Plaintiff received a license to use Steam and content delivered on Steam—a benefit they hold but have not relinquished.

Plaintiffs' reliance on *I.B. ex rel. Fife v. Facebook, Inc.,* 905 F. Supp. 2d 989, 1001 (N.D. Cal. 2012) is similarly misplaced. *Fife* applied California law and the court focused on the California legislature's repeal of a statutory requirement that minors restore consideration to the other party upon disaffirmance. *Id.* at 1001-03. Unlike California law, here RCW 26.28.030 **does** require restoration of any remaining consideration to the other party for disaffirmance to be effective. Moreover, *Fife* does not address Valve's key argument that Plaintiffs' continued use of Steam renders their disaffirmance ineffective; in fact, the *Fife* court distinguishes the *E.K.D.* case (*supra*) on those grounds. *Id.* at 1003.

2.      The Parents Must Arbitrate Their Claims.

Plaintiffs' opposition ignores the dispositive fact that the parents' claims arise exclusively from the minors' relationship with Valve, which exists through the SSA and the license it grants to use Steam. Plaintiffs do not plead the existence of any duty Valve owed to the parents; rather, the parents' claims are intertwined with the minors' claims. The minor plaintiffs agreed in the SSA to arbitrate their claims, and the parents cannot have greater rights than the minors through whom their claims are derived. Accordingly, the parents must arbitrate their claims. Plaintiffs neither refute that argument, nor address the case law cited in Valve's motion applying that analysis to require arbitration. (*See* Dkt. #10 at 13-14 & citations therein.) *See also THI of New Mexico at Vida Encantada, LLC v. Archuleta,* No. CIV. 11-399 LH/ACT, 2013 WL 2387752, at *11 (D.N.M. Apr. 30, 2013) (derivative claims must be arbitrated; "Defendant derives her claims through Ms. Lucero, and thus, Defendant is equally bound to submit the claims of the Estate to

REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION
(No. 16-cv-01941-JCC) -7
4815-7353-0948.05
030917/1000/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

arbitration"); *Ritter v. Grady Auto. Grp., Inc.*, 973 So. 2d 1058, 1065-66 (Ala. 2007) (nonsignatory spouse was bound by arbitration agreement signed by his wife when his tort claims arose from the same breach of duties allegedly owed to her); *see also Archbishop Coleman F. Carroll High Sch., Inc. v. Maynoldi*, 30 So. 3d 533, 544-45 (Fla. Dist. Ct. App. 2010) (parents' claims for injuries to deceased son were subject to same alcohol defense as could have been brought against him because the "derivative claimant should not acquire greater rights than the decedent (or in this case, the minor) could ever have had"); *Freeman v. Leader Nat. Ins. Co.*, 58 S.W.3d 590, 597 (Mo. Ct. App. 2001) ("A party making a claim through a derivative right acquires no greater rights in law or equity than the party for whom it was substituted").

Plaintiffs weakly argue that they can avoid arbitration because they also brought a Consumer Protection Act claim. But the parents' and minors' claims share the same factual basis, regardless of what legal claims are asserted. It's the factual basis that counts. *See, e.g., International Paper Co. v. Schwabediessen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000) (enforcing an arbitration agreement in a purchase order against a nonsignatory customer because the purchase order "provide[d] part of the factual foundation for every claim asserted" by the customer). All of the asserted claims arise from the minors' use of Steam and their relationships with Valve, which exist through the licenses the SSA granted. Thus, litigating those claims necessarily involves the SSA.

This Court recently compelled arbitration on analogous facts in *Rahmany v. T-Mobile USA, Inc. and Subway Sandwich Shops, Inc.,* No. C16-1416 JCC (Dkt. # 25) (W.D. Wash. Jan. 5, 2017). The plaintiffs in *Rahmany* claimed Subway colluded with T-Mobile to violate the TCPA. The plaintiffs had no contract with Subway, but the Court compelled arbitration of their claims against Subway under the arbitration clause in plaintiffs' T-Mobile service agreement because the plaintiffs' claims could not be resolved without analyzing T-Mobile's conduct and the terms and conditions of the T-Mobile service agreement. *Id.* The same logic applies here.

REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION
(No. 16-cv-01941-JCC) -8
4815-7353-0948.05
030917/1000/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

Instead of explaining how parents with derivative claims could have greater rights than the minors through whom their claims are derived, or addressing the case law cited in Valve's opening brief, Plaintiffs spend time trying to distinguish *Townsend v. Quadrant Corp.*, 173 Wash. 2d 451, 268 P.3d 917 (2012), arguing it is specific to contract claims.  Valve's motion did not rely on (or even cite) *Townsend*.  Nonetheless, *Townsend* is at the very least a good example of courts' reluctance to let a non-signatory to a contract avoid a contractual arbitration requirement when the non-signatory derives its rights through a signatory.

Lastly, Plaintiffs try to distinguish *Montoya*, 2016 WL 5340651, by arguing that the non-signatory plaintiffs in that case were required to arbitrate because they used Comcast's services, while here the parents do not use Steam.  Who used Comcast's services was not the dispositive issue in *Montoya*.  The *Montoya* court recognized that receiving the benefits of a contact was **one** basis for compelling arbitration under that contract, but held that "[n]on-signatories are also compelled to arbitrate when 'the claims [of the non-signatory] are *intertwined with* the underlying contractual obligations."  *Id*. at *5 (quoting *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1046 (9th Cir. 2009)) (ellipses and emphasis in original).  As established above, the parents' claims are all interdependent on the underlying contractual obligations because they are derived through the minors, who use Steam under the license the SSA granted.  Just as in *Montoya*, the parents' claims here "presume the existence of the underlying contract" because they are "predicat[ed] … on the direct receipt of services" from Valve under the SSA's license. *See id.* at *6.  Even if receipt of benefits was required, the parents pled that they gave their kids money to buy skins and other items through Steam.  (Dkt. #1-3, ¶¶ 99-101.)  Those purchases accept and exercise the benefits of the license granted by the SSA.

3.      Plaintiffs' Miscellaneous Enforceability Challenges Fail.

None of Plaintiffs' various contract law challenges to the arbitration agreement have merit.  As an initial matter, those challenges to enforceability are delegated to the arbitrator by the incorporation of the American Arbitration Association (AAA) commercial and consumer

REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION
(No. 16-cv-01941-JCC) -9
4815-7353-0948.05
030917/1000/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

arbitration rules in the SSA § 11. *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) ("[I]ncorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability."). The AAA rules delegate to the arbitrator the decision on "any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." *See* AAA Commercial Arbitration Rule R-7; AAA Consumer Arbitration Rule R-14.

Even if the contract law arguments were left to this Court for decision, they should be rejected. Plaintiffs' argument that the SSA is an illegal contract because skins gambling is illegal misstates the law. Washington courts refuse to enforce a contract on the basis of illegality only if the performance required under the contract requires or relies on an illegal act. *See Sherwood & Roberts-Yakima, Inc. v. Cohan*, 2 Wash. App. 703, 710, 469 P.2d 574 (1970). That is not the case here, where the performance required under the SSA—the grant of a license to use Steam—does not require any illegal action by any party and is not "illegal in and of itself."

Plaintiffs also claim the SSA is procedurally unconscionable because it is an adhesion contract, but that argument was squarely rejected by the Washington Supreme Court in the very case on which Plaintiffs rely. *See Zuver v. Airtouch Commc'ns, Inc.*, 153 Wash. 2d 293, 304-05, 103 P.3d 753 (2004) (citation omitted) (rejecting a procedural unconscionability challenge to an arbitration agreement in an adhesion contract; "the fact that an agreement is an adhesion contract does not necessarily render it procedurally unconscionable"); *see also Carideo v. Dell, Inc.*, 520 F. Supp. 2d 1241, 1249 (W.D. Wash. 2007) (same).

Plaintiffs assert that the SSA is substantively unconscionable for several reasons, none of which has merit. A term is substantively unconscionable only if it is "one-sided or overly harsh," "[s]hocking to the conscience," "monstrously harsh," or "exceedingly calloused." *Adler v. Fred Lind Manor*, 153 Wash. 2d 331, 344-45, 103 P.3d 773 (2004) (citations omitted). First, Plaintiffs claim the arbitration provision is substantively unconscionable because they must "front the costs" when filing an arbitration, even though Valve agrees to reimburse all costs of

REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION
(No. 16-cv-01941-JCC) -10
4815-7353-0948.05
030917/1000/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

certain arbitrations. SSA § 11 (Dkt. #11-7 at 11.) Plaintiffs misunderstand the AAA rules, which cap their maximum payment at the $200 filing fee. *See* Costs of Arbitration, attachment to AAA Consumer Arbitration Rules.[1] Moreover, Valve's agreement to pay arbitration fees renders the provision not substantively unconscionable under Washington law. *Zuver*, 153 Wash. 2d at 310 (citation omitted). *See also Coppock*, 2013 WL 1192632, at *7 (applying South Dakota law; enforcing an arbitration provision that required Citigroup "to reimburse the initial filing fee if the claimant prevails" and "to advance or reimburse the filing and other fees under certain circumstances."). Plaintiffs argue that *Mohamed v. Uber Techs., Inc.*, 109 F. Supp. 3d 1185 (N.D. Cal. 2015), supports their unconscionability argument, but Plaintiffs ignore that the Ninth Circuit later reversed the district court and compelled arbitration of all claims except the Private Attorney General Act claim, notwithstanding any cost issues. *See Mohamed v. Uber Techs., Inc.*, No. 15-16178, 2016 WL 7470557, at *6 (9th Cir. Dec. 21, 2016).

Plaintiffs also claim the SSA is substantively unconscionable because "Valve allowed the gambling sites to target minor children …" (Dkt. #27 at 26.) Plaintiffs' argument is unclear and Plaintiffs cite no authority to support or explain it. Insofar as Plaintiffs argue equitable principles prevent enforcement of the arbitration provision, it is well settled that under the FAA, "a district court's consideration of a motion to compel arbitration is limited to determining whether the parties entered into a valid agreement to arbitrate, and does not reach the merits of the parties' claims." *Wolff v. Westwood Mgmt., LLC*, 503 F. Supp. 2d 274, 283 (D.D.C. 2007), *aff'd*, 558 F.3d 517 (D.C. Cir. 2009) (citations omitted). Further, enforcing the arbitration provision does not "shield [Valve] from any significant responsibility" as Plaintiffs assert, but rather puts the decision regarding culpability with the arbitrator, as the parties agreed.

Plaintiffs then claim the SSA is illusory because Valve has allegedly not enforced it against gambling websites. But Plaintiffs never claim Valve owes **Plaintiffs** a contractual duty

---

[1] *See* American Arbitration Association Consumer Arbitration Rules, *available at* https://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTAGE2021425&revision=latestreleased.

REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION
(No. 16-cv-01941-JCC) -11
4815-7353-0948.05
030917/1000/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

to enforce the SSA against third parties. Valve's enforcement of the SSA against a third party cannot amount to a waiver of an entirely separate contractual provision with Plaintiffs. Further, Plaintiffs have failed to meet their "heavy burden of proof" that Valve waived the arbitration provision, which is the only contract provision at issue. *See Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694 (9th Cir. 1986).

Plaintiffs also argue the SSA is illusory because it reserves the right to Valve to make unilateral modifications. That does not make the SSA unenforceable. *See Ekin v. Amazon Servs., LLC,* 84 F. Supp. 3d 1172, 1176 (W.D. Wash. 2014) (holding that Amazon's unilateral reservation of a right to modify its terms and conditions did not render them unenforceable or unconscionable; "Washington and Ninth Circuit courts have a history of enforcing contracts containing change-in-terms provisions"); *see also Alaska Airlines. Inc. v. Carey,* 395 F. App'x 476, 479 (9th Cir. 2010) ("Alaska Airlines' unilateral right to modify the terms of the Mileage Plan do[es] not make the plan an illusory contract"). Further, the SSA gives users 60 days' advance notice of changes and a choice whether to accept them. (Dkt. #11-7 at 10.) "[A]rbitration agreements which allow a party to prospectively modify the agreement with notice are enforceable and not illusory." *Morgan v. Xerox Corp.*, No. 2:13–cv–00409–TLN–AC, 2013 WL 2151656, at *5 (E.D. Cal. May 16, 2013). And, even if a unilateral right to make changes were one factor in a substantive unconscionability analysis, Plaintiffs have not identified any other factors that could make the arbitration agreement "[s]hocking to the conscience," "monstrously harsh," or "exceedingly calloused." *Adler*, 153 Wash. 2d at 344-45.

**D.     Conclusion.**

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, contains a strong public policy in support of arbitration when there is a valid arbitration agreement and the dispute falls within the scope of that agreement. The SSA readily satisfies both criteria. Accordingly, the Court should: (1) compel Plaintiffs to arbitrate all claims against Valve pursuant to the arbitration agreement in the SSA, and (2) stay all claims against Valve pending arbitration.

REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION
(No. 16-cv-01941-JCC) -12
4815-7353-0948.05
030917/1000/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

DATED this 9th day of March, 2017.

RIDDELL WILLIAMS P.S.


By  */s/ Gavin W. Skok*
　　　Gavin W. Skok, WSBA #29766
　　　Sarah E. Joye, WSBA #44357
　　　James H. Wendell, WSBA #46489

　　　And

MONTGOMERY MCCRACKEN WALKER &
RHOADS, LLP


By  */s/ Charles B. Casper*
　　　Charles B. Casper (admitted *pro hac vice*)
　　　123 S. Broad Street, 24th Floor
　　　Philadelphia, PA  19109
　　　(215) 772-1500

　　　Attorneys for Defendant Valve Corporation

REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION
(No. 16-cv-01941-JCC) -13
4815-7353-0948.05
030917/1000/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington  98154-1192
206.624.3600

# CERTIFICATE OF SERVICE

I certify that I am a secretary at the law firm of Riddell Williams P.S. in Seattle, Washington.  I am a U.S. citizen over the age of eighteen years and not a party to the within cause.  On the date shown below, I caused to be served a true and correct copy of the foregoing on counsel of record for all other parties to this action as indicated below:

| Service List | |
|---|---|
| Kim D. Stephens, WSBA #11984<br>Jason T. Dennett, WSBA #30686<br>**TOUSLEY BRAIN STEPHENS PLLC**<br>1700 Seventh Avenue, Suite 2200<br>Seattle, WA  98101<br>Tel: (206) 682-5600<br>Fax: (206) 682-2992<br>KStephens@tousley.com<br>jdennett@tousley.com<br><br>*Attorneys for Plaintiffs* | ☐ Via US Mail<br>☐ Via Messenger<br>☒ Via ECF/ Email<br>☐ Via over-night delivery |
| Jasper D. Ward IV<br>Alex C. Davis<br>Patrick Walsh<br>**JONES WARD PLC**<br>Marion E. Taylor Building<br>312 S. Fourth Street, Sixth Floor<br>Louisville, Kentucky 40202<br>Tel: (502) 882-6000<br>Fax: (502) 587-2007<br>jasper@jonesward.com<br>alex@jonesward.com<br>patrick@jonesward.com<br>*Attorneys for Plaintiffs* | ☐ Via US Mail<br>☐ Via Messenger<br>☒ Via ECF / Email<br>☐ Via over-night delivery |

REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION
   (No. 16-cv-01941-JCC) -14
4815-7353-0948.05
030917/1000/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington  98154-1192
206.624.3600

<table>
<tr><td>

Paul C. Whalen (PW1300)<br>
**LAW OFFICE OF PAUL C. WHALEN, P.C.**<br>
768 Plandome Road<br>
Manhasset, New York 11030<br>
Tel: (516) 426-6870<br>
Fax: (212) 658-9685<br>
pcwhalen@gmail.com<br><br>
*Attorneys for Plaintiffs*

</td><td>

☐ Via US Mail<br>
☐ Via Messenger<br>
☒ Via ECF / Email<br>
☐ Via over-night delivery

</td></tr>
</table>

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

EXECUTED this 9th day of March, 2017, in Seattle, Washington.

Courtney R. Tracy

REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION
 (No. 16-cv-01941-JCC) -15
4815-7353-0948.05
030917/1000/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

# EXHIBIT 5

The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WOLFIRE GAMES, LLC, William Herbert
and Daniel Escobar, individually and on
behalf of all others similarly situated,

Plaintiffs,

v.

VALVE CORPORATION,

Defendant.

Case No. 2:21-cv-00563-JCC

SEAN COLVIN, EVERETT STEPHENS,
RYAN LALLY, SUSANN DAVIS, and
HOPE MARCHIONDA, individually and on
behalf of all others similarly situated,

Plaintiffs,

v.

VALVE CORPORATION,

Defendant.

Case No. 2:21-cv-00650-JCC

**DEFENDANT VALVE CORPORATION'S
MOTION TO COMPEL ARBITRATION**

**NOTE ON MOTION CALENDAR:**
**September 17, 2021**

MOTION TO COMPEL ARBITRATION
(2:21-CV-00563-JCC) -

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

123294342

## I.    INTRODUCTION

Seven of the eight Plaintiffs are individual users of Valve's online gaming platform—Steam—who purchased video games through Steam, using Steam accounts (the "Individual Plaintiffs").[1]  In purchasing games on Steam, the Individual Plaintiffs repeatedly agreed to Valve's Steam Subscriber Agreement ("SSA") and its requirement to arbitrate "all disputes and claims between us."  Yet, instead of commencing arbitration as agreed, they sued in court.  Plaintiff Wolfire Games, LLC—a video game publisher—also joined their lawsuit.  All eight Plaintiffs asserted identical claims against Valve based on the same alleged facts.

In a decision that was affirmed by the Ninth Circuit last year, this Court in another proposed class action against Valve evaluated the SSA's arbitration agreement and held that it was valid and enforceable against Steam users who agreed to the SSA when making purchases on Steam—just like the Individual Plaintiffs here—or creating Steam accounts.  *G.G. v. Valve Corp.*, No. C16-1941-JCC, 2017 WL 1210220 (W.D. Wash. Apr. 3, 2017), *affirmed in part and vacated in part*, 799 F. App'x 557, 558–59 (9th Cir. Apr. 3, 2020).

In compelling arbitration of claims Steam users brought against Valve (and claims their parents brought on their behalf) in *G.G. v. Valve*, this Court explained that "[t]he FAA reflects a 'liberal federal policy favoring arbitration.'"  2017 WL 1210220, at *2 (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)).  This Court went on to observe that "[t]he FAA requires courts to compel arbitration if (1) a valid agreement to arbitrate exists, and (2) the dispute falls within the scope of that agreement."  *Id.* (*citing Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)).  "If both of these two requirements are fulfilled, then the FAA 'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration.'"  *Id.* (quoting *Chiron Corp.*, 207 F.3d at 1130).  And "any doubts concerning the scope of arbitrable issues

---

[1] The Individual Plaintiffs are Sean Colvin, Susann Davis, Daniel Escobar, William Herbert, Ryan Lally, Hope Marchionda and Everett Stephens.

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

MOTION TO COMPEL ARBITRATION
(2:21-CV-00563-JCC) - 1

123294342

should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 626 (1985)).

Applying these principles, this Court compelled arbitration of all claims brought against Valve by or on behalf of Steam users. *Id.* at *3, 5. The Ninth Circuit affirmed. 799 F. App'x at 558–59. Nothing has changed since the Ninth Circuit's April 2020 decision.

The same arbitration agreement, the same logic, and the same Ninth Circuit authority lead to the same result here. Accordingly, Valve moves the Court for an order (1) compelling the Individual Plaintiffs to arbitrate all claims against Valve individually as they agreed in the SSA, and (2) staying all claims against Valve pending completion of arbitration, including all claims brought by Wolfire Games.

## II.   STATEMENT OF FACTS

### A.   Valve and Steam.

Valve develops and distributes video games and content for use on personal computers. Declaration of Christopher Boyd ("Boyd Decl.") ¶ 2. Valve also operates Steam. Steam is an online platform that includes (1) an online store, where users can purchase subscriptions and licenses for video games that can be played online, digital content, and virtual items related to games, and (2) features such as matchmaking, achievement tracking, game updates, and a library to store games. *Id.*

### B.   Every Steam User or Game Purchaser Agrees to the SSA.

#### 1.   *All Users Agree to the SSA When Creating a Steam Account.*

Steam is free to use, but all users are required to first create a Steam account. Boyd Decl. ¶ 3; *G.G.*, 2017 WL 1210220, at *1. As part of the account-creation process, the user is presented with the SSA, which is also publicly accessible at any time at https://store.steampowered.com/subscriber_agreement/. Boyd Decl. ¶ 3. At all times since at least January 1, 2017, the SSA was (and continues to be) easily accessible on the account-

MOTION TO COMPEL ARBITRATION
(2:21-CV-00563-JCC) - 2

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

123294342

creation screen either because the entire SSA was presented on the same account creation screen or through a hyperlink to the words "Steam Subscriber Agreement" in the sentence requiring acceptance. *Id.* ¶ 5. It is impossible to create a Steam account unless the user affirmatively accepts the SSA by clicking a checkbox or button to indicate agreement:



*Id.* ¶ 4, Ex. A; *see also G.G.*, 2017 WL 1210220, at *1 ("A Steam account cannot be created unless the subscriber accepts the SSA.").

MOTION TO COMPEL ARBITRATION
(2:21-CV-00563-JCC) - 3

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

123294342

2.  *All Purchasers Agree to the SSA Each Time They Purchase Games or Digital Content on Steam.*

Purchases may be made on Steam only through a Steam account, created as discussed above.  Boyd Decl. ¶ 6.  All persons who purchase video games must agree anew to the SSA to complete each purchase.  *Id.*, Ex. B; *see also G.G.*, 2017 WL 1210220, at *1.

Before Steam will allow a purchaser to complete any purchase of a video game— regardless of whether Valve or a third party developed and published the game—the purchaser must click a checkbox that states, "I agree to the terms of the Steam Subscriber Agreement." Boyd Decl. ¶ 6.  The SSA is hyperlinked to the words "Steam Subscriber Agreement" and is available with a single click.  *Id.*, Ex. B.  Purchasers cannot complete any purchase until they click the box to accept the SSA (*id.*) as shown here:



MOTION TO COMPEL ARBITRATION
(2:21-CV-00563-JCC) - 4

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

123294342

Boyd Decl., Ex. B at 3.

**C.     The SSA Requires Arbitration of All Disputes Between Steam Users and Valve.**

The SSA grants Steam users a license to use Steam and the content and services available on Steam.  Boyd Decl., Ex. E ("SSA") ¶¶ 1(B), 2(A); *G.G.*, 2017 WL 1210220, at *1.  But the granting of that license is conditioned upon Steam users' agreement to arbitrate all disputes.  The arbitration agreement is conspicuous, clear, and consumer-friendly, and every version of the SSA in effect during the proposed class period includes an arbitration provision and a notice of that provision in capital letters near the top of the first page.  *See* Boyd Decl., Exs. C–E.

The SSA's introductory paragraph directs Steam users to the arbitration provision: "SECTION 11 CONTAINS A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER.  IT AFFECTS HOW DISPUTES ARE RESOLVED.  PLEASE READ IT." SSA at 1.

Section 11 of the SSA is titled "DISPUTE RESOLUTION/BINDING ARBITRATION/CLASS ACTION WAIVER" and states in part, in capital letters:

> YOU AND VALVE AGREE TO RESOLVE ALL DISPUTES AND CLAIMS BETWEEN US IN INDIVIDUAL BINDING ARBITRATION. THAT INCLUDES, BUT IS NOT LIMITED TO, ANY CLAIMS ARISING OUT OF OR RELATING TO: (i) ANY ASPECT OF THE RELATIONSHIP BETWEEN US; (ii) THIS AGREEMENT; OR (iii) YOUR USE OF STEAM, YOUR ACCOUNT, HARDWARE OR THE CONTENT AND SERVICES. IT APPLIES REGARDLESS OF WHETHER SUCH CLAIMS ARE BASED IN CONTRACT, TORT, STATUTE, FRAUD, UNFAIR COMPETITION, MISREPRESENTATION OR ANY OTHER LEGAL THEORY, AND INCLUDES ALL CLAIMS BROUGHT ON BEHALF OF ANOTHER PARTY.

It also explains that the FAA applies to the arbitration provision, and provides that the "[t]he arbitration will be governed by the Consumer Arbitration Rules (or the Commercial Arbitration Rules, if the Consumer Arbitration rules are inapplicable) of the American

MOTION TO COMPEL ARBITRATION
(2:21-CV-00563-JCC) - 5

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

123294342

Arbitration Association ('AAA') as modified by this Agreement." SSA § 11. The SSA even hyperlinks to the AAA website for ease of access. *Id*.

Section 11 includes other consumer-friendly provisions and plain-language explanations of the parties' arbitration agreement, such as:

- Agreeing that arbitration may be conducted by phone, on documents, or in person in the county where the Steam subscriber lives or at another agreed location. *Id*.

- Agreeing that for claims seeking $10,000 or less, Valve will reimburse filing fees, pay a user's share of AAA's arbitration costs, and not seek its attorneys' fees or costs unless the arbitrator determines the claims are frivolous or filed for harassment. *Id*.

- Describing the differences between arbitration and court proceedings in plain English. *Id*.

- Explaining that Steam users and Valve are waiving their rights to a trial in court. *Id*. ("YOU UNDERSTAND THAT YOU AND VALVE ARE GIVING UP THE RIGHT TO SUE IN COURT AND TO HAVE A TRIAL BEFORE A JUDGE OR JURY.").

It also includes a conspicuous class action waiver and agreement to arbitrate claims individually:

> D. Individual Binding Arbitration Only
>
> YOU AND VALVE AGREE NOT TO BRING OR PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION, WHISTLE BLOWER ACTION, OR CLASS, COLLECTIVE, OR REPRESENTATIVE ARBITRATION, EVEN IF AAA's RULES WOULD OTHERWISE ALLOW ONE. THE ARBITRATOR MAY AWARD RELIEF ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT OF THAT PARTY'S INDIVIDUAL CLAIM. You and Valve also

MOTION TO COMPEL ARBITRATION
(2:21-CV-00563-JCC) - 6

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

123294342

> agree not to seek to combine any action or arbitration with any other action or arbitration without the consent of all parties to this Agreement and all other actions or arbitrations.
>
> This Agreement does not permit class, collective, or representative arbitration. A court has exclusive authority to rule on any assertion that it does.

*Id.*

### D. The Individual Plaintiffs Repeatedly Agreed to the SSA, Including Its Arbitration Agreement.

All of the Individual Plaintiffs allege that they purchased PC games through the Steam store. Dkt. #34 ("Consol. Compl.") ¶¶ 25–31. Two of the Individual Plaintiffs (Susann Davis and Hope Marchionda) claim to have purchased games on Steam for their minor children, who have their own Steam accounts. *Id.* ¶¶ 27, 30. Regardless of whether Plaintiffs Davis and Marchionda created their own Steam accounts, they were required to agree to the SSA each time they made a purchase on Steam. Boyd Decl. ¶ 6; *see also G.G.*, 2017 WL 1210220, at *1. The other Individual Plaintiffs do not claim to have purchased games on Steam for anyone other than themselves (Consol. Compl. ¶¶ 25–26, 28–29, 31), indicating they have (i) created their own Steam accounts and (ii) purchased games through Steam, as discussed above.

### E. Procedural Background and Plaintiffs' Allegations.

Ignoring their obligations in the SSA not only to arbitrate their disputes but to do so individually, Plaintiffs purport to bring this suit as a class action on behalf of a class defined as "[a]ll persons and entities who, directly or through an agent, purchased or sold a PC game on the Steam Store in the United States and its territories from January 28, 2017 through the present . . . ." Consol. Compl. ¶ 302. All eight Plaintiffs seek to represent that proposed class, but all except Wolfire Games, the game developer and publisher, agreed not to bring or participate in a class action. Plaintiffs alternatively suggest that the proposed class can be broken into proposed subclasses of "game purchasers," "non-subscriber game purchasers," and "game publishers." *Id.* ¶ 303.

MOTION TO COMPEL ARBITRATION
(2:21-CV-00563-JCC) - 7

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

123294342

Plaintiffs' Consolidated Complaint alleges eight causes of action against Valve, including three Sherman Act Section 2 claims alleging monopolization, three Sherman Act Section 2 claims alleging attempted monopolization, a Sherman Act Section 1 claim alleging unreasonable restraints of trade, and a claim alleging violation of the Washington Consumer Protection Act ("CPA").  In short, Plaintiffs claim that Valve's success in building a popular PC video game platform and its alleged efforts to give Steam users access to low prices make Valve a monopolist whose actions should be found illegal.

## III.    **ARGUMENT**

The arbitration agreement in the SSA was considered by this Court and the Ninth Circuit in *G.G. v. Valve* as recently as last year.  Both courts held it was enforceable, and both courts held it required arbitration of claims brought against Valve by Steam-user plaintiffs.  The Individual Plaintiffs here agreed to the SSA's arbitration agreement, just as the Steam-user plaintiffs did in *G.G. v. Valve*.  Their agreement to arbitrate is just as enforceable here as the Steam users' agreement was in *G.G. v. Valve*.  Accordingly, the Individual Plaintiffs should be compelled to individually arbitrate all claims, as agreed, and litigation of all claims should be stayed pending the outcome of arbitration, including those brought by Plaintiff Wolfire Games.

A. **The SSA's Arbitration Agreement Is Valid and Enforceable, and Requires Arbitration of the Individual Plaintiffs' Claims.**

1. *This Court and the Ninth Circuit Both Enforced the SSA's Arbitration Agreement to Require Arbitration of Claims Brought By Steam Users in Another Recent Putative Class Action.*

This Court is familiar with the SSA's arbitration agreement.  In *G.G. v. Valve*, a group of minors who were Steam users and their parents brought a proposed class action against Valve claiming it violated Washington gambling laws and the CPA through certain features and sales on Steam.  2017 WL 1210220, at *2.  In granting Valve's motion to compel arbitration, this Court held:

123294342

- "The SSA has a binding and conspicuous arbitration agreement in Section 11 . . . ." *Id.* at *1.

- The minor Steam users agreed to the SSA and its arbitration agreement when they created Steam accounts, then again every time they made purchases on Steam. *Id.* at *1–2.

- "Plaintiffs' procedural unconscionability argument is unpersuasive" because the arbitration agreement was conspicuous and each party had an opportunity to understand its terms. *Id.* at *3.

- That the arbitration agreement required the plaintiffs to pay the upfront costs of arbitration, subject to reimbursement, did not make it substantively unconscionable. *Id.*

- "The arbitration agreement with the minor Plaintiffs is valid." *Id.*

The parties then individually arbitrated their claims, as agreed, and Valve prevailed in the individual arbitrations. On Plaintiffs' appeal, the Ninth Circuit last year affirmed the order compelling arbitration of all claims brought by and on behalf of the Steam users who had agreed to the SSA, holding that "[t]he plaintiffs failed to show that the arbitration agreement itself is unenforceable based on waiver, equitable estoppel, or public-policy grounds." *G.G.*, 799 F. App'x at 558 (internal citations omitted).[2]

As the Ninth Circuit held, the SSA's arbitration agreement is valid and enforceable against Steam users and purchasers, all of whom have accepted it once or more. The Individual Plaintiffs fall within that group because they allege they "purchased PC Desktop Games through the Steam Store." Consol. Compl. ¶¶ 25–31. While two of the Individual Plaintiffs, Davis and Marchionda, assert without pleading any supporting facts that they have "not agreed to the Steam Subscriber Agreement," each admits that she "purchased PC Desktop Games through the Steam

---

[2] The Ninth Circuit vacated the portion of the Court's order compelling the parent plaintiffs to arbitrate their own individual claims because the parents—who neither had Steam accounts nor made any purchases on Steam—had not agreed to the SSA. *G.G.*, 799 F. App'x at 558.

MOTION TO COMPEL ARBITRATION
(2:21-CV-00563-JCC) - 9

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

123294342

Store for her minor child." *Id.* ¶¶ 27, 30. The Boyd Declaration proves that each time one purchases a game on Steam—no matter whom it is for—one must agree to the SSA. Boyd Decl. ¶ 6, Ex. B.

Thus, all of the Individual Plaintiffs agreed to and are bound by the SSA, including its arbitration agreement, and should be required to individually arbitrate their claims, as agreed.

    2.    <u>*Extensive Other Authority Supports Enforcement of the Individual Plaintiffs' Arbitration Agreement in the SSA.*</u>

Ninth Circuit authority and other decisions from this Court support the conclusion that the SSA's arbitration agreement is just as enforceable against the Individual Plaintiffs here as it was in *G.G.*, where this court recognized the strong federal policy favoring arbitration. *See* 2017 WL 1210220, at *2. The Ninth Circuit has embraced the strong public policy favoring arbitration by repeatedly enforcing arbitration agreements. *See, e.g.*, *Balan v. Tesla, Inc.*, 840 F. App'x 303, 305 (9th Cir. Mar. 22, 2021); *Mortensen v. Bresnan Commc'ns, LLC*, 722 F.3d 1151, 1159–60, 1162 (9th Cir. 2013); *Ferguson v. Corinthian Colls., Inc.*, 733 F.3d 928, 934, 938 (9th Cir. 2013); *Coneff v. AT&T Corp.*, 673 F.3d 1155, 1160–61 (9th Cir. 2012).

This Court has repeatedly enforced arbitration agreements in consumer contracts. *See, e.g.*, *In re Wyze Data Incident Litig.*, No. C20-0282-JCC, 2020 WL 6202724, at *4 (W.D. Wash. Oct. 22, 2020) (Coughenour, J.) (enforcing clickwrap arbitration agreement and compelling arbitration in putative consumer class action asserting state common law and privacy claims); *Ekin v. Amazon Servs., LLC*, 84 F. Supp. 3d 1172, 1174–75, 1178 (W.D. Wash. 2014) (Coughenour, J.) (compelling arbitration in a putative consumer class action and recognizing district court's limited discretion to disregard valid arbitration agreements under *AT&T Mobility* and Ninth Circuit law); *Coppock v. Citigroup, Inc.*, No. C11-1984-JCC, 2013 WL 1192632, at *1, 10 (W.D. Wash. Mar. 22, 2013) (Coughenour, J.) (enforcing arbitration agreement in putative consumer class action asserting TCPA and FDCPA claims).

MOTION TO COMPEL ARBITRATION
(2:21-CV-00563-JCC) - 10

123294342

This policy in favor of arbitration applies equally to the antitrust claims alleged here. *See Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1103, 1115 (C.D. Cal. 2002) (compelling arbitration of Sherman Act claims and explaining, "[t]he general policy in favor of arbitration applies equally to antitrust claims") (citations omitted); *accord Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 723 (9th Cir. 1999). The U.S. Supreme Court's decision in *American Express Co. v. Italian Colors Restaurant* leaves no doubt that an arbitration agreement with a class action waiver is just as enforceable in an antitrust case as in any other. 570 U.S. 228, 233–34 (2013).

As this Court recognized in *G.G.*, "[t]he FAA requires courts to compel arbitration if (1) a valid agreement to arbitrate exists, and (2) the dispute falls within the scope of that agreement." 2017 WL 1210220, at *2 (*citing Chiron Corp.*, 207 F.3d at 1130). The Ninth Circuit's holding in *G.G.* that a valid arbitration agreement exists between Valve and Steam users satisfies the first requirement for enforcement. Whether this dispute falls within the scope of the SSA's arbitration agreement (the second requirement) is a question of arbitrability delegated to the arbitrator by the incorporation of the AAA Consumer and Commercial Arbitration Rules into the SSA's arbitration agreement, as the Ninth Circuit also held in *G.G. See* 799 F. App'x at 558 (Steam users "clearly and unmistakably agreed to arbitrate questions of arbitrability because the arbitration agreement incorporates AAA rules"); *see also In re Wyze Data Incident Litig.*, 2020 WL 6202724, at *3 (incorporation of AAA rules delegates issues of arbitrability to arbitrator).

When, as here, an arbitration provision satisfies these conditions, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration . . . ." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original); *see also G.G.*, 2017 WL 1210220, at *2 (same). Accordingly, the Court should compel individual arbitration of the Individual Plaintiffs' claims.

MOTION TO COMPEL ARBITRATION
(2:21-CV-00563-JCC) - 11

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

123294342

**B.**     **All Claims Should Be Stayed Pending Arbitration.**

> **1.**     *The Individual Plaintiffs' Claims Should Be Stayed.*

Section 3 of the FAA "requires courts to stay litigation of arbitral claims pending arbitration of those claims in accordance with the terms of the agreement . . . ." *AT&T Mobility*, 563 U.S. at 344 (internal quotations omitted); *see also G.G.*, 2017 WL 1210220, at \*5 (staying case pending arbitration); *Coppock*, 2013 WL 1192632, at \*10 (same).  Accordingly, the Court should stay the Individual Plaintiffs' claims against Valve pending arbitration.

> **2.**     *Wolfire Games' Claims Should Be Stayed Pending Arbitration.*

The Court should also stay all proceedings on Wolfire Games' claims while the Individual Plaintiffs arbitrate their identical claims.  All Plaintiffs pled the same claims and damages based on the same facts, and all Plaintiffs seek to represent the same class.  Allowing Wolfire Games to proceed with its claims in this Court while the Individual Plaintiffs arbitrate their claims in parallel proceedings would be wasteful and risk conflicting decisions.  To eliminate those inefficiencies and risks, and to vindicate the strong policy favoring arbitration, the Court should stay Wolfire Games' claims pending completion of the arbitrations of the Individual Plaintiffs' claims.

This Court's inherent authority to manage its docket includes broad discretion to stay litigation of Wolfire Games' claims pending arbitration of the Individual Plaintiffs' claims. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983) ("In some cases, of course, it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration.  That decision is one left to the district court (or to the state trial court under applicable state procedural rules) as a matter of its discretion to control its docket.").

Courts routinely exercise their discretion to stay non-arbitrable claims that arise out of the same facts as claims in arbitration or are otherwise intertwined with such claims.  As Judge Martinez explained:

MOTION TO COMPEL ARBITRATION
(2:21-CV-00563-JCC) - 12

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

123294342

In accordance with the FAA policy of staying any litigation that contravenes enforceable arbitration agreements, "if a suit against a nonsignatory is based upon the same operative facts and is inherently inseparable from the claims against a signatory, the trial court has discretion to grant a stay if the suit would undermine the arbitration proceedings and thwart the federal policy in favor of arbitration."

*T-Mobile USA, Inc. v. Montijo*, No. C12-1317-RSM, 2012 WL 6194204, at *6 (W.D. Wash. Dec. 11, 2012) (staying claims of non-signatory to arbitration agreement pending outcome of arbitration because of overlapping issues and for considerations of judicial economy and efficiency) (citation omitted); *see also Sunlight Prod. Techs. v. MPOWERD*, No. CV-15-126-MWF, 2015 WL 12655479, at *6 (C.D. Cal. Sept. 17, 2015) (staying non-arbitrable claims where "the various claims asserted in both the arbitration and present litigation rely on the same set of core facts"); *Bates v. Morgan Stanley Smith Barney LLC*, No. CIV.S-09-3049-FCD/GGH, 2010 WL 3341819, at *6 (E.D. Cal. Aug. 25, 2010) (judicial economy supported stay of non-arbitrable claims where the outcome of the arbitration could "well impact those claims in this action" and "[a]llowing the two matters to proceed concurrently would unnecessarily risk inconsistent judgments and defeat efficiency"); *Bischoff*, 180 F. Supp. 2d at 1115 (staying non-arbitrable claims in putative antitrust class action given the "similarity of the issues of law and fact" and the "potential for inconsistent findings absent a stay").

This case is precisely the situation in which the Court should exercise its discretion to stay Wolfire Games' claims to promote the purposes of the FAA, further judicial economy, and avoid the risk of inconsistent judgments.  Specifically:

- Wolfire Games' claims rest on the same alleged facts and legal arguments as the claims of the seven Individual Plaintiffs.

- All eight Plaintiffs assert identical antitrust causes of action alleging that Valve violated Sherman Act Sections 1 and 2, as well as the CPA.  Consol. Compl. ¶¶ 317–92.

MOTION TO COMPEL ARBITRATION
(2:21-CV-00563-JCC) - 13

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

123294342

- All Plaintiffs allege that Valve uses the same techniques to restrain trade, control prices, and exclude competition. *See, e.g.*, *id.* ¶¶ 312, 379, 382, 389; *see also id.* ¶ 307 (alleging "Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Valve").

- All Plaintiffs seek to represent the same putative class of persons and entities who "purchased or sold a PC game on the Steam Store." *Id.* ¶ 302. Plaintiffs suggest for the first time in the Consolidated Complaint that, in the alternative, the single class they pled could be broken into three subclasses (*id.* ¶ 303). But the claims in the Consolidated Complaint are all based on the same facts and liability theories, for all plaintiffs and putative class and subclass members.

- Plaintiffs allege they are similarly situated to each other and the putative class with respect to important questions of law and fact, such as the definition of the relevant market and Valve's power and conduct within that market. *Id.* ¶ 312.

Arbitrators hearing the Individual Plaintiffs' claims will consider and decide *all* of the underlying questions of liability and damages that Plaintiffs allege are common to the putative class as a whole, including those questions allegedly common to Wolfire Games and the Individual Plaintiffs. *See In re Samsung Galaxy Smartphone Mktg. & Sales Practices Litig.*, 298 F. Supp. 3d 1285, 1304 (N.D. Cal. 2018) ("A stay of all claims is particularly warranted in the class-action context because the complaint admits that common questions of fact and law predominate."); *Morales v. Lexxiom, Inc.*, No. CV-09-6549-SVW-DTBx, 2010 WL 11507515, at *10–11 (C.D. Cal. Jan. 29, 2010) (staying non-arbitrable claims pending arbitration; "Plaintiffs are hoisted by their own petard: because they seek a class action, their First Amended Complaint contains nearly two pages explaining that common issues are predominant in this litigation").

Moreover, all Plaintiffs seek injunctive relief requiring Valve to make substantial changes to its business practices, heightening the risk that each proceeding will impose different standards of conduct on Valve—specifically, (i) the arbitration as to the Individual Plaintiffs

MOTION TO COMPEL ARBITRATION
(2:21-CV-00563-JCC) - 14

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

123294342

(because the SSA permits arbitrators to order injunctive relief only in favor of the party arbitrating and only to the extent of that party's individual claim (SSA § 11)), and (ii) the court proceeding as to "the class and the public," if Wolfire Games should succeed (Consol. Compl., Prayer for Relief ¶ (a)).  *See In re DirecTV Early Cancellation Fee Mktg. & Sales Practices Litig.*, No. MDL 09-2093-AG-ANx, 2010 WL 11469932, at *2 (C.D. Cal. Nov. 15, 2010) (noting heightened risk of inconsistent determinations if injunctive relief claims proceeded pending arbitration); *see also* Consol. Compl. ¶ 313 (alleging that "the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant").

Importantly, Valve would be substantially prejudiced by going forward simultaneously in arbitrations and in court, but Wolfire Games would be prejudiced, if at all, to a far lesser degree by a stay of its claims while identical claims are being arbitrated.  "When considering whether to stay an action, the Court must weigh 'the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay.'" *Babare v. Sigue Corp.*, No. C20-0894-JCC, 2020 WL 8617424, at *1 (W.D. Wash. Sept. 30, 2020) (quoting *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962)).  Wolfire Games does not allege any ongoing harm and "a delay in collecting potential damages is not a particularly severe hardship." *Id.* at *2.  In contrast, requiring Valve to go forward simultaneously in both arbitration and in court would cause significant hardship by creating significant duplication of work—and thereby multiplying costs and business distraction—as well as creating a significant risk of inconsistent results, as discussed above.  A stay of all claims, including those asserted by Wolfire Games, is warranted on these facts.  *See, e.g.*, *Naini v. King Co. Pub. Hosp. Dist. No. 2*, No. C19-0886-JCC, 2020 WL 468910, at *2–3 (W.D. Wash. Jan. 29, 2020) (applying *CMAX* factors and staying litigation pending completion of hospital hearing process when factual issues likely to arise in litigation

MOTION TO COMPEL ARBITRATION
(2:21-CV-00563-JCC) - 15

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

123294342

"will also be discussed and debated" during hearing process, even though defendants were unlikely to suffer hardship without a stay and plaintiff claimed prejudice from delay in completing hearing process and recovering damages).

Judge Burgess stayed litigation of non-arbitrable claims under similar circumstances in *Ballard v. Corinthian Colleges, Inc.*, No. C06-5256-FDB, 2006 WL 2380668 (W.D. Wash. Aug. 16, 2006), where a group of students sued a for-profit college. Several students had signed enrollment agreements containing an arbitration clause, while others had not. *Id.* at *1. The court enforced the arbitration agreements against students who signed them (*id.*), and held the claims of the non-signatory students should be stayed pending those arbitrations because those claims depended on the same facts and were inherently inseparable from the arbitrable claims:

> [T]he claims asserted in the complaint are brought by Plaintiffs jointly and are grounded in identical facts and legal theories. Simultaneous prosecution of the claims in arbitration and this litigation would clearly be a waste of judicial resources. In addition, given the interdependence of the claims, simultaneous litigation of such claims in separate forums would likely lead to a duplication of effort, as well as the risk of inconsistent decisions and inefficiencies. Although Plaintiffs briefly assert that there is no appropriate reason to stay these proceedings, the Court is convinced otherwise. Further, the Court finds imposition of a stay will present no significant [pre]judice to Plaintiffs.

*Id.* at *2.

This Court reached a similar conclusion in *Boeing Co. v. Agricultural Insurance Co.*, No. C05-021C, 2005 WL 2276770 (W.D. Wash. Sept. 29, 2005), and stayed claims brought by non-signatories to an arbitration agreement. *Id.* at *5–7. As this Court stated, "the Court's primary concern is to avoid proceeding in a way that renders the arbitration between Boeing and Federal 'redundant and meaningless; in effect, thwarting the federal policy in favor of arbitration.'" *Id.* at *5 (quoting *Harvey v. Joyce*, 199 F.3d 790, 796 (5th Cir. 2000)). Because the facts and issues overlapped between the arbitrable claims and those not subject to arbitration, and to avoid the result of "the Court first compelling arbitration of a dispute, and then adjudicating that same

MOTION TO COMPEL ARBITRATION
(2:21-CV-00563-JCC) - 16

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

123294342

dispute," this Court stayed the non-arbitrated claims to promote the "same interests" as compelling arbitration. *Id.* at \*6.

The same reasoning and analysis apply equally here to claims brought by Wolfire Games. Accordingly, the Court should exercise its discretion to stay the claims of Wolfire Games in order to promote judicial efficiency, avoid the risk of inconsistent judgments, and avoid rendering the arbitrations between Valve and the Individual Plaintiffs "redundant and meaningless . . . [thus] thwarting the federal policy in favor of arbitration." *Id*. at \*5 (quoting *Harvey*, 199 F.3d at 795).

## IV.   CONCLUSION

For the foregoing reasons, Valve respectfully requests that the Court (1) compel the Individual Plaintiffs to arbitrate their claims against Valve individually, and (2) stay all claims of all Plaintiffs, including Plaintiff Wolfire Games, pending the outcome of arbitration of the Individual Plaintiffs' claims.

MOTION TO COMPEL ARBITRATION
(2:21-CV-00563-JCC) - 17

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

123294342

DATED this 23rd day of June, 2021.

FOX ROTHSCHILD LLP


*s/ Gavin W. Skok*
Gavin W. Skok, WSBA #29766
Laura P. Hansen, WSBA #48669
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
Telephone: 206.624.3600
Facsimile: 206.389.1708
E-mail: gskok@foxrothschild.com
lhansen@foxrothschild.com


MONTGOMERY McCRACKEN WALKER &
RHOADS LLP


*s/ Charles B. Casper*
Charles B. Casper, *admitted pro hac vice*
1735 Market Street, 21st Floor
Philadelphia, PA 19103
Telephone: 215.772.1500
Email: ccasper@mmwr.com


FOX ROTHSCHILD LLP


*s/ Kristen W. Broz*
Kristen W. Broz, *admitted pro hac vice*
2020 K Street, N.W., Suite 500
Washington, DC 20006
Telephone: 202.431.3100
E-mail: kbroz@foxrothschild.com

*Attorneys for Defendant*

MOTION TO COMPEL ARBITRATION
(2:21-CV-00563-JCC) - 18

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

123294342

**CERTIFICATE OF SERVICE**

I certify that I am a secretary at the law firm of Fox Rothschild LLP in Seattle, Washington. I am a U.S. citizen over the age of eighteen years and not a party to the within cause. On the date shown below, I caused to be served a true and correct copy of the foregoing on counsel of record for all other parties to this action as indicated below:

| **Service List** | |
|---|---|
| Alicia Cobb<br>QUINN EMANUEL URQUHART & SULLIVAN LLP<br>1109 First Avenue, Suite 210<br>Seattle, WA 98101<br>Ph. 206-905-7000<br>Fax 206-905-7100<br>Email: aliciacobb@quinnemanuel.com<br><br>A. Owen Glist<br>Ankur Kapoor<br>Jeffrey I. Shinder<br>CONSTANTINE CANNON LLP<br>335 Madison Ave., 9th Floor<br>New York, NY 10017<br>Ph. 212-350-2776<br>Fax 212-350-2701<br>Email: oglist@constantinecannon.com<br>akapoor@constantinecannon.com<br>jshinder@constantinecannon.com<br><br>Adam Wolfson<br>QUINN EMANUEL URQUHART & SULLIVAN LLP<br>865 S. Figueroa St., 10th Floor<br>Los Angeles, CA 90017<br>Ph. 213-443-3000<br>Email: adamwolfson@quinnemanuel.com<br><br>Charles Stevens<br>QUINN EMANUEL URQUHART & SULLIVAN LLP<br>50 California St., 22nd Floor<br>San Francisco, CA 94111<br>Ph. 415-875-6600<br>Email: charliestevens@quinnemanuel.com | ☐ Via US Mail<br>☐ Via Messenger<br>☒ Via CM/ECF / Email<br>☐ Via over-night delivery |

MOTION TO COMPEL ARBITRATION
(2:21-CV-00563-JCC) - 19

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

123294342

David Golden
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave., 22nd Floor
Washington, DC 20004
Ph. 202-204-4527
Email: dgolden@constantinecannon.com

David Du LeRay
Steig David Olson
Shane Seppinni
QUINN EMANUEL URQYHART & SULLIVAN
51 Madison Ave., 22nd Floor
New York, NY 10010
Ph. 212-849-7630
Email: davidleray@quinnemanuel.com
steigolson@quinnemanuel.com
shaneseppinni@quinnemanuel.com

Kenneth J. Rubin
Timothy B. McGranor
Kara M. Mundy
VORYS SATER SEYMOUR & PEASE
52 E. Gay St.
PO Box 1008
Columbus, OH 43215
Ph. 614-464-6400
Email: kjrubin@vorys.com
tbmcgranor@vorys.com
kmmundy@vorys.com

*Attorneys for Plaintiffs*

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

EXECUTED this 23rd day of June, 2021, in Seattle, Washington.

_____
Courtney R. Brooks

MOTION TO COMPEL ARBITRATION
(2:21-CV-00563-JCC) - 20

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

123294342

# EXHIBIT 6

AMERICAN ARBITRATION ASSOCIATION | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

# AMERICAN ARBITRATION ASSOCIATION

# DEMAND FOR ARBITRATION CONSUMER ARBITRATION RULES

1.Which party is sending in the filing documents?

Consumer ☑   Business ☐

2. Briefly explain the dispute:

This dispute arises from Valve Corporation's ("Valve") anticompetitive conduct whereby current and former subscribers to Valve's on-line gaming platform, Steam, including Claimant, paid supracompetitive prices for the on-line video games and downloadable content ("DCL) they purchased to use on Valve's on-line gaming platform, Steam. Valve's anticompetitive conduct includes, *inter alia*, Valve's use of a Platform Most Favored Nations ("PMFN) provision in its agreements with game developers and publishers which, due to Valve's market power, stifled and harmed competition in the on-line PC game distribution market. The PMFN prevented game developers and publishers from selling their games on other on-line gaming sites with lower costs and/or sales commissions for lower prices than they sold their games on the Steam platform. Valve was therefore able to charge and maintain its supracompetitive 30% commission on each Steam enabled game sold, forcing game publishers to charge consumers, including Claimant, more for their Steam enabled games and DLC than they otherwise would have in a competitive market.

Claimant contends that Valve is liable to Claimant for Illegal Monopoly Maintenance in Violation of 15 U.S.C. § 2, Illegal Attempted Monopolization in Violation of 15 U.S.C. § 2, Anticompetitive Course of Conduct in Violation of 15 U.S.C. § 1 and violation or related state laws.

Claimant seeks damages, including, but are not limited to, the recovery of overcharges which are subject to trebling, prejudgment interest, costs and attorney fees. See 15 U.S.C. § 15(a).

3. Specify the amount of money in dispute, if any: $595.42

4. State any other relief you are seeking:

- Attorney Fees
- Interest
- Arbitration Costs
- Other: Trebled damages, Prejudgment Interest, Costs and Attorneys' Fees.

5. Identify the requested city and state for the hearing if an in-person hearing is held:

City: Columbus State: OH

6. Please provide contact information for both the Consumer and the Business. Attach additional sheets or forms as needed.

**Consumer:**

Name: Jason Irias
Address: 160 N Elizabeth St,
City: Chicago
State: IL
Zip Code: 60607
Telephone: +13125325579
Email: jasonirias062@gmail.com

**Consumer's Representative (if known):**

Name: Gary E. Mason
Firm: Mason LLP
Address: 5335 Wisconsin Avenue, N.W., Suite 640
City: Washington
State: DC
Zip Code: 20015-2052
Telephone: (202) 429-2290
Fax: 202-429-2294
Email: gmason@masonllp.com

Name: Kenneth J. Rubin
Firm: Vorys, Sater, Seymour and Pease LLP.
Address: 52 East Gay Street
City: Columbus
State: OH
Zip Code: 43215
Telephone: (614)-464-5692
Fax:
Email: kjrubin@vorys.com

**Business:**

Name: Valve Corporation
Address: Valve Corporation, P.O. Box 1688
City: Bellevue,
State: WA
Zip Code: 98004
Telephone:
Fax:
Email:

**Business' Representative (if known):**

Name: Charles Casper
Firm: Montgomery McCracken
Address: 1735 Market Street
City: Philadelphia
State: PA
Zip Code: 19103
Telephone: 215-772-1500
Fax: 215-772-7620
Email: ccasper@mmwr.com

Date: 10/31/2023

**7. Send a copy of this completed form to the AAA together with:**

- A clear, legible copy of the contract containing the parties' agreement to arbitrate disputes;
- The proper filing fee (filing fee information can be found in the Costs of Arbitration section of the Consumer Arbitration Rules); and
- A copy of the court order, if arbitration is court-ordered.

**8. Send a copy of the completed form and any attachments to all parties and retain a copy of the form for your records.**

To file by mail, send the initial filing documents and the filing fee to: AAA Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043.

To file online, visit www.adr.org and click on **File or Access Your Case** and follow directions. To avoid the creation of duplicate filings, the AAA requests that the filing documents and payment be submitted together. When filing electronically, no hard copies are required.

Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit a completed Affidavit for Waiver of Fees, available on our website.

Pursuant to New Jersey Statues $ 2A:23B-I et seq. consumers with a gross monthly income of less than 300%

of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the New Jersey Arbitration Act, and to all consumer arbitrations conducted in New Jersey. If you believe that you meet these requirements, you must submit a completed Affidavit for Waiver of Fees, available on our website.

American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043 https://www.adr.org | AAA Customer Service 1-800-778-7879

# EXHIBIT 7

THE HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE VALVE ANTITRUST LITIGATION

No. 2:21-cv-00563- JNW

**VALVE CORPORATION'S STATUS REPORT RE ORDER (DKT. 66)**

Defendant Valve Corporation ("Valve") respectfully submits this status report regarding developments related to the Court's October 25, 2021 Order, which compelled arbitration under the arbitration agreement in a prior Steam Subscriber Agreement ("SSA") as to individual plaintiffs Sean Colvin, Susann Davis, Daniel Escobar, William Herbert, Ryan Lally, Hope Marchionda and Everett Stephens ("Consumer Plaintiffs"). (Dkt. No. 66.) That Order granted Valve's motion to compel arbitration as to the Consumer Plaintiffs but held that "any objections with respect to the existence, scope or validity of the arbitration agreement" were reserved for arbitrators. (Dkt. No. 66 at 3.) The Court stayed the Consumer Plaintiffs' claims pending arbitration. (*Id.* at 5.)

VALVE CORPORATION'S STATUS REPORT RE ORDER (DKT. 66)
CASE NO. 2:21-cv-00563-JNW – 1

On July 8, 2024, an arbitrator ruled that the arbitration agreement in the prior SSA was unenforceable and dismissed arbitrations brought against Valve by John Elliott and three other individuals represented by Bucher Law PLLC ("Bucher Law").[1] This arbitrator was the first and only arbitrator to squarely address the overall enforceability of the arbitration agreement in that SSA. Valve has not challenged those rulings of unenforceability and does not plan to do so.

On August 9, 2024, Bucher Law and Hagens Berman Sobol Shapiro LLP filed a putative class action in this Court captioned *Elliott v. Valve Corporation*, No. 2:24-cv-01218-JNW, naming John Elliott and the three other individuals as plaintiffs and proposed class representatives.[2] The *Elliott* complaint was marked as related to this action, is pending before this Court, and asserts claims that overlap with the claims the Consumer Plaintiffs asserted in this action in 2021. *Compare* Complaint ¶¶ 184-252, *Elliott v. Valve Corporation*, No. 2:24-cv-01218 (W.D. Wash. filed Aug. 9, 2024), *with* Dkt. No. 34 ¶¶ 317-392. The plaintiffs in *Elliott* allege that they "won binding decisions from arbitrators rendering Valve's arbitration provision unenforceable" and assert claims on behalf of a putative nationwide class of persons who bought games, or made in-game purchases, on Steam. (*Id.* ¶¶ 13, 167.) The *Elliott* putative class overlaps with the class the Consumer Plaintiffs sought in this case. *Compare* Complaint ¶ 167, *Elliott v. Valve Corporation*, No. 2:24-cv-01218 (W.D. Wash. filed Aug. 9, 2024), *with* Dkt. No. 34 ¶ 302.

---

[1]   Only one of the Consumer Plaintiffs in this case filed an arbitration demand against Valve, but the American Arbitration Association has not yet assigned that case to an arbitrator.

[2]   Valve was served with the *Elliott* complaint on August 23, 2024.

VALVE CORPORATION'S STATUS REPORT RE ORDER (DKT. 66)
CASE NO. 2:21-cv-00563-JNW – 2

In light of the arbitrator's rulings that the arbitration agreement in the prior SSA is unenforceable, on September 26, 2024, Valve updated the SSA to remove the arbitration agreement and class action waiver. (*See* Ex. A.) The current SSA now provides:

> All disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction. You and Valve hereby consent to the exclusive jurisdiction of such courts and waive any objections as to personal jurisdiction or venue in such courts.

DATED this 27th day of September 2024.

*s/ Blake Marks-Dias*
Blake Marks-Dias, WSBA No. 28169
Eric A. Lindberg, WSBA No. 43593
CORR CRONIN LLP
1015 Second Avenue, Floor
10 Seattle, WA 98104
(206) 625-8600 Phone
(206) 625-0900 Fax
bmarksdias@corrcronin.com
elindberg@corrcronin.com

Kristen Ward Broz (*pro hac vice*)
FOX ROTHSCHILD LLP
2020 K. St. NW, Ste. 500
Washington, DC 20006
Telephone (202) 794-
1220 Fax (202) 461-3102
kbroz@foxrothschild.com

Nathan M. Buchter *(pro hac vice)*
FOX ROTHSCHILD LLP
2000 Market Street STE 20TH FL
Philadelphia, PA 19103
Telephone (215) 299-3010
nbuchter@foxrothschild.com

VALVE CORPORATION'S STATUS REPORT RE ORDER (DKT. 66)
CASE NO. 2:21-cv-00563-JNW – 3

Charles B. Casper (*pro hac vice*)
Peter Breslauer (*pro hac vice*)
Robert E. Day (*pro hac vice*)
Jessica Rizzo (*pro hac vice*)
MONTGOMERY McCRACKEN WALKER
& RHOADS LLP
1735 Market Street, 21st Floor
Philadelphia, PA 19103
Telephone (215) 772-1500
ccasper@mmwr.com
pbreslauer@mmwr.com
rday@mmwr.com
jrizzo@mmwr.com

*Attorneys for Defendant Valve Corporation*

VALVE CORPORATION'S STATUS REPORT RE ORDER (DKT. 66)
CASE NO. 2:21-cv-00563-JNW – 4

# EXHIBIT 8

AMERICAN ARBITRATION ASSOCIATION

CONSUMER RULES AND MASS ARBITRATION SUPPLEMENTARY RULES

| John Elliott | CASE NO. 01-23-0005-2849 |
|---|---|
| v. | JURISDICTIONAL AWARD |
| Valve Corporation | |

On December 21, 2021, a class action complaint was filed in the United States District Court for the Western District of Washington alleging that Respondent Valve Corporation violated the antitrust laws causing injury to the purchasers of video games offered for sale on Respondent's online platform. Claimant John Elliott was a putative member of the class. After denying a motion to dismiss an amended class action complaint on May 6, 2022, the District Court granted in part Respondent's motion to compel arbitration. The Court found an arbitration clause to exist and, therefore, compelled arbitration of all consumer disputes. However, the court ruled that that any claims of unconscionability in connection with the arbitration agreement must be determined by the arbitrator due to a broad delegation clause in the AAA rules incorporated into the parties' arbitration agreement.

Pursuant to the First Scheduling Order and Order on Preliminary Hearing, the parties submitted cross motions to dismiss this action. As neither party requested oral argument on the motions, these motions have been decided on the written submissions. Accordingly, I, Jeffrey H Dasteel, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties, and having been duly sworn, and having fully reviewed and considered the written documents submitted to me by the parties, do hereby AWARD as follows:

JURISDICTIONAL AWARD - 1

**Claimant's Motion to Dismiss the Arbitration for Lack of Jurisdiction**

Claimant contends the arbitration agreement in the Respondent's online Steam Subscriber Agreement (SSA) is invalid because he did not receive proper notice of the requirement to arbitrate disputes and the arbitration agreement's bar to collective or representative actions violates the so-called *McGill* rule.

Respondent opposes Claimant's motion. Respondent contends the arbitration agreement is valid and has been declared to be valid by federal courts. Respondent also contends the *McGill* rule does not apply to this case because the choice of law provision in the SSA restricts claims to Washington state law. In addition, Respondent contends the *McGill* rule nonetheless would not apply because Claimant seeks private rather than public injunctive relief. Finally, Respondent contends that even if the *McGill* rule makes a request for public injunctive relief unenforceable, such a finding would not invalidate the entire arbitration agreement.

**The Scope of the Arbitrator's Jurisdiction to Determine Jurisdiction**

As noted by the District Court in its Order compelling arbitration, "[i]n a motion to compel arbitration, the Court determines '(1) whether a valid agreement to arbitrate exists and, if so, (2) whether the agreement encompasses the dispute at issue.'" *Wolfire Games, LLC v. Valve Corp., D.C. WD Was. Case No. C21-0563-JCC (Oct. 25, 2021), slip op. at 2 (internal citation omitted).* Here, the District Court determined that an arbitration agreement exists in the SSA. Accordingly, all consumer plaintiffs in the putative class action were ordered to arbitrate their claims. *Id. at 3.*

However, as a part of the Order compelling arbitration, the District Court ordered the parties to arbitrate any claims of unconscionability of the arbitration agreement because the arbitration agreement allocated to the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration

JURISDICTIONAL AWARD - 2

agreement." *Id.* Although Claimant has not raised claims of unconscionability, he has challenged the validity of the arbitration agreement. Neither ground raised by Claimant here were before the District Court. Because the District Court's order finding an arbitration agreement exists also allocates to the arbitrator jurisdiction to determine validity of the arbitration agreement, the District Court's order compelling arbitration allocates jurisdiction to the arbitrator to determine Claimant's jurisdictional claims. Accordingly, I find that both Claimant's challenges fall within the scope of my jurisdiction to determine the validity or existence of the arbitration agreement.

**Claimant's Challenge to Notice of the Terms and Conditions of the Arbitration Agreement**

Claimant contends he did not receive proper notice of the terms and conditions of the arbitration agreement. For the reasons set forth below, I agree.

***Legal Standard***

In *Berman v. Freedom Financial Network, LLC*, 30 F4th 849 (9th Cir. 2022), the court "revisit[ed] an issue first addressed by our court in *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171 (9th Cir. 2014): Under what circumstances can the use of a website bind a consumer to a set of hyperlinked 'terms and conditions' that the consumer never saw or read?"[1] *Berman* at 849. Under 9th Circuit law, "*[u]nless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract [for a clickwrap style agreement] will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action,*

---

[1] Claimant suggests the arbitrator can decide the validity or existence of an arbitration agreement based on a standard different from the standard set forth by the courts. Claimant suggests the arbitrator adopt the standard suggested in *Jeffrey H. Dasteel, Consumer Click Arbitration: A Review of Online Consumer Arbitration Agreements, 9 ARB. L. REV. 1 (2017)*. Regardless of the arbitrator's personal views about what the proper inquiry notice standard should be, the arbitrator is bound to follow existing law.

JURISDICTIONAL AWARD - 3

*such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms."* Id. at 856.

Further, *"[w]ebsite users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print. Because 'online providers have complete control over the design of their websites, the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers.'"* Id. at 857 (internal citations omitted). In addition, *"the notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement."* Id. at 858.

Finally, when applying the *Berman* standard, the arbitrator must consider both the full context of the transaction as well as the placement and appearance of the terms and conditions notice. *Keebaugh v. Warner Bros. Entertainment, Inc.*, 22-55982 (9th Cir. Apr 26, 2024), slip op. at 15-16. Here, the arbitrator must consider Claimant's history of transactions with Respondent and the modification of the terms and conditions over time to determine whether the text and placement of the website terms and conditions hyperlink properly put Claimant on inquiry notice as required by law.

**Notice to Claimant Elliott of the Arbitration Agreement**

It is uncontroverted that Claimant first entered into an SSA with Respondent beginning in 2003. (*Elliott Affidavit*.) It also is uncontroverted that at the time Claimant entered into his first SSA, there was no arbitration provision in the agreement. (*Cf. Ex. L (SSA from 2008 without an arbitration agreement).)* As of 2011, the SSA terms and conditions still did not include an arbitration agreement. (*See Ex. M.)* The arbitration agreement first appeared in the SSA in 2012. (*See Ex. N.)*

JURISDICTIONAL AWARD - 4

Respondent relies on the hyperlink method of notice to bind consumers to the terms of the arbitration agreement included in the terms and conditions. According to the Boyd Declaration, Respondent has used essentially the same method for consumers to create user accounts since 2017. Pursuant to that method, before the user can create an account or make any online purchases, the user must check a box and "agree to the terms and conditions of the Steam Subscriber Agreement." (*See Exhibits to Boyd Declaration.*) A user can view the terms and conditions if the user clicks on the "Steam Subscriber Agreement" hyperlink.[2] In the web pages supplied by both Claimant and Respondent, the hyperlink is set off in bright white type in comparison to the remainder of the sentence, which is in dull grey type. In one edition, the hyperlink is underlined. If a user clicks on the hyperlink, the first page of the terms and conditions includes in all capital letters the phrase "*SECTION 11 CONTAINS A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER. IT MAY AFFECT Y OUR LEGAL RIGHTS. PLEASE READ IT. IF YOU ARE A CUSTOMER WITH RESIDENCE IN THE EUROPEAN UNION, SECTION 11 DOES NOT APPLY TO YOU.*" (See, e.g., copies of SSA annexed to the Boyd Declaration.)

Respondent has provided no evidence that Claimant Elliott had actual knowledge of the arbitration agreement in the terms and conditions. It appears to be uncontroverted that at some time after 2012 when Respondent first inserted an arbitration agreement into the terms and conditions, Claimant Elliott clicked the box to acknowledge agreement to the terms and conditions. However, Claimant Elliott contends that clicking on the acknowledgment box is not valid as to

---

[2] Claimant notes that in the UK version of the SSA, Respondent has provided a version of the terms and conditions that requires users to scroll through the terms of conditions before affirming consent. Courts have routinely found this form of notice to be enforceable. *Berman at 856*. Respondent's choice to use a hyperlink notice for its US website creates the risk that its manifestation of this form of notice may be determined to be insufficient under the circumstances of a specific case based on the history of transactions with the consumer.

JURISDICTIONAL AWARD - 5

him because at the time he first agreed to the SSA there was no arbitration agreement and there was no conspicuous notice that Respondent subsequently had changed its terms and conditions to include an arbitration agreement.

Although the web pages provided to the arbitrator reflect the subscriber agreement was "last updated August 28, 2020," the sign-up and purchase web pages do not indicate which parts of the SSA were modified or that the subscribers from 2011 and earlier should be aware that a mandatory arbitration agreement had been added to the terms and conditions.  Respondent, which had complete control over the content of its own website, failed to provide evidence that it at any time had posted on the subscriber website a conspicuous notice of a fundamental change to the user's legal rights. Based on the foregoing, I find that by merely indicating a "last updated" date for its terms and conditions Respondent provided Claimant with no reason to know that Respondent had fundamentally changed the dispute resolution procedures to which Claimant originally agreed.  Accordingly, I find that Respondent failed to provide Claimant with the conspicuous notice required to put Claimant on inquiry notice of the material change in terms and conditions.

**Claimant's Motion to Dismiss under the _McGill_ Rule**

In addition to lack of sufficient notice, Claimant contends the arbitration agreement is invalid because it contravenes the _McGill_ rule.  The arbitration agreement in the SSA prohibits Claimant from seeking or obtaining relief that is not individual to Claimant.  It is uncontroverted that this bar precludes Claimant from seeking public injunctive relief.  "_In California, contractual provisions waiving the right to seek public injunctive relief in any forum are unenforceable. (citation omitted). We have held that this McGill rule does not violate the FAA._" Keebaugh v. Warner Bros. Entm't, Case No. 22-55982 (9th Cir. Apr 26, 2024), slip op. at 29.

JURISDICTIONAL AWARD - 6

Respondent opposes Claimant's motion on three grounds. First, citing *Keebaugh,* Respondent contends that even if Claimant's claim falls under the *McGill* rule, that does not invalidate the entire arbitration agreement. In *Keebaugh,* the court noted that even if the anti-public injunction clause in the arbitration agreement is unenforceable, that does not make the remainder of the arbitration agreement unconscionable.

Respondent's argument misses the point. Claimant does not seek to avoid the arbitration agreement based on unconscionability. Instead, Claimant seeks to avoid arbitration based on the clause in the arbitration agreement that provides "[i]f any part of Section 11 (Dispute Resolution/Binding Arbitration/Class Action Waiver) is found to be illegal or unenforceable, the rest will remain in effect (with an arbitration award issued before any court proceedings begin), **except that if a finding of partial illegality or unenforceability would allow class, collective, or representative arbitration, all of Section 11 will be unenforceable and the claim or dispute will be resolved in court.**" (Emphasis added.) If, due to the *McGill* rule, the arbitration agreement's ban on public injunctive relief is unenforceable, then but for the exception quoted above, Claimant would be able to bring a claim for public injunctive relief in arbitration. However, pursuant to the express terms of the Section 11 exception, because the *McGill* rule would permit Claimant to bring a claim for public injunctive relief in arbitration, the entire agreement is unenforceable and Claimant's claims must be resolved in court. [3]

---

[3] If Respondent's argument is correct that the bar against public injunctive relief is unenforceable but the remainder of the arbitration agreement survives, then Claimant would be permitted to pursue public injunctive relief in arbitration. According to the SSA, such a determination must be made by a court and not the arbitrator: "This Agreement does not permit class, collective, or representative arbitration. A court has exclusive authority to rule on any assertion that it does." (*SSA, §11D*). The exception clause included in Section 11 of the SSA, which by its terms invalidates the entire arbitration agreement if the *McGill* rule applies, means that under the circumstances of this case, the arbitrator is not ruling on any party's assertion that the arbitration agreement permits a representative action.

JURISDICTIONAL AWARD - 7

Respondent next contends the *McGill* rule does not apply because the arbitration agreement is governed by a Washington state choice of law clause. Respondent contends, and Claimant does not contest, there is no equivalent to the *McGill* rule under Washington state law. *See, Crosby v. Amazon.com, Inc., 2021 WL 3185091 (CD Cal. April 19, 2021)*. There is thus a conflict between application of Washington state and California law to the validity of the arbitration agreement's ban on claims for public injunctive relief.

The arbitration agreement in the SSA states that "[t]he U.S. Federal Arbitration Act applies to this Section 11 as far as your country's laws permit." Under the FAA, the validity of an arbitration agreement is a matter of applicable state contract law. *Berman v. Freedom Fin. Network, LLC, 30 F.4th 849, 855 (9th Cir. 2022)*. Section 10 of the SSA provides: "*You and Valve agree that this Agreement shall be deemed to have been made and executed in the State of Washington, U.S.A., and Washington law, excluding conflict of laws principles and the Convention on Contracts for the International Sale of Goods, governs all claims arising out of or relating to: (i) any aspect of the relationship between us; (ii) this Agreement; or (iii) your use of Steam, your Account or the Content and Services, except that the U.S. Federal Arbitration Act governs arbitration as far as your country's laws permit.*"[4]

Claimant resides in California. Whether California state law applies to determine the validity of the arbitration agreement depends on whether California has an overriding interest in

---

[4] Respondent's quotation of Section 10 in its Opposition Brief omitted the exception clause at the end of the quoted sentence in Section 10. Claimant contends the omitted clause means Washington state law does not apply to arbitration proceedings. However, from the context, the reference to the FAA makes clear the procedural law applicable to arbitration is the FAA and not whatever Washington state procedural arbitration law may exist. Under the FAA, it is state law (to the extent not preempted) that determines whether the arbitration agreement's bar on public injunctive relief is valid.

JURISDICTIONAL AWARD - 8

the application of its laws to this question. *Hope v. Early Warning Services LLC, 2023 WL 5505020 (CD Cal. July 13, 2023).* In *Hope,* a California resident made a claim under California's unfair competition law where the underlying contract provided New York state law as the choice of law. As is the case here, there was no analogue to the *McGill* rule under New York state law. The court held *"California has a materially greater interest than New York in enforcing its policy of refusing to permit contractual terms that eliminate this right [*to seek public injunctive relief]." *Id. slip op.at 6. Hope v. Early Warning Services* is indistinguishable from this case. Accordingly, California law and the *McGill* rule applies to determine whether the arbitration agreement in the SSA is valid as to this Claimant. *See also Mejia v. DACM Inc., 54 Cal.App.5th 691 (2020) (applying the McGill rule to an arbitration agreement notwithstanding a Utah choice of law clause in the contract).*

Finally, Respondent contends that even if California law applies to the arbitration agreement, the *McGill* rule is inapplicable because Claimant does not seek the kind of public injunctive relief that *McGill* declared to be unwaivable. The *McGill* court described the salient facts in that case as follows: "*plaintiff Sharon McGill opened a credit card account with defendant Citibank, N.A. (Citibank) and purchased a 'credit protector' plan (Plan). Under the Plan, Citibank agreed to defer or to credit certain amounts on McGill's credit card account when a qualifying event occurred, such as long-term disability, unemployment, divorce, military service, or hospitalization. Citibank charged a monthly premium for the Plan based on the amount of McGill's credit card balance. . . McGill filed this class action based on Citibank's marketing of the Plan and the handling of a claim she made under it when she lost her job in 2008.*" *McGill v. Citibank, N.A., 2 Cal. 5th 945, 953 (Cal. 2017).*

JURISDICTIONAL AWARD - 9

The *McGill* Court held that the plaintiff was seeking public injunctive relief, and that the arbitration agreement was unenforceable so far as it prohibited the plaintiff from seeking such relief. The Court concluded that "*public injunctive relief under the UCL, the CLRA, and the false advertising law is relief that has 'the primary purpose and effect of' prohibiting unlawful acts that threaten future injury to the general public.*" Id. at 955. According to the Court, "*[t]he UCL addresses 'unfair competition,' which 'mean[s] and include [s] any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law].' (Bus. & Prof. Code, § 17200.) Its purpose 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services."* Id at 954 (internal citations omitted). "*On the other hand, relief that has the primary purpose or effect of redressing or preventing injury to an individual plaintiff—or to a group of individuals similarly situated to the plaintiff—does not constitute public injunctive relief.*" Id.

Respondent relies on *Hodges v. Comcast Cable Communications*, 21 F.4th 535 (9th Cir. 2021), for the proposition that although Claimant labels its claim as one for public injunctive relief, he actually seeks private injunctive relief and therefore such claims are waivable. In *Hodges,* the plaintiff entered into a subscriber agreement that included a waiver of the right for the subscriber to seek injunctive relief on behalf of the general public. The *Hodges* court acknowledged the efficacy of the *McGill* rule that a claimant cannot waive the right to seek a public injunction under applicable California law in any forum and that the *McGill* rule is not preempted by the FAA. The plaintiff – as Claimant has done here – labelled the injunctive relief sought as "public" and, therefore, non-waivable. However, the court looked beyond that characterization to examine the scope of the relief itself. The court determined that although the relief sought to prohibit future

JURISDICTIONAL AWARD - 10

violations of law, "*these requests on their face stand to benefit only Comcast 'cable subscribers'— i.e., by definition they will only benefit a 'group of individuals similarly situated to the plaintiff.'*" Id. at 549. On that basis, the court determined the injunctive relief sought by the plaintiff was not non-waivable "public" injunctive relief and the *McGill* rule did not apply. *Id.*

In *Mejia v. DACM Inc., 54 Cal.App.5th 691 (2020),* the California Court of Appeal took a broader view of what constitutes public injunctive relief. In that case, the plaintiff purchased a motorcycle from the defendant on credit. The plaintiff complained that the manner in which the defendant informed customers of the credit terms violated a number of statutes, including California's Consumer Legal Remedies Act and Unfair Competition Law. The plaintiff sought an injunction prohibiting the defendant from selling vehicles to consumers without informing consumers of the credit terms and complying with a requirement to provide all disclosures regarding financing in a single document. The plaintiff contended the arbitration agreement included in the sale agreement was unenforceable under the *McGill* rule because it barred plaintiff from seeking a public injunction in any forum. The Court of Appeal affirmed the trial court's denial of the plaintiff's motion to compel arbitration under the *McGill* rule because *"the plaintiff's claim for injunctive relief has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public." Id. at 703-4.*

In *Ramsey v. Comcast Cable Communications, LLC, 99 Cal.App.5th 197 (2023)*, the plaintiff alleged violations of the Consumer Legal Remedies Act and the UCL based on the defendant's practice of concealing available price discounts from customers unless a subscriber called in to customer service and threatened to terminate the subscription. The plaintiff sought a permanent injunction under the UCL. The court of appeal affirmed the trial court's denial of

JURISDICTIONAL AWARD - 11

defendant's motion to compel arbitration finding the arbitration agreement's ban on claims for public injunctive relief made the arbitration agreement unenforceable.

The court reasoned that "[a]*n injunction that seeks to prohibit a business from engaging in unfair or deceptive practices and marketing, requires it to provide enhanced pricing transparency, and requires it to comply with our consumer protection laws, does have the primary purpose and effect of protecting the public, and thus falls within McGill's definition of public injunctive relief.*" *Id. at 206.* The court acknowledged that an injunction that "*requires Comcast to make consumers 'aware of any and all price reductions and rebates,' would benefit both existing Comcast subscribers and any member of the public who considers signing up with Comcast (i.e., potential subscribers).*" *Id. at 207.* Declining to follow *Hodges,* the court held that "*the requested injunction would primarily benefit existing and potential Comcast subscribers by providing them with more truthful and transparent pricing options. To the extent Ramsey benefits from this relief, it would be incidentally, as a member of the public.*" *Id. at 207.*

The key distinction *McGill* makes between private and public injunctive relief is whether the request for an injunction under the UCL has as its primary purpose the protection of consumers who in the future may suffer harm from the defendant's ongoing unlawful conduct. As stated by the California Supreme Court, "an injunction under the UCL … is clearly for the benefit of the general public . . . and is designed to prevent further harm to the public at large rather than to redress or prevent injury to a plaintiff." Id at 955. California Civil Code Section 17204 expressly requires a private plaintiff to have suffered an injury to have standing to pursue public injunctive relief under Section 17203. Necessarily, any consumer who purchases product in the future would become similarly situated to an existing plaintiff, who already has suffered injury. If Respondent's reading of *McGill* were correct, no individual plaintiff could seek public injunctive relief under the

JURISDICTIONAL AWARD - 12

UCL because any such plaintiff would personally benefit from the injunction with respect to any future purchases and thus be a member of the class of individuals who would benefit from injunctive relief. *Meija* and *Ramsey* are the better reasoned cases providing that an individual plaintiff harmed by a defendant's unlawful conduct seeks public injunctive relief to bar such conduct in the future even though the injunction may personally benefit the plaintiff in the same manner as any other member of the public.

Here, Claimant alleges Respondent has engaged in monopolistic and anticompetitive conduct through its domination of the online video game market. Claimant alleges Respondent uses its monopoly power to fix and inflate prices to consumers and to impose a Platform Most Favored Nations Clause (PMFN) on game developers resulting in increased prices to purchasers. Claimant seeks damages and an injunction under the UCL *"enjoining Valve from using PMFN clauses, charging the supracompetitive tax, and otherwise illegally acquiring, maintaining, and abusing its monopoly power in the PC game distribution market."* (Amended Demand at ¶105.)

Although the requested injunctive relief would benefit Claimant and other past purchasers of video games on Respondent's platform to the extent they might make future purchases, it primarily would benefit the general public by preventing ongoing anticompetitive conduct against all potential future purchasers of video games on Respondent's platform. Accordingly, I find Claimant's demand for injunctive relief under the UCL seeks a public injunction. The arbitration agreement's bar of such relief is unenforceable, and, by its express terms, so is the entire arbitration agreement. All Claimant's claims must be adjudicated in court.

**********

JURISDICTIONAL AWARD - 13

For the reasons set forth above, Claimant Ellott's motion to dismiss this arbitration without prejudice due to absence of a valid and enforceable arbitration agreement is granted.[5]

## JURISDICTIONAL AWARD

1. Claimant Elliott's motion to dismiss this arbitration without prejudice due to the absence of a valid and enforceable arbitration agreement is granted.

2. The administrative fees of the American Arbitration Association totaling $1,725 shall be borne as incurred, and the compensation of the arbitrator totaling $2,500 shall be borne as incurred.

Dated this 8th day of July, 2024.

_____
Jeffrey H. Dasteel

_____

[5] Because I have granted Claimant's motion to dismiss for lack of a valid and enforceable arbitration agreement, the parties' remaining motions are dismissed as moot.

JURISDICTIONAL AWARD - 14

# EXHIBIT 9

AMERICAN ARBITRATION ASSOCIATION

CONSUMER RULES AND MASS ARBITATION SUPPLEMENTARY RULES

Ricardo Camargo

v.

Valve Corporation

CASE NO. 01-23-0005-2885

JURISDICTIONAL AWARD

On December 21, 2021, a class action complaint was filed in the United States District Court for the Western District of Washington alleging that Respondent Valve Corporation violated the antitrust laws causing injury to the purchasers of video games offered for sale on Respondent's online platform. Claimant Ricardo Camargo was a putative member of the class. After denying a motion to dismiss an amended class action complaint on May 6, 2022, the District Court granted in part Respondent's motion to compel arbitration. The Court found an arbitration clause to exist and, therefore, compelled arbitration of all consumer disputes. However, the court ruled that any claims of unconscionability in connection with the arbitration agreement must be determined by the arbitrator due to a broad delegation clause in the AAA rules incorporated into the parties' arbitration agreement.

Pursuant to the First Scheduling Order and Order on Preliminary Hearing, the parties submitted cross motions to dismiss this action. As neither party requested oral argument on the motions, these motions have been decided on the written submissions. Accordingly, I, Jeffrey H Dasteel, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties, and having been duly sworn, and having fully reviewed and considered the written documents submitted to me by the parties, do hereby AWARD as follows:

JURISDICTIONAL AWARD - 1

**Claimant's Motion to Dismiss the Arbitration for Lack of Jurisdiction**

Claimant contends the arbitration agreement in the Respondent's online Steam Subscriber Agreement (SSA) is invalid because the arbitration agreement's bar to collective or representative actions violates the so-called *McGill* rule. Respondent opposes Claimant's motion. Respondent contends the arbitration agreement is valid and has been declared to be valid by federal courts. Respondent also contends the *McGill* rule does not apply to this case because the choice of law provision in the SSA restricts claims to Washington state law. In addition, Respondent contends the *McGill* rule nonetheless would not apply because Claimant seeks private rather than public injunctive relief. Finally, Respondent contends that even if the *McGill* rule makes a request for public injunctive relief unenforceable, such a finding would not invalidate the entire arbitration agreement.

**The Scope of the Arbitrator's Jurisdiction to Determine Jurisdiction**

As noted by the District Court in its Order compelling arbitration, "[i]n a motion to compel arbitration, the Court determines '(1) whether a valid agreement to arbitrate exists and, if so, (2) whether the agreement encompasses the dispute at issue.'" *Wolfire Games, LLC v. Valve Corp., D.C. WD Was. Case No. C21-0563-JCC (Oct. 25, 2021), slip op. at 2 (internal citation omitted).* Here, the District Court determined that an arbitration agreement exists in the SSA. Accordingly, all consumer plaintiffs in the putative class action were ordered to arbitrate their claims. *Id. at 3.*

However, as a part of the Order compelling arbitration, the District Court ordered the parties to arbitrate any claims of unconscionability of the arbitration agreement because the arbitration agreement allocated to the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." *Id.* Although Claimant has not raised claims of unconscionability, he has challenged

JURISDICTIONAL AWARD - 2

the validity of the arbitration agreement. The ground raised by Claimant here was not before the District Court. Because the District Court's order finding an arbitration agreement exists also allocates to the arbitrator jurisdiction to determine validity of the arbitration agreement, the District Court's order compelling arbitration allocates jurisdiction to the arbitrator to determine Claimant's jurisdictional claims. Accordingly, I find that Claimant's challenge to jurisdiction falls within the scope of my jurisdiction to determine the validity or existence of the arbitration agreement.

**Claimant's Motion to Dismiss under the *McGill* Rule**

Claimant contends the arbitration agreement is invalid because it contravenes the *McGill* rule. The arbitration agreement in the SSA prohibits Claimant from seeking or obtaining relief that is not individual to Claimant. It is uncontroverted that this bar precludes Claimant from seeking public injunctive relief. "*In California, contractual provisions waiving the right to seek public injunctive relief in any forum are unenforceable. (citation omitted). We have held that this McGill rule does not violate the FAA.*" Keebaugh v. Warner Bros. Entm't, Case No. 22-55982 (9th Cir. Apr 26, 2024), slip op. at 29.

Respondent opposes Claimant's motion on three grounds. First, citing *Keebaugh,* Respondent contends that if Claimant's claim falls under the *McGill* rule, that does not invalidate the entire arbitration agreement. In *Keebaugh,* the court noted that even if the anti-public injunction clause in the arbitration agreement is unenforceable, that does not make the remainder of the arbitration agreement unconscionable. *Id.*

Respondent's argument misses the point. Claimant does not seek to avoid the SSA's arbitration agreement based on unconscionability. Instead, Claimant seeks to avoid arbitration based on the clause in the arbitration agreement that provides "[i]f any part of Section 11 (Dispute Resolution/Binding Arbitration/Class Action Waiver) is found to be illegal or unenforceable, the

JURISDICTIONAL AWARD - 3

rest will remain in effect (with an arbitration award issued before any court proceedings begin), **except that if a finding of partial illegality or unenforceability would allow class, collective, or representative arbitration, all of Section 11 will be unenforceable and the claim or dispute will be resolved in court.**" (Emphasis added.) If, due to the *McGill* rule, the arbitration agreement's ban on public injunctive relief is unenforceable, then but for the exception quoted above, Claimant would be able to bring a claim for public injunctive relief in arbitration. However, pursuant to the express terms of the Section 11 exception, because the *McGill* rule would permit Claimant to bring a claim for public injunctive relief in arbitration, the entire agreement is unenforceable and Claimant's claims must be resolved in court. [1]

Respondent next contends the *McGill* rule does not apply because the arbitration agreement is governed by a Washington state choice of law clause. Respondent contends, and Claimant does not contest, there is no equivalent to the *McGill* rule under Washington state law. *See, Crosby v. Amazon.com, Inc., 2021 WL 3185091 (CD Cal. April 19, 2021).* There is thus a conflict between application of Washington state and California law to the validity of the arbitration agreement's ban on claims for public injunctive relief.

The arbitration agreement in the SSA states that "[t]he U.S. Federal Arbitration Act applies to this Section 11 as far as your country's laws permit." Under the FAA, the validity of an arbitration agreement is a matter of applicable state contract law. *Berman v. Freedom Fin. Network,*

---

[1] If, as noted above, Respondent's argument is correct that the bar against public injunctive relief is unenforceable but the remainder of the arbitration agreement survives, then Claimant would be permitted to pursue public injunctive relief in arbitration. According to the SSA, such a determination must be made by a court and not the arbitrator: "This Agreement does not permit class, collective, or representative arbitration. A court has exclusive authority to rule on any assertion that it does." (*SSA, §11D*). The exception clause included in Section 11 of the SSA, which by its terms invalidates the entire arbitration agreement if the *McGill* rule applies, means that under the circumstances of this case, the arbitrator is not ruling on any party's assertion that the arbitration agreement permits a representative action.

JURISDICTIONAL AWARD - 4

*LLC, 30 F.4th 849, 855 (9th Cir. 2022).* Section 10 of the SSA provides: *"You and Valve agree that this Agreement shall be deemed to have been made and executed in the State of Washington, U.S.A., and Washington law, excluding conflict of laws principles and the Convention on Contracts for the International Sale of Goods, governs all claims arising out of or relating to: (i) any aspect of the relationship between us; (ii) this Agreement; or (iii) your use of Steam, your Account or the Content and Services, except that the U.S. Federal Arbitration Act governs arbitration as far as your country's laws permit."*[2]

Claimant resides in California. Whether California state law applies to determine the validity of the arbitration agreement depends on whether California has an overriding interest in the application of its laws to this question. *Hope v. Early Warning Services LLC, 2023 WL 5505020 (CD Cal. July 13, 2023).* In *Hope,* a California resident made a claim under California's unfair competition law where the underlying contract provided New York state law as the choice of law. As is the case here, there was no analogue to the *McGill* rule under New York state law. The court held *"California has a materially greater interest than New York in enforcing its policy of refusing to permit contractual terms that eliminate this right* [to seek public injunctive relief].*" Id. slip op.at 6. Hope v. Early Warning Services* is indistinguishable from this case. Accordingly, California law and the *McGill* rule applies to determine whether the arbitration agreement in the SSA is valid as to this Claimant. *See also Mejia v. DACM Inc., 54 Cal.App.5th 691 (2020)*

---

[2] Respondent's quotation of Section 10 in its Opposition Brief omitted the exception clause at the end of the quoted sentence in Section 10. Claimant contends the omitted clause means Washington state law does not apply to arbitration proceedings. However, from the context, the reference to the FAA makes clear the procedural law applicable to arbitration is the FAA and not whatever Washington state procedural arbitration law may exist. Under the FAA, it is state law (to the extent not preempted) that determines whether the arbitration agreement's bar on public injunctive relief is valid.

JURISDICTIONAL AWARD - 5

*(applying the McGill rule to an arbitration agreement notwithstanding a Utah choice of law clause in the contract).*

Finally, Respondent contends that even if California law applies to the arbitration agreement, the *McGill* rule is inapplicable because Claimant does not seek the kind of public injunctive relief that *McGill* declared to be unwaivable. The *McGill* court described the salient facts in that case as follows: "*plaintiff Sharon McGill opened a credit card account with defendant Citibank, N.A. (Citibank) and purchased a 'credit protector' plan (Plan). Under the Plan, Citibank agreed to defer or to credit certain amounts on McGill's credit card account when a qualifying event occurred, such as long-term disability, unemployment, divorce, military service, or hospitalization. Citibank charged a monthly premium for the Plan based on the amount of McGill's credit card balance. . . McGill filed this class action based on Citibank's marketing of the Plan and the handling of a claim she made under it when she lost her job in 2008.*" *McGill v. Citibank, N.A., 2 Cal. 5th 945, 953 (Cal. 2017).*

The *McGill* Court held that the plaintiff was seeking public injunctive relief, and that the arbitration agreement was unenforceable so far as it prohibited the plaintiff from seeking such relief. The Court concluded that "*public injunctive relief under the UCL, the CLRA, and the false advertising law is relief that has 'the primary purpose and effect of' prohibiting unlawful acts that threaten future injury to the general public.'*" *Id.* at 955. According to the Court, "*[t]he UCL addresses 'unfair competition,' which 'mean[s] and include [s] any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law].' (Bus. & Prof. Code, § 17200.) Its purpose 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.'*" *Id* at 954 (internal citations omitted). "*On the other hand, relief that has the*

JURISDICTIONAL AWARD - 6

*primary purpose or effect of redressing or preventing injury to an individual plaintiff—or to a group of individuals similarly situated to the plaintiff—does not constitute public injunctive relief."* *Id.*

Respondent relies on *Hodges v. Comcast Cable Communications, 21 F.4th 535 (9th Cir. 2021),* for the proposition that although Claimant labels its claim as one for public injunctive relief, he actually seeks private injunctive relief and therefore such claims are waivable. In *Hodges,* the plaintiff entered into a subscriber agreement that included a waiver of the right for the subscriber to seek injunctive relief on behalf of the general public. The *Hodges* court acknowledged the efficacy of the *McGill* rule that a claimant cannot waive the right to seek a public injunction under applicable California law in any forum and that the *McGill* rule is not preempted by the FAA. The plaintiff – as Claimant has done here – labelled the injunctive relief sought as "public" and, therefore, non-waivable. However, the court looked beyond that characterization to examine the scope of the relief itself. The court determined that although the relief sought to prohibit future violations of law, *"these requests on their face stand to benefit only Comcast 'cable subscribers'— i.e., by definition they will only benefit a 'group of individuals similarly situated to the plaintiff.'"* Id. at 549. On that basis, the court determined the injunctive relief sought by the plaintiff was not non-waivable "public" injunctive relief and the *McGill* rule did not apply. *Id.*

In *Mejia v. DACM Inc., 54 Cal.App.5th 691 (2020),* the California Court of Appeal took a broader view of what constitutes public injunctive relief. In that case, the plaintiff purchased a motorcycle from the defendant on credit. The plaintiff complained that the manner in which the defendant informed customers of the credit terms violated a number of statutes, including California's Consumer Legal Remedies Act and Unfair Competition Law. The plaintiff sought an injunction prohibiting the defendant from selling vehicles to consumers without informing

JURISDICTIONAL AWARD - 7

consumers of the credit terms and complying with a requirement to provide all disclosures regarding financing in a single document. The plaintiff contended the arbitration agreement included in the sale agreement was unenforceable under the *McGill* rule because it barred plaintiff from seeking a public injunction in any forum. The Court of Appeal affirmed the trial court's denial of the plaintiff's motion to compel arbitration under the *McGill* rule because *"the plaintiff's claim for injunctive relief has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public." Id. at 703-4.*

In *Ramsey v. Comcast Cable Communications, LLC, 99 Cal.App.5th 197 (2023)*, the plaintiff alleged violations of the Consumer Legal Remedies Act and the UCL based on the defendant's practice of concealing available price discounts from customers unless a subscriber called in to customer service and threatened to terminate the subscription. The plaintiff sought a permanent injunction under the UCL. The court of appeal affirmed the trial court's denial of defendant's motion to compel arbitration finding the arbitration agreement's ban on claims for public injunctive relief made the arbitration agreement unenforceable.

The court reasoned that "[a]*n injunction that seeks to prohibit a business from engaging in unfair or deceptive practices and marketing, requires it to provide enhanced pricing transparency, and requires it to comply with our consumer protection laws, does have the primary purpose and effect of protecting the public, and thus falls within McGill's definition of public injunctive relief." Id. at 206.* The court acknowledged that an injunction that *"requires Comcast to make consumers 'aware of any and all price reductions and rebates,' would benefit both existing Comcast subscribers and any member of the public who considers signing up with Comcast (i.e., potential subscribers)." Id. at 207.* Declining to follow *Hodges,* the court held that *"the requested injunction would primarily benefit existing and potential Comcast subscribers by providing them with more*

JURISDICTIONAL AWARD - 8

*truthful and transparent pricing options. To the extent Ramsey benefits from this relief, it would be incidentally, as a member of the public." Id. at 207.*

The key distinction *McGill* makes between private and public injunctive relief is whether the request for an injunction under the UCL has as its primary purpose the protection of consumers who in the future may suffer harm from the defendant's ongoing unlawful conduct. As stated by the California Supreme Court, "*an injunction under the UCL … is clearly for the benefit of the general public . . . and is designed to prevent further harm to the public at large rather than to redress or prevent injury to a plaintiff.*" Id at 955. California Civil Code Section 17204 expressly requires a private plaintiff to have suffered an injury to have standing to pursue public injunctive relief under Section 17203. Necessarily, any consumer who purchases product in the future would become similarly situated to an existing plaintiff, who already has suffered injury. If Respondent's reading of *McGill* were correct, no individual plaintiff could seek public injunctive relief under the UCL because any such plaintiff would personally benefit from the injunction with respect to any future purchases and thus be a member of the class of individuals who would benefit from injunctive relief. *Mejia* and *Ramsey* are the better reasoned cases. They provide that an individual plaintiff harmed by a defendant's unlawful conduct seeks public injunctive relief to bar such conduct in the future even though the injunction may personally benefit the plaintiff in the same manner as any other member of the public.

Here, Claimant alleges Respondent has engaged in monopolistic and anticompetitive conduct through its domination of the online video game market. Claimant alleges Respondent uses its monopoly power to fix and inflate prices to consumers and to impose a Platform Most Favored Nations Clause (PMFN) on game developers resulting in increased prices to purchasers. Claimant seeks damages and an injunction under the UCL "*enjoining Valve from using PMFN*

JURISDICTIONAL AWARD - 9

*clauses, charging the supracompetitive tax, and otherwise illegally acquiring, maintaining, and abusing its monopoly power in the PC game distribution market."* (Amended Demand at ¶105.)

Although the requested injunctive relief would benefit Claimant and other past purchasers of video games on Respondent's platform to the extent they might make future purchases, it primarily would benefit the general public by preventing ongoing anticompetitive conduct against all potential future purchasers of video games on Respondent's platform. Accordingly, I find Claimant's demand for injunctive relief under the UCL seeks a public injunction. The arbitration agreement's bar of such relief is unenforceable, and, by its express terms, so is the entire arbitration agreement. All Claimant's claims must be adjudicated in court.

**\*\*\*\*\*\*\*\*\*\***

For the reasons set forth above, Claimant Camargo's motion to dismiss this arbitration without prejudice due to absence of a valid arbitration agreement is granted.[3]

---

[3] Because I have granted Claimant's motion to dismiss for lack of a valid arbitration agreement, the parties' remaining motions are dismissed as moot.

JURISDICTIONAL AWARD - 10

## JURISDICTIONAL AWARD

1. Claimant Camargo's motion to dismiss this arbitration without prejudice due to the absence of an enforceable arbitration agreement is granted.

2. The administrative fees of the American Arbitration Association totaling $1,725 shall be borne as incurred, and the compensation of the arbitrator totaling $2,500 shall be borne as incurred.

Dated this 8th day of July, 2024.

_____
Jeffrey H. Dasteel, Arbitrator

JURISDICTIONAL AWARD - 11

# EXHIBIT 10

AMERICAN ARBITRATION ASSOCIATION

CONSUMER RULES AND MASS ARBITRATION SUPPLEMENTARY RULES

| | |
|---|---|
| Bradly Smith | CASE NO. 01-23-0005-2887 |
| v. | JURISDICTIONAL AWARD |
| Valve Corporation | |

On December 21, 2021, a class action complaint was filed in the United States District Court for the Western District of Washington alleging that Respondent Valve Corporation violated the antitrust laws causing injury to the purchasers of video games offered for sale on Respondent's online platform. Claimant Bradly Smith was a putative member of the class. After denying a motion to dismiss an amended class action complaint on May 6, 2022, the District Court granted in part Respondent's motion to compel arbitration. The Court found an arbitration clause to exist and, therefore, compelled arbitration of all consumer disputes. However, the court ruled that any claims of unconscionability in connection with the arbitration agreement must be determined by the arbitrator due to a broad delegation clause in the AAA rules incorporated into the parties' arbitration agreement.

Pursuant to the First Scheduling Order and Order on Preliminary Hearing, the parties submitted cross motions to dismiss this action. As neither party requested oral argument on the motions, these motions have been decided on the written submissions. Accordingly, I, Jeffrey H Dasteel, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties, and having been duly sworn, and having fully reviewed and considered the written documents submitted to me by the parties, do hereby AWARD as follows:

JURISDICTIONAL AWARD - 1

**Claimant's Motion to Dismiss the Arbitration for Lack of Jurisdiction**

Claimant contends the arbitration agreement in the Respondent's online Steam Subscriber Agreement (SSA) is invalid because he did not receive proper notice of the requirement to arbitrate disputes and the arbitration agreement's bar to collective or representative actions violates the so-called *McGill* rule.

Respondent opposes Claimant's motion. Respondent contends the arbitration agreement is valid and has been declared to be valid by federal courts. Respondent also contends the *McGill* rule does not apply to this case because the choice of law provision in the SSA restricts claims to Washington state law. In addition, Respondent contends the *McGill* rule nonetheless would not apply because Claimant seeks private rather than public injunctive relief. Finally, Respondent contends that even if the *McGill* rule makes a request for public injunctive relief unenforceable, such a finding would not invalidate the entire arbitration agreement.

**The Scope of the Arbitrator's Jurisdiction to Determine Jurisdiction**

As noted by the District Court in its Order compelling arbitration, "[i]n a motion to compel arbitration, the Court determines '(1) whether a valid agreement to arbitrate exists and, if so, (2) whether the agreement encompasses the dispute at issue.'" *Wolfire Games, LLC v. Valve Corp., D.C. WD Was. Case No. C21-0563-JCC (Oct. 25, 2021), slip op. at 2 (internal citation omitted).* Here, the District Court determined that an arbitration agreement exists in the SSA. Accordingly, all consumer plaintiffs in the putative class action were ordered to arbitrate their claims. *Id. at 3.*

However, as a part of the Order compelling arbitration, the District Court ordered the parties to arbitrate any claims of unconscionability of the arbitration agreement because the arbitration agreement allocated to the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration

JURISDICTIONAL AWARD - 2

agreement." *Id.* Although Claimant has not raised claims of unconscionability, he has challenged the validity of the arbitration agreement. Neither ground raised by Claimant here were before the District Court. Because the District Court's order finding an arbitration agreement exists also allocates to the arbitrator jurisdiction to determine validity of the arbitration agreement, the District Court's order compelling arbitration allocates jurisdiction to the arbitrator to determine Claimant's jurisdictional claims. Accordingly, I find that both Claimant's challenges fall within the scope of my jurisdiction to determine the validity or existence of the arbitration agreement.

**Claimant's Motion to Dismiss under the *McGill* Rule**

Claimant contends the arbitration agreement is invalid because it contravenes the *McGill* rule. The arbitration agreement in the SSA prohibits Claimant from seeking or obtaining relief that is not individual to Claimant. It is uncontroverted that this bar precludes Claimant from seeking public injunctive relief. "*In California, contractual provisions waiving the right to seek public injunctive relief in any forum are unenforceable. (citation omitted). We have held that this McGill rule does not violate the FAA.*" *Keebaugh v. Warner Bros. Entm't, Case No. 22-55982 (9th Cir. Apr 26, 2024), slip op. at 29.*

Respondent opposes Claimant's motion on three grounds. First, citing *Keebaugh,* Respondent contends that if Claimant's claim falls under the *McGill* rule, that does not invalidate the entire arbitration agreement. In *Keebaugh,* the court noted that even if the anti-public injunction clause in the arbitration agreement is unenforceable, that does not make the remainder of the arbitration agreement unconscionable.

Respondent's argument misses the point. Claimant does not seek to avoid the arbitration agreement here based on unconscionability. Instead, Claimant seeks to avoid arbitration based on the clause in the arbitration agreement that provides "[i]f any part of Section 11 (Dispute

JURISDICTIONAL AWARD - 3

Resolution/Binding Arbitration/Class Action Waiver) is found to be illegal or unenforceable, the rest will remain in effect (with an arbitration award issued before any court proceedings begin), **except that if a finding of partial illegality or unenforceability would allow class, collective, or representative arbitration, all of Section 11 will be unenforceable and the claim or dispute will be resolved in court.**"   (Emphasis added.)   If, due to the *McGill* rule, the arbitration agreement's ban on public injunctive relief is unenforceable, then but for the exception quoted above, Claimant would be able to bring a claim for public injunctive relief in arbitration.  However, pursuant to the express terms of the Section 11 exception, because the *McGill* rule would permit Claimant to bring a claim for public injunctive relief in arbitration, the entire agreement is unenforceable, and Claimant's claims must be resolved in court. [1]

Respondent next contends the *McGill* rule does not apply because the arbitration agreement is governed by a Washington state choice of law clause.  Respondent contends, and Claimant does not contest, there is no equivalent to the *McGill* rule under Washington state law.  *See, Crosby v. Amazon.com, Inc., 2021 WL 3185091 (CD Cal. April 19, 2021)*.  There is thus a conflict between application of Washington state and California law to the validity of the arbitration agreement's ban on claims for public injunctive relief.

The arbitration agreement in the SSA states that "[t]he U.S. Federal Arbitration Act applies to this Section 11 as far as your country's laws permit."   Under the FAA, the validity of an

---

[1] As noted above, if Respondent's argument is correct that the bar against public injunctive relief is unenforceable but the remainder of the arbitration agreement survives, then Claimant would be permitted to pursue public injunctive relief in arbitration.  According to the SSA, such a determination must be made by a court and not the arbitrator: "This Agreement does not permit class, collective, or representative arbitration.  A court has exclusive authority to rule on any assertion that it does." (SSA, *§11D*).  The exception clause included in Section 11 of the SSA, which by its terms invalidates the entire arbitration agreement if the *McGill* rule applies, means that under the circumstances of this case, the arbitrator is not ruling on any party's assertion that the arbitration agreement permits a representative action.

JURISDICTIONAL AWARD - 4

arbitration agreement is a matter of applicable state contract law. *Berman v. Freedom Fin. Network, LLC, 30 F.4th 849, 855 (9th Cir. 2022)*. Section 10 of the SSA provides: *"You and Valve agree that this Agreement shall be deemed to have been made and executed in the State of Washington, U.S.A., and Washington law, excluding conflict of laws principles and the Convention on Contracts for the International Sale of Goods, governs all claims arising out of or relating to: (i) any aspect of the relationship between us; (ii) this Agreement; or (iii) your use of Steam, your Account or the Content and Services, except that the U.S. Federal Arbitration Act governs arbitration as far as your country's laws permit."*[2]

Between 2017 (when Claimant first entered into an SSA) and 2021, Claimant resided in California. Although Claimant now resides in Missouri, Claimant alleges he made the bulk of his online purchases on Respondent's website between 2017 and 2021. Therefore, the question is whether California or Washington state law applies to those purchases. Whether California state law applies to determine the validity of the arbitration agreement depends on whether California has an overriding interest in the application of its laws to Claimant's purchases while he resided in California. *Hope v. Early Warning Services LLC, 2023 WL 5505020 (CD Cal. July 13, 2023)*. In *Hope,* a California resident made a claim under California's unfair competition law where the underlying contract provided New York state law as the choice of law. As is the case here, there was no analogue to the *McGill* rule under New York state law. The court held *"California has a*

---

[2] Respondent's quotation of Section 10 in its Opposition Brief omitted the exception clause at the end of the quoted sentence in Section 10. Claimant contends the omitted clause means Washington state law does not apply to arbitration proceedings. However, from the context, the reference to the FAA makes clear the procedural law applicable to arbitration is the FAA and not whatever Washington state procedural arbitration law may exist. Under the FAA, it is state law (to the extent not preempted) that determines whether the arbitration agreement's bar on public injunctive relief is valid.

JURISDICTIONAL AWARD - 5

*materially greater interest than New York in enforcing its policy of refusing to permit contractual terms that eliminate this right"* to seek public injunctive relief. *Id. slip op.at 6. Hope v. Early Warning Services* is indistinguishable from this case. Accordingly, California law and the *McGill* rule applies to determine whether the arbitration agreement in the SSA is valid as to this Claimant. *See also Mejia v. DACM Inc., 54 Cal.App.5th 691 (2020) (applying McGill to arbitration agreement notwithstanding a Utah choice of law clause in contract).*[3]

Finally, Respondent contends that even if California law applies to the arbitration agreement, the *McGill* rule is inapplicable because Claimant does not seek the kind of public injunctive relief that *McGill* declared to be unwaivable. The *McGill* court described the salient facts in that case as follows: "*plaintiff Sharon McGill opened a credit card account with defendant Citibank, N.A. (Citibank) and purchased a 'credit protector' plan (Plan). Under the Plan, Citibank agreed to defer or to credit certain amounts on McGill's credit card account when a qualifying event occurred, such as long-term disability, unemployment, divorce, military service, or hospitalization. Citibank charged a monthly premium for the Plan based on the amount of McGill's credit card balance. . . McGill filed this class action based on Citibank's marketing of the Plan and the handling of a claim she made under it when she lost her job in 2008."* McGill v. Citibank, N.A., 2 Cal. 5th 945, 953 (Cal. 2017).

The *McGill* Court held that the plaintiff was seeking public injunctive relief, and that the arbitration agreement was unenforceable so far as it prohibited the plaintiff from seeking such relief. The Court concluded that "*public injunctive relief under the UCL, the CLRA, and the false*

---

[3] Although Claimant may have made some purchases while residing in Missouri, that does not invalidate his right to seek public injunctive relief under the UCL based on purchases he made while residing in California.

JURISDICTIONAL AWARD - 6

*advertising law is relief that has 'the primary purpose and effect of' prohibiting unlawful acts that threaten future injury to the general public." Id. at 955.* According to the Court, *"[t]he UCL addresses 'unfair competition,' which 'mean[s] and include [s] any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law].' (Bus. & Prof. Code, § 17200.) Its purpose 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." Id at 954 (internal citations omitted).* "On the other hand, relief that has the primary purpose or effect of redressing or preventing injury to an individual plaintiff—or to a group of individuals similarly situated to the plaintiff—does not constitute public injunctive relief." *Id.*

Respondent relies on *Hodges v. Comcast Cable Communications, 21 F.4th 535 (9th Cir. 2021),* for the proposition that although Claimant labels its claim as one for public injunctive relief, he actually seeks private injunctive relief and therefore such claims are waivable. In *Hodges,* the plaintiff entered into a subscriber agreement that included a waiver of the right for the subscriber to seek injunctive relief on behalf of the general public. The *Hodges* court acknowledged the efficacy of the *McGill* rule that a claimant cannot waive the right to seek a public injunction under applicable California law in any forum and that the *McGill* rule is not preempted by the FAA. The plaintiff – as Claimant has done here – labelled the injunctive relief sought as "public" and, therefore, non-waivable. However, the court looked beyond that characterization to examine the scope of the relief itself. The court determined that although the relief sought to prohibit future violations of law, *"these requests on their face stand to benefit only Comcast 'cable subscribers'— i.e., by definition they will only benefit a 'group of individuals similarly situated to the plaintiff.'"*

JURISDICTIONAL AWARD - 7

*Id.* at 549. On that basis, the court determined the injunctive relief sought by the plaintiff was not non-waivable "public" injunctive relief and the *McGill* rule did not apply. *Id.*

In *Mejia v. DACM Inc., 54 Cal.App.5th 691 (2020),* the California Court of Appeal took a broader view of what constitutes public injunctive relief. In that case, the plaintiff purchased a motorcycle from the defendant on credit. The plaintiff complained that the manner in which the defendant informed customers of the credit terms violated a number of statutes, including California's Consumer Legal Remedies Act and Unfair Competition Law. The plaintiff sought an injunction prohibiting the defendant from selling vehicles to consumers without informing consumers of the credit terms and complying with a requirement to provide all disclosures regarding financing in a single document. The plaintiff contended the arbitration agreement included in the sale agreement was unenforceable under the *McGill* rule because it barred plaintiff from seeking a public injunction in any forum. The Court of Appeal affirmed the trial court's denial of the plaintiff's motion to compel arbitration under the *McGill* rule because *"the plaintiff's claim for injunctive relief has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public." Id. at 703-4.*

In *Ramsey v. Comcast Cable Communications, LLC, 99 Cal.App.5th 197 (2023),* the plaintiff alleged violations of the Consumer Legal Remedies Act and the UCL based on the defendant's practice of concealing available price discounts from customers unless a subscriber called in to customer service and threatened to terminate the subscription. The plaintiff sought a permanent injunction under the UCL. The court of appeal affirmed the trial court's denial of defendant's motion to compel arbitration finding the arbitration agreement's ban on claims for public injunctive relief made the arbitration agreement unenforceable.

JURISDICTIONAL AWARD - 8

The court reasoned that "[a]*n injunction that seeks to prohibit a business from engaging in unfair or deceptive practices and marketing, requires it to provide enhanced pricing transparency, and requires it to comply with our consumer protection laws, does have the primary purpose and effect of protecting the public, and thus falls within McGill's definition of public injunctive relief.*" *Id. at 206.* The court acknowledged that an injunction that "*requires Comcast to make consumers 'aware of any and all price reductions and rebates,' would benefit both existing Comcast subscribers and any member of the public who considers signing up with Comcast (i.e., potential subscribers).*" *Id. at 207.* Declining to follow *Hodges,* the court held that "*the requested injunction would primarily benefit existing and potential Comcast subscribers by providing them with more truthful and transparent pricing options. To the extent Ramsey benefits from this relief, it would be incidentally, as a member of the public.*" *Id. at 207.*

The key distinction *McGill* makes between private and public injunctive relief is whether the request for an injunction under the UCL has as its primary purpose the protection of consumers who in the future may suffer harm from the defendant's ongoing unlawful conduct. As stated by the California Supreme Court, "an injunction under the UCL … is clearly for the benefit of the general public . . . and is designed to prevent further harm to the public at large rather than to redress or prevent injury to a plaintiff." *Id at 955.* California Civil Code Section 17204 expressly requires a private plaintiff to have suffered an injury to have standing to pursue public injunctive relief under Section 17203. Necessarily, any consumer who purchases product in the future would become similarly situated to an existing plaintiff, who already has suffered injury. If Respondent's reading of *McGill* were correct, no individual plaintiff could seek public injunctive relief under the UCL because any such plaintiff would personally benefit from the injunction with respect to any future purchases and thus be a member of the class of individuals who would benefit from

JURISDICTIONAL AWARD - 9

injunctive relief.  *Meija* and *Ramsey* are the better reasoned cases providing that an individual plaintiff harmed by a defendant's unlawful conduct seeks public injunctive relief to bar such conduct in the future even though the injunction may personally benefit the plaintiff in the same manner as any other member of the public.

Here, Claimant alleges Respondent has engaged in monopolistic and anticompetitive conduct through its domination of the online video game market.  Claimant alleges Respondent uses its monopoly power to fix and inflate prices to consumers and to impose a Platform Most Favored Nations Clause (PMFN) on game developers resulting in increased prices to purchasers. Claimant seeks damages and an injunction under the UCL "*enjoining Valve from using PMFN clauses, charging the supracompetitive tax, and otherwise illegally acquiring, maintaining, and abusing its monopoly power in the PC game distribution market.*"  (Amended Demand at ¶105.)

Although the requested injunctive relief would benefit Claimant and other past purchasers of video games on Respondent's platform to the extent they might make future purchases, it primarily would benefit the general public by preventing ongoing anticompetitive conduct against all potential future purchasers of video games on Respondent's platform.  Accordingly, I find Claimant's demand for injunctive relief under the UCL seeks a public injunction.  The arbitration agreement's bar of such relief is unenforceable, and, by its express terms, so is the entire arbitration agreement.  All Claimant's claims must be adjudicated in court.

***********

JURISDICTIONAL AWARD - 10

For the reasons set forth above, Claimant Smith's motion to dismiss this arbitration without prejudice due to absence of a valid arbitration agreement is granted.[4]

## JURISDICTIONAL AWARD

1. Claimant Smith's motion to dismiss this arbitration without prejudice due to the absence of a valid and enforceable arbitration agreement is granted.

2. The administrative fees of the American Arbitration Association totaling $1,725 shall be borne as incurred, and the compensation of the arbitrator totaling $2,500 shall be borne as incurred.

Dated this 8th day of July, 2024.

_____
Jeffrey H. Dasteel

_____

[4] Because I have granted Claimant's motion to dismiss for lack of an enforceable arbitration agreement for violation of the *McGill* rule thereby invalidating the entire arbitration pursuant to the express terms of that agreement, the parties' remaining arguments, motions and contentions are dismissed as moot.

JURISDICTIONAL AWARD - 11

# EXHIBIT 11

AMERICAN ARBITRATION ASSOCIATION

CONSUMER RULES AND MASS ARBITRATION SUPPLEMENTARY RULES

| | |
|---|---|
| Javier Rovira | CASE NO. 01-23-0005-2891 |
| v. | JURISDICTIONAL AWARD |
| Valve Corporation | |

On December 21, 2021, a class action complaint was filed in the United States District Court for the Western District of Washington alleging that Respondent Valve Corporation violated the antitrust laws causing injury to the purchasers of video games offered for sale on Respondent's online platform. Claimant Rovira was a putative member of the class. After denying a motion to dismiss an amended class action complaint on May 6, 2022, the District Court granted in part Respondent's motion to compel arbitration. The Court found an arbitration clause to exist and, therefore, compelled arbitration of all consumer disputes. However, the court ruled that that any claims of unconscionability in connection with the arbitration agreement must be determined by the arbitrator due to a broad delegation clause in the AAA rules incorporated into the parties' arbitration agreement.

Pursuant to the First Scheduling Order and Order on Preliminary Hearing, the parties submitted cross motions to dismiss this action. As neither party requested oral argument on the motions, these motions have been decided on the written submissions. Accordingly, I, Jeffrey H Dasteel, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties, and having been duly sworn, and having fully reviewed and considered the written documents submitted to me by the parties, do hereby AWARD as follows:

JURISDICTIONAL AWARD - 1

**Claimant's Motion to Dismiss the Arbitration for Lack of Jurisdiction**

Claimant contends the arbitration agreement in the Respondent's online Steam Subscriber Agreement (SSA) is invalid because he did not receive proper notice of the requirement to arbitrate disputes.  Respondent opposes Claimant's motion. Respondent contends the arbitration agreement is valid and has been declared to be valid by federal courts.

**The Scope of the Arbitrator's Jurisdiction to Determine Jurisdiction**

As noted by the District Court in its Order compelling arbitration, "[i]n a motion to compel arbitration, the Court determines '(1) whether a valid agreement to arbitrate exists and, if so, (2) whether the agreement encompasses the dispute at issue.'" *Wolfire Games, LLC v. Valve Corp., D.C. WD Was. Case No. C21-0563-JCC (Oct. 25, 2021), slip op. at 2 (internal citation omitted).* Here, the District Court determined that an arbitration agreement exists in the SSA.  Accordingly, all consumer plaintiffs in the putative class action were ordered to arbitrate their claims. *Id. at 3.*

However, as a part of the Order compelling arbitration, the District Court ordered the parties to arbitrate any claims of unconscionability of the arbitration agreement because the arbitration agreement allocated to the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." *Id.*  Although Claimant has not raised claims of unconscionability, he has challenged the validity of the arbitration agreement.  The ground raised by Claimant here was not before the District Court.  Because the District Court's order finding an arbitration agreement exists also allocates to the arbitrator jurisdiction to determine validity of the arbitration agreement, the District Court's order compelling arbitration allocates jurisdiction to the arbitrator to determine Claimant's jurisdictional claim.  Accordingly, I find that Claimant's challenge to jurisdiction falls within the scope of my jurisdiction to determine the validity or existence of the arbitration agreement.

JURISDICTIONAL AWARD - 2

**<u>Claimant's Challenge to Notice of the Terms and Conditions of the Arbitration Agreement</u>**

Claimant contends he did not receive proper notice of the terms and conditions of the arbitration agreement.  For the reasons set forth below, I agree.

***Legal Standard***

In *Berman v. Freedom Financial Network, LLC, 30 F4th 849 (9th Cir. 2022),* the court *"revisit[ed] an issue first addressed by our court in Nguyen v. Barnes & Noble, Inc. , 763 F.3d 1171 (9th Cir. 2014): Under what circumstances can the use of a website bind a consumer to a set of hyperlinked 'terms and conditions' that the consumer never saw or read?"[1]  Berman at 849.* Under 9th Circuit law, *"[u]nless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract [for a clickwrap style agreement]will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms."* Id. at 856.

Further, *"[w]ebsite users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print. Because 'online providers have complete control over the design of their websites, the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers.'"* Id. at 857 *(internal citations omitted).*  In addition, *"the notice must explicitly*

---

[1] Claimant suggests the arbitrator can decide the validity or existence of an arbitration agreement based on a standard different from the standard set forth by the courts. Claimant suggests the arbitrator adopt the standard suggested in *Jeffrey H. Dasteel, Consumer Click Arbitration: A Review of Online Consumer Arbitration Agreements, 9 ARB. L. REV. 1 (2017).*   Regardless of the arbitrator's personal views about what the proper inquiry notice standard should be, the arbitrator is bound to follow existing law.

JURISDICTIONAL AWARD - 3

*notify a user of the legal significance of the action she must take to enter into a contractual agreement." Id. at 858.*

Finally, when applying the *Berman* standard, the arbitrator must consider both the full context of the transaction as well as the placement and appearance of the terms and conditions notice. *Keebaugh v. Warner Bros. Entertainment, Inc., 22-55982 (9th Cir. Apr 26, 2024), slip op. at 15-16.* Here, the arbitrator must consider Claimant's history of transactions with Respondent and the modification of the terms and conditions over time to determine whether the text and placement of the website terms and conditions hyperlink properly put Claimant on inquiry notice as required by law.

### Notice to Claimant of the Arbitration Agreement

It is uncontroverted that Claimant first entered into an SSA with Respondent beginning in 2006. (*Rovira Affidavit*.) It also is uncontroverted that at the time Claimant entered into his first SSA, there was no arbitration provision in the agreement. (*Cf. Ex. L (SSA from 2008 without an arbitration agreement).*) As of 2011, the SSA terms and conditions still did not include an arbitration agreement. (*See Ex. M.*) The arbitration agreement first appeared in the SSA in 2012. (*See Ex. N.*)

Respondent relies on the hyperlink method of notice to bind consumers to the terms of the arbitration agreement included in the terms and conditions. According to the Boyd Declaration, Respondent has used essentially the same method for consumers to create user accounts since 2017. Pursuant to that method, before the user can create an account or make any online purchases, the user must check a box and "agree to the terms and conditions of the Steam Subscriber Agreement." (*See Exhibits to Boyd Declaration.*) A user can view the terms and conditions if the user clicks on

JURISDICTIONAL AWARD - 4

the "Steam Subscriber Agreement" hyperlink.[2]  In the web pages supplied by both Claimant and Respondent, the hyperlink is set off in bright white type in comparison to the remainder of the sentence, which is in dull grey type.  In one edition, the hyperlink is underlined.  If a user clicks on the hyperlink, the first page of the terms and conditions includes in all capital letters the phrase "*SECTION 11 CONTAINS A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER. IT MAY AFFECT Y OUR LEGAL RIGHTS. PLEASE READ IT. IF YOU ARE A CUSTOMER WITH RESIDENCE IN THE EUROPEAN UNION, SECTION 11 DOES NOT APPLY TO YOU.*" (See, e.g., copies of SSA annexed to the Boyd Declaration.)

Respondent has provided no evidence that Claimant Rovira had actual knowledge of the arbitration agreement in the terms and conditions.  At some time after 2012 when Respondent first inserted an arbitration agreement into the terms and conditions, Respondent contends that Claimant clicked the box to acknowledge agreement to the terms and conditions.  However, Claimant contends that clicking on the acknowledgment box is not valid as to him because at the time he first entered into an SSA there was no requirement to arbitrate disputes and he had insufficient notice of a material change in the dispute resolution procedures.

Although the web pages provided to the arbitrator reflect that the subscriber agreement was "last updated August 28, 2020," the sign-up and purchase web pages do not indicate which parts of the SSA were modified or that the subscribers from 2011 and earlier should be aware that a mandatory arbitration agreement had been added to the terms and conditions.  Respondent, which

---

[2] Claimant notes that in the UK version of the SSA, Respondent has provided a version of the terms and conditions that requires users to scroll through the terms of conditions before affirming consent.  Courts have routinely found this form of notice to be enforceable. *Berman at 856*.  Respondent's choice to use a hyperlink notice for its US website creates the risk that its manifestation of this form of notice may be determined to be insufficient under the circumstances of a specific consumer's case.

JURISDICTIONAL AWARD - 5

had complete control over the content of its own website, failed to provide evidence that at any time it posted on the subscriber website a conspicuous notice of a fundamental change to the user's legal rights. Based on the foregoing, I find that by merely indicating a "last updated" date for its terms and conditions Respondent provided Claimant with no reason to know that Respondent had fundamentally changed the dispute resolution procedures to which Claimant originally agreed. Accordingly, I find that Respondent failed to provide Claimant with the conspicuous notice required to put Claimant on inquiry notice of the material change in terms and conditions.

***********

For the reasons set forth above, Claimant Rovira's motion to dismiss this arbitration without prejudice due to absence of a valid arbitration agreement is granted.[3]

## JURISDICTIONAL AWARD

1. Claimant Rovira's motion to dismiss this arbitration without prejudice due to the absence of a valid arbitration agreement is granted.

2. The administrative fees of the American Arbitration Association totaling $1,725 shall be borne as incurred, and the compensation of the arbitrator totaling $2,500 shall be borne as incurred.

Dated this 8th day of July, 2024.

_____
Jeffrey H. Dasteel

_____

[3] Because I have granted Claimant's motion to dismiss for lack of a valid and enforceable arbitration agreement, the parties' remaining motions are dismissed as moot.

JURISDICTIONAL AWARD - 6

# EXHIBIT 12

| From: | AAA Cheryl Florio |
|---|---|
| To: | Gary Mason; Jacob Eisenberg; Theo Bell; Danielle Perry; Mari Gribble; McTigue Jr., Michael W; McInerney, Colm P; Slawe, Meredith C; AAAFiling@valvesoftware.com |
| Cc: | AAA Cheryl Florio |
| Subject: | Individual Claimants v. Valve Corporation - Case 01-23-0005-8758 |
| Date: | Friday, April 25, 2025 2:59:53 PM |
| Attachments: | image747192.png<br>image878531.png<br>(04.23.2025) Letter from M. McTigue to the AAA.pdf<br>Exhibits To Letter.pdf |

Dear Parties:

This will acknowledge receipt of the attached letter dated April 23, 2025 with exhibits, on behalf of Respondent.

This will confirm that we have not received the payment for the Case Management Fees requested and invoiced in our correspondence dated March 24, 2025.  Pursuant to CA CCP 1281.98, AAA requests Claimants review the relevant section of the statute and provide a response on how they wish to proceed.  Please respond on or before *April 30, 2025*.

Thank you,



**AAA Cheryl Florio**
**Director of ADR Operations**

American Arbitration Association
T: 401 431 4779 F: 866 644 0234 E: CherylFlorio@adr.org
16 Market Square 1400 16th Street, Suite 400, Denver, CO 80202
adr.org | icdr.org | aaaicdrfoundation.org



The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

# EXHIBIT 13



5335 Wisconsin Ave. NW, Suite 640, Washington D.C. 20015 | 202.429.2290 | masonllp.com

April 30, 2025

**Via Email**

Cheryl Florio
Director of ADR Operations
American Arbitration Association
16 Market Square, 1400 16th Street
Suite 400
Denver, CO 80202
Email: CherylFlorio@adr.org

Re:    **Claimants' Response to AAA's Apil 25, 2025 Email**

Dear Ms. Florio:

Claimants write in response to AAA's April 25, 2025, email "confirm[ing] that [AAA] ha[s] not received the payment for the Case Management Fees [AAA] requested and invoiced [to Valve]." As requested, Claimants, having reviewed Cal. Code Civ. Proc. ("CA CCP") § 1281.98, elect to proceed as follows:

### Election under CA CCP § 1281.98(b)(3).

With respect to the 14,911 pending arbitration cases in which Valve failed to timely pay the invoiced Case Management Fees, Claimants elect to proceed in accordance CA CCP §1281.98(b)(3) and are preparing appropriate court filings to compel Valve to pay all arbitration fees required of it to proceed with these arbitrations and all other appropriate relief or sanctions, including, but not limited to, entry of default judgments against Valve on the underlying claims.

### Election under CA CCP § 1281.98(b)(4)

Claimants' counsel are also in the process of identifying a subset of the 14,911 Claimants that intend to proceed with their arbitration claims despite Valve's failure to pay the invoiced Case Management Fees pursuant to CA CCP § 1281.98(b)(4) and/or AAA Consumer Rule 54(a). These Claimants will include, but not be limited to, Claimants who never agreed to Valve's revised Steam Subscriber Agreement dated September 26, 2024, either by cancelling their accounts or ceasing its use, and we will provide AAA and Valve a list of these Claimants once they have been identified.

These Claimants will also seek to recover all arbitration fees they pay due to Valve's refusal to pay them as part of any arbitration award, as well as all other available sanctions against Valve,

Letter to Cheryl Florio
Page 2
April 30, 2025

including, but not limited to, monetary sanctions, issue sanctions, evidence sanctions, and/or terminating sanctions as codified in CA CCP §§ 1281.98(b)(4) and (d).

**AAA Should Not Administratively Close the 14,911 Claims due to Valve's Non-Payment of AAA Administrative Fees.**

AAA should not administratively close the 14,911 claims due to Valve's non-payment of AAA administrative fees.  As noted above, Claimants will be seeking court orders or judgments compelling Valve to pay its AAA fees and proceed with the arbitration.  Thus, AAA should not close any of these arbitrations to provide any Claimants that wish to proceed with their arbitrations the opportunity to pay Valve's unpaid fees and proceed with their arbitrations.

Likewise, AAA should not close any of the remaining 14,911 claims that don't immediately proceed to arbitration. Instead, but only to the extent necessary, AAA should place any of these cases that don't immediately proceed to arbitration in administrative suspension (or "hold") pending any relevant court rulings regarding Valve's refusal to pay the invoiced arbitration fees, including any determination of whether Valve should be compelled to pay its AAA arbitration fees and proceed to arbitration, and any other appropriate sanctions that could impact these proceedings.

**The 5,000 Claims Subject to Review by the Process Arbitration Should Not Be Closed.**

Likewise, AAA should not close any of the 5,000 Claims that AAA has determined will be appointed to a Process Arbitrator.  There are no unpaid invoices outstanding in these cases which therefore must proceed at this time.

Moreover, notwithstanding Valve's claims to the contrary, the parties have previously agreed to a process server, and to a strike and rank process for the appointment of a Process Arbitrator in these cases. *See* AAA's July 29, 2024 *(*AAA confirming that the *"*The parties agreed to a strike and rank list process to which the AAA will first pre-screen the potential [process] arbitrators. After the AAA completes its initial screening process, we will send the parties a list of five potential Process Arbitrators to strike and rank."*).

Based on the above, none of these cases should be closed by AAA at this time.  Instead, AAA should place on administrative hold the 14,911 claims pending: 1) payment of Valve's fees by certain Claimants or 2) a final ruling by a court on the issue of whether Valve should be compelled to pay the outstanding AAA invoice.

Letter to Cheryl Florio
Page 3
April 30, 2025

Please let us know if you have any questions or need additional information.

Sincerely,

Gary E. Mason

cc:     All counsel of record

# EXHIBIT 14

### SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

ONE MANHATTAN WEST

NEW YORK, NY 10001-8602
———
TEL: (212) 735-3000

FAX: (212) 735-2000

WWW.SKADDEN.COM

DIRECT DIAL
212-735-3529
DIRECT FAX
917-777-3529
EMAIL ADDRESS
MICHAEL.MCTIGUE@SKADDEN.COM

FIRM/AFFILIATE OFFICES
————
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON D.C.
WILMINGTON
————
ABU DHABI
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

May 1, 2025

**VIA ELECTRONIC MAIL**

Cheryl Florio
Director of ADR Operations
American Arbitration Association
16 Market Square, 1400 16th Street
Suite 400
Denver, CO 80202
CherylFlorio@adr.org

   RE:  *Individual Claimants v. Valve*, Case 01-23-0005-8758

Dear Ms. Florio:

   We write on behalf of Valve in response to Claimants' counsel Mason LLP's ("Claimants' Counsel") April 30, 2025 letter to the AAA regarding the above-referenced matters.

   By way of background, Claimants' Counsel's mass arbitration is divided into two tranches: (i) three mass submissions made in December 2023, totaling 14,911 Claimants (the "December 2023 Submitted Claims"); and (ii) another mass submission made in April 2024, totaling 5,000 Claimants (the "April 2024 Submitted Claims"). On April 23, 2025, Valve notified the AAA that it would not pay the AAA's March 24, 2025 invoice, seeking a payment of $20,875,400 in Case Management Fees relating to the December 2023 Submitted Claims. As Valve explained, the AAA does not have jurisdiction over these matters because there is no arbitration agreement, and therefore the arbitrations should be closed. Also, none of these arbitrations are subject to California Code of Civil Procedure ("CCCP") § 1281.98. (*See* Valve's April 23, 2025 letter to the AAA.)

   The AAA then asked Claimants' Counsel how it wanted to proceed. As to the December 2023 Submitted Claims, Claimants' Counsel states in its April 30, 2025 letter that it intends to commence a court action seeking to compel Valve to pay the arbitration fees, while simultaneously proceeding with the arbitrations for an

Cheryl Florio, Director of ADR Operations
May 1, 2025
Page 2

unidentified subset of the Claimants. Claimants' Counsel has further requested that—aside from the subset of presently unidentified Claimants' arbitrations it may proceed with—the AAA should place all the arbitrations "in administrative suspension (or 'hold') pending any relevant court rulings."

Claimants' Counsel's requests are an improper attempt to deviate from the AAA's rules and practices and should be rejected.

*First*, as Valve made clear in its prior letter, there is no basis to apply CCCP § 1281.98 (or any other provision of California arbitration law) to any of these Claimants. (*See* Valve's April 23, 2025 letter at 3-4.) Thus, Claimants' Counsel's reliance on CCCP § 1281.98 for its proposed course of action is improper.[1]

*Second*, there is no basis for Claimants' Counsel to seek an "administrative suspension" of these arbitrations pending the outcome of any hypothetical court action it might initiate.[2] Consistent with its rules and prior practice in mass arbitrations, the AAA should close the arbitrations.

*Third*, Claimants' Counsel's request that the AAA also "hold" the arbitrations while it determines if some unidentified subset of Claimants (if any) may elect on some date in the future to proceed with their arbitrations is also improper. There are no grounds under its rules for the AAA to hold the arbitrations in abeyance while Claimants' Counsel completes some exercise to determine whether any Claimants wish to proceed with their arbitrations, which are in any event improper.

Consistent with its rules and prior practice in mass arbitrations, the AAA should promptly close the arbitrations because Valve has exercised its right to decline to pay the arbitration fees and Claimants (or their counsel) have declined to advance the fees.[3]

Finally, the AAA's March 24, 2025 invoice—and Valve's April 23, 2025 letter in response—pertained to the December 2023 Submitted Claims. It is thus unclear why Claimants' Counsel's letter also addresses the separate April 2024 Submitted Claims. Nonetheless, Valve notes Claimants' Counsel's position that it agrees with

---

[1]    While the CCCP does not apply to any of these arbitrations for the reasons set forth in Valve's prior letter, under no circumstances could it even theoretically apply to any Claimants that do not reside in California—and non-California residents comprise the vast majority of the Claimants here.

[2]    Nor does Claimants' Counsel cite any support for this request.

[3]    While Claimants' Counsel asserts that the "AAA should not close any of these arbitrations to provide any Claimants that wish to proceed with their arbitrations the opportunity to pay Valve's unpaid fees and proceed with their arbitrations," it has not identified any such Claimants. Thus, at this time no Claimants have agreed to advance the fees and the arbitrations should be closed.

Cheryl Florio, Director of ADR Operations
May 1, 2025
Page 3

Valve that the Process Arbitrator for those additional arbitrations should be appointed using the strike-and-rank method.

Valve submits this letter under a full reservation of rights, as the arbitrations should be closed because there is no arbitration agreement and therefore the AAA does not have jurisdiction over these matters.

Sincerely,

*/s/ Michael W. McTigue Jr.*

Michael W. McTigue Jr.

cc:     All counsel of record

# EXHIBIT 15

| **From:** | AAA Cheryl Florio |
|---|---|
| **To:** | Gary Mason; Jacob Eisenberg; Theo Bell; Danielle Perry; Mari Gribble; McTigue Jr., Michael W; McInerney, Colm P; Slawe, Meredith C; AAAFiling@valvesoftware.com |
| **Cc:** | AAA Cheryl Florio |
| **Subject:** | Individual Claimants v. Valve Corporation - Case 01-23-0005-8758 |
| **Date:** | Thursday, May 15, 2025 4:41:48 PM |
| **Attachments:** | image341519.png |
| | image169768.png |

Dear Counsel,

The AAA is in receipt of Claimants' letter dated April 30, 2025 and Respondent's letter dated May 1, 2025.

Regarding the 14,911 cases for which Respondent did not remit the AAA Case Management fees, the AAA will place these cases in abeyance pending a Court's Ruling in accordance with Claimants' request.

The AAA will proceed with case administration of a subset of cases as referenced in Claimants' letter upon receipt of Claimants' identification of the subset, and Claimants' corresponding advanced payment of Respondent's Case Management Fees for the subset.

Thank you,

 **AAA Cheryl Florio**
**Director of ADR Operations**

American Arbitration Association
T: 401 431 4779 F: 866 644 0234 E: CherylFlorio@adr.org
16 Market Square 1400 16th Street, Suite 400, Denver, CO 80202
adr.org | icdr.org | aaaicdrfoundation.org



The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

# EXHIBIT 16



Northeast Case Management Center
Heather Santo
Vice President
1301 Atwood Avenue, Suite 211N
Johnston, RI 02919
Telephone: (866)293-4053

May 14, 2024

Gary E. Mason, Esq.
Mason, LLP
5335 Wisconsin Avenue NorthWest, Suite 640
Washington, DC 20016
Via Email to: gmason@masonllp.com

Charles B. Casper, Esq.
Montgomery McCracken Walker & Rhoads, LLP
1735 Market Street
Philadelphia, PA 19103-7505
Via Email to: ccasper@mmwr.com

Case Number: 01-23-0005-8758

19,911 Individual Claimants[1]
-vs-
Valve Corporation

Dear Parties:

The American Arbitration Association (AAA) confirms receipt of the parties' submissions dated April 19, 2024, in which Claimants request the appointment of a Process Arbitrator, while Respondent opposes such appointment.

In Claimants' submission, they request that a Process Arbitrator be appointed to determine the Reimbursement of AAA Filing Fees, the Enforceability of the Arbitration Agreement and the Scope of Discovery. In addition, they oppose the appointment of a Process Arbitrator to determine a prospective Motion to Dismiss by Respondent. In Respondent's submission, they oppose the appointment of a Process Arbitrator on each of the issues identified by Claimants and confirmed that they are not seeking a Process Arbitrator to rule on a prospective Motion to Dismiss.

After careful review of the parties' submissions and MA-6 of the Mass Arbitration Supplementary Rules, effective August 1, 2023, the AAA has determined the issues submitted are not administrative issues and can be presented to Merits Arbitrators upon their appointment. Therefore, the AAA will not appoint a Process Arbitrator to hear and determine the issues submitted by the 14,911 individual claimants whose demands for arbitration were received on December 6, 2023, December 12, 2023 and December 19, 2023.

The next administrative step for these 14,911 individual claimants is the selection of the Merits Arbitrators. An administrative conference call is scheduled to discuss this process with the parties on **May 23, 2024** at **12:00 pm Eastern Time**. The call information is:

Telephone Number:    +1 (855) 633-2040

---

[1] In their first round of filings, Claimants filed a total of 14,911 individual demands for arbitration on December 6, 2023, December 12, 2023 and December 19, 2023.  Claimants filed an additional 5,000 individual demands for arbitration on April 26, 2024.

Access Code:                2486784#

The parties should also be prepared to discuss the next administrative steps for the 5,000 additional individual demands filed by Claimants on April 26, 2024. Please note that the Mass Arbitration Supplementary Rules as effective April 1, 2024 apply to the matters received on April 26, 2024.

We encourage the parties to meet and confer prior to this call to identify any agreements between the parties that will facilitate an efficient and streamlined arbitrator selection process.

Additionally, the Case Management Fee of $1,400 for each of the 14,911 cases must be paid prior to the arbitrator selection process. An invoice will be provided separately.

I would like to remind the parties that Global Mediation is still available and the AAA has many sophisticated mediators who can help the parties resolve these cases or in the alternative, mediate the pending issues referenced above. Attached are some resumes of AAA mediators for the parties to consider.

If you have any questions, please feel free to contact me.

Sincerely,
/s/
Meirav Werbel
Senior Case Administrator
Direct Dial: (401)414-5522
Email: MeiravWerbel@adr.org

Supervisor Information: Victoria Chandler | Director of ADR Operations | e: VictoriaChandler@adr.org

cc:     Douglas Matthews
        Timothy B. McGranor
        Lauren Sheller
        Theodore B. Bell
        Kenneth J. Rubin, Esq.
        Jeremy Mishkin, Esq.
        John G. Papianou, Esq.
        Benjamin Goldman
        Kara M. Mundy, Esq.
        Danielle L. Perry, Esq.
        Robert E. Day